FILED

2020 Apr-30  PM 11:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| MICHAEL BURBRIDGE, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ADTRAN INC., THOMAS R. STANTON, MICHAEL FOLIANO, and ROGER D. SHANNON, <br><br> Defendants. | Case No. 5:20-cv-00050-LCB <br><br> <u>CLASS ACTION</u> <br><br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

010865-11/1260990 V1

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ...................................................................1

II.   JURISDICTION AND VENUE ...............................................................9

III.  PARTIES ...............................................................................................10

    A.    Lead Plaintiffs ...........................................................................10

    B.    Defendants .................................................................................10

II.   SUBSTANTIVE ALLEGATIONS .........................................................14

    A.    Background Information .............................................................17

        1.    ADTRAN's Business and Operations ...............................17

            a.    The Importance of ADTRAN's Inventory Management ...............19

            b.    ADTRAN's Sharp Decline in Business from CenturyLink ..........19

            c.    ADTRAN's Pivot to the International Market .............................21

        2.    ADTRAN's Faulty Systems of Internal Accounting Control for its Inventory .....................................23

        3.    ADTRAN's Knowledge of Problems Impacting its Tier 1 Customer Deutsche Telekom ..........................26

        4.    ADTRAN's Knowledge of Problems Impacting its Tier 1 Customer Telmex .............................................29

    B.    Defendants' False and Misleading Statements During the Class Period ..............32

    C.    ADTRAN's Financial Statements Failed to Comply with GAAP ........................53

    D.    Loss Causation ...........................................................................56

    E.    Additional Scienter Allegations ................................................59

IV.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE ......................................66

V.    NO SAFE HARBOR ..............................................................................67

VI.   CLASS ACTION ALLEGATIONS ........................................................68

VII.  CLAIMS BROUGHT UNDER THE EXCHANGE ACT ........................69

IX.   JURY DEMAND ...................................................................................73

010865-11/1260990 V1

Lead Plaintiffs Michael Burbridge and Reza Adhami, Ph.D. (collectively, "Lead Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which Lead Plaintiffs allege upon personal knowledge. Lead Plaintiffs' information and belief is based upon Lead Counsel's investigation, which included review and analysis of: (i) ADTRAN's regulatory filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) ADTRAN's press releases and public statements; (iii) analyst reports concerning ADTRAN; (iv) interviews with former ADTRAN employees; and (v) additional public information regarding the Company. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.   NATURE OF THE ACTION

1.      This securities class action arises from Defendants' false and misleading statements and omissions about ADTRAN's accounting for excess and obsolete inventory, the adequacy of the Company's internal controls over financial reporting, and ADTRAN's relationship with its most important Tier 1 international telecommunication clients, Deutsche Telekom and Telmex. Between February 13, 2019 and October 31, 2019 ("Class Period"), in the Company's SEC filings, Defendants repeatedly confirmed ADTRAN's compliance with its stated inventory accounting policies, affirmed the effectiveness of the Company's internal controls over financial reporting, and emphasized the strong demand signals they were receiving from prized telco customers Deutsche Telekom and Telmex. Defendants, however, concealed material deficiencies in ADTRAN's inventory accounting systems, which resulted in an inaccurate determination of ADTRAN's inventories, understatement of ADTRAN's excess and

obsolete inventory reserve, and overstatement of important reported financial metrics dependent upon the stated E&O reserve figure, including net income and earnings per share (EPS).  In addition, while hyping Deutsche Telekom's and Telmex's "very clear and strong" demand, Defendants omitted to disclose material facts about ADTRAN's customers that were certain to impact the Company's future revenues, including Deutsche Telekom's plan to dramatically reduce capital expenditures and severe installation delays and problems at Telmex.  Defendants' misrepresentations about ADTRAN's inventories, internal controls over financial reporting, and existing projects with its major Tier 1 telco clients inflated the price of ADTRAN's common stock, until a series of disclosures about ADTRAN's deficient inventory accounting systems, reduced shipments to Deutsche Telekom and Telmex, and disappointing financial performance and outlook, caused the stock price to plummet.

2.      Based in Huntsville, Alabama, ADTRAN is a networking and communications company that provides services which enable voice, data, video, and internet communications across a variety of network infrastructures.  ADTRAN also offers a broad portfolio of flexible software and hardware network solutions to service providers.  The Company differentiates itself from competitors by offering cost-effective solutions for access and aggregation.

3.      Over the past decade, the Company has experienced a significant decline in annual revenues due to the loss of substantial business from historical American Tier 1 telecommunication clients, including AT&T and CenturyLink.  As business from domestic Tier 1 carriers has decreased, ADTRAN has become a more global company with deepening engagements with Tier 1 carriers worldwide.  Among ADTRAN's most important international carrier clients are German telecommunications company Deutsche Telekom, and Latin American carrier Telmex.  Indeed, throughout the Class Period, Deutsche Telekom and Telmex were two

of the three largest ADTRAN's customers, repeatedly individually contributing more than 10% of ADTRAN's quarterly revenue. While large project wins at these international carriers hold the promise of a steady revenue stream over the next several years, the work offers low-margins. Moreover, the Company has sunk significant sums on recent acquisitions, including SmartRg, to gain a greater footing in the cloud services and next-generation open networking solutions space. Accordingly, 2018 marked a year of net losses and negative EPS. Thus, given ADTRAN's core competencies and business strategy, it was critical for ADTRAN to maintain efficient supply chain and inventory controls and continue to execute on shipments to Deutsche Telekom and Telmex to return to profitability in 2019.

4.      Unbeknownst to investors, ADTRAN's internal controls over financial reporting relating to its represented inventories were entirely defective. According to well-placed, reliable former ADTRAN employees with personal knowledge of the subject matter, and further corroborated by Defendants' later disclosures, ADTRAN relied on an "ancient" inventory accounting and Enterprise Resource Planning system internally referred to as "Baan." The Baan system was so outdated and obsolete that the Company's staff was forced to create their own workarounds to the system. As a result of the "clunky and unreliable" system, ADTRAN struggled with documenting and verifying the existence of all inventories. Indeed, according to a former ADTRAN employee, old and unsalable inventory was littered across ADTRAN's corporate headquarters and was everywhere you looked. As a result of this complete breakdown in internal controls, key reports and related data used to value ADTRAN's inventory were incomplete and inputs and assumptions used to determine ADTRAN's excess and obsolete inventory reserve were inaccurate. As a direct consequence of ADTRAN's faulty systems for inventory accounting, at points during the Class Period, Defendants understated ADTRAN's

excess and obsolete inventory reserves and overstated important financial metrics dependent upon the E&O reserve figure, including ADTRAN's reported net income and earnings per share (EPS).

5.      Defendants knew both before and throughout the Class Period about ADTRAN's faulty and unreliable inventory accounting system, but refused to invest sufficient resources in a proper inventory management system.  Indeed, Defendant Stanton himself admitted to ADTRAN employees the inventory accounting system was inadequate.  Specifically, at an ADTRAN employee meeting occurring in either 2017 or 2018 in which Defendant Stanton met with CW1 and several other ADTRAN employees at Company headquarters, Defendant Stanton discussed the need to update ADTRAN's accounting system.  Moreover, Defendant Stanton took undisclosed steps to address the Company's problematic inventory control system, including creating a task force to assess which software program ADTRAN should purchase to replace the antiquated Baan system.  Moreover, ADTRAN even solicited bids from ERP software firms for a replacement system, but no change was made during the relevant time period due to concerns it would impact ADTRAN's bottom line and stock price.

6.      Notwithstanding the foregoing, in ADTRAN's SEC filings, Defendants repeatedly represented ADTRAN's compliance with the Company's stated inventory accounting policy of "writing down the Company's inventory for estimated obsolescence or unmarketable inventory by an amount equal to the difference between the cost of inventory and the estimated fair value." Defendants further quantified ADTRAN's reserve for excess and obsolete inventory, and confirmed the accuracy of financial metrics dependent upon the E&O reserve figure, including ADTRAN's reported net income and EPS.  Defendants also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), falsely attesting to the accuracy of

ADTRAN's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

7.      Separate and apart from Defendants' improper inventory accounting, Defendants concealed material facts about Deutsche Telekom and Telmex that were certain to impact the Company's future revenues.  In particular, based on Deutsche Telekom's participation in an expensive auction bidding process for 5G access lines orchestrated by German regulators in the first quarter of 2019, Defendants knew that Deutsche Telekom intended to significantly decrease its capital expenditure for ADTRAN access and aggregation products until at least the beginning of 2020.  Moreover, Defendants knew of severe problems plaguing its project at Telmex and the Company's relationship with this critical customer.  Specifically, in negotiating the Telmex project, ADTRAN steadfastly refused to bundle installation services onto the Telmex contract, angering Telmex executives.  Accordingly, Telmex was forced to hire an inexperienced third-party contractor.  As a result, the project suffered from severe delays in product installations as well as improper installations that led to damaged products and massive product failures.  These installation issues caused an overall buildup of too much ADTRAN product inventory and ultimately resulted in Telmex putting a pause on shipments of ADTRAN goods by summer 2019.

8.      Former employees and other sources confirm Defendants' knowledge of Deutsche Telekom's spending plans in 2019 and problems at the Telmex project throughout the Class Period.  Based on regular forecasts Deutsche Telekom provided to Defendants and public information about the 5G auction, ADTRAN should have been aware that the launch of 5G had the potential to be disruptive to their forecasts.  Moreover, a former employee confirmed that Defendants were well-aware of the third-party technician's delay in installing the products.  All

throughout 2019, ADTRAN offered to help with the installations, but the two companies could not agree on a rate to pay for the installation work.  During the first half of 2019, Telmex provided reports to ADTRAN management of massive product failures.  In response, ADTRAN conducted testing and analysis of the problem and determined that Telmex's third-party installation workers were installing them incorrectly.

9.      Indeed, Defendant Stanton had actual knowledge of the product damage issues causing the delay in installation at Telmex, as he kept updated on all aspects of the work for Telmex through regular ADTRAN team calls and spoke frequently about the project and installation issues directly with Telmex representatives.  In fact, Defendant Stanton even met personally with Telmex officials for a review meeting to discuss the project installation issues sometime between spring and July 2019.  ADTRAN prepared for at least two months in advance of the review meeting.  As a result of the review meeting, ADTRAN set up a training session for those installing the work in Guadalajara, Mexico so that the equipment would be properly installed.

10.      Despite this knowledge, however, throughout the Class Period, Defendants assured investors that their rosy guidance projecting strong quarter-to-quarter revenue growth was justified, given the "very clear and strong plans" their two most important international telecommunication clients, Deutsche Telekom and Telmex, were communicating to Defendants confirming the clients' intent "to increase their broadband" with ADTRAN's products throughout 2019.  Defendants falsely claimed that ADTRAN's large European Tier 1 customer (Deutsche Telekom) would continue its spending on existing ADTRAN projects and that business in the European region would "be consistent with where we were last year."  In fact, in response to analyst skepticism, Defendants refuted that there would be "a traditional kind of

falloff in 3Q from [ADTRAN's] European customers," and instead would be an "uptick." Similarly, Defendants falsely told investors that "[Telmex] ha[d] shared with us their plans. And right now, we're expecting kind of solid strength through the year with that customer."

11.     The market learned the true facts about ADTRAN's inventory accounting systems and relationship with its Tier 1 customers through a series of disclosures beginning on July 17, 2019, when during aftermarket hours, ADTRAN issued a press release announcing positive financial results for the quarter ended June 30, 2019. The Company designated these results as "preliminary," making the disturbing announcement that it was investigating potential weaknesses in its accounting internal controls that may have led to errors in its previously reported financial results from past accounting periods.

12.     On the earnings call the next day, the Company also disclosed that it was slashing 3Q revenue guidance that missed the lowest analyst estimate. In contrast to its prior statements of seeing strong demand from Deutsche Telekom, the Company claimed that earnings in the third quarter would be significantly impacted by a "temporary slowdown in capital spending for access at a Tier 1 European carrier customer," which analysts immediately identified as Deutsche Telekom.

13.     In response to this alarming news, ADTRAN's share price dropped more than 23% from $15.39 to close at $11.80 per share on July 18, 2019, on trading volume that was more than nine times the 20-day average for this time of day.

14.     ADTRAN shares fell for a second straight session on July 19, 2019, building on the previous day's 23% plummet as securities analysts continued to digest the Company's recent results and outlook. Indeed, analyst firms cut their ADTRAN share price targets, citing the

Company's delay in filing their financials due to the assessment of its internal controls over inventory accounting and the impact of a major customers' lower spending.

15.     Subsequent disclosures in August and September 2019 confirmed that the market's severe reaction to this news was justified – ADTRAN was forced to admit that it had a material weakness in its internal controls that had led to the material overstatement of its 1Q2019 financial results.

16.     On October 9, 2019, ADTRAN disclosed disappointing "preliminary" earnings for the third quarter of 2019, explaining that based on preliminary information, revenue for the quarter was only expected to be $119 million, after guiding for $130-$150 million in July 2019. In addition to the continued slowdown in the spending at an international Tier 1 customer (Deutsche Telekom), the Company explained that the dismal performance and sales miss was driven by a pause in shipments to ADTRAN's other major international Tier 1 customer, Telmex.  Defendants explained, "Although we expect our Latin American customer sales to rebound, our current visibility regarding timing is limited."  In turn, for the fourth quarter 2019, ADTRAN announced that it expected revenue to range from flat to slightly down from the third quarter's dismal figure.  Overall, the Company's international business dropped from $81 million to $31 million quarter-over-quarter, ADTRAN's worst international top-line performance since June 2016.  On this news, the Company's share price fell $2.10 per share, over 19%, to close at $8.81 per share on October 10, 2019, on unusually high trading volume.

17.     Finally, on October 31, 2019, ADTRAN came clean when it clarified the true nature of the problems occurring at the Telmex project on an earnings call with analysts.  In particular, the Company admitted that Telmex had paused shipments based on a build-up of inventory and that the parties were engaged in negotiations regarding the build out of ADTRAN

products.  On this news, ADTRAN shares dropped $0.77 per share to close trading at $8.81 per

share on October 31, 2019 – a decline of more than 8%.

18.   All told, ADTRAN's stock lost over $430 million in shareholder value during the

Class Period, down more than 50% from their Class Period high.



## II.   JURISDICTION AND VENUE

19.   The claims asserted herein arise under and pursuant to: (i) Sections 10(b) and

20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated

thereunder (17 C.F.R. § 240.10b-5).

20.   This Court has jurisdiction over the claims asserted in this Complaint pursuant to

Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337.

21.   Venue is proper in this District pursuant to Section 27 of the Exchange Act (15

U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  ADTRAN maintains its corporate headquarters in

Huntsville, Alabama, which is situated in this District, conducts substantial business in this

District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

22. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   PARTIES

**A.    Lead Plaintiffs**

23. Lead Plaintiff Michael Burbridge is an individual investor. Lead Plaintiff Burbridge purchased shares of ADTRAN stock on the Nasdaq Stock Market ("Nasdaq") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

24. Lead Plaintiff Reza Adhami, Ph.D. is an individual investor. Lead Plaintiff Adhami purchased shares of ADTRAN stock on the Nasdaq Stock Market ("Nasdaq") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.    Defendants**

25. Defendant ADTRAN is a global telecommunications equipment provider with over 1,900 employees worldwide. Incorporated in Delaware, the Company maintains its corporate headquarters within this judicial district at 901 Explorer Blvd., Huntsville, Alabama. ADTRAN's stock trades on the Nasdaq, which is an efficient market, under ticker symbol "ADTN." Throughout the Class Period, ADTRAN had over 48 million shares of stock outstanding, owned by at least thousands of investors.

26.     Defendant Thomas R. Stanton ("Stanton") was, at all relevant times, the Chief Executive Officer ("CEO") of the Company and Chairman of ADTRAN's Board of Directors. Stanton has led ADTRAN since September 2005, when he was named CEO.  In 2007, Stanton was later named Chairman of the Board.  Prior to stewarding the Company, Stanton held a number of senior management roles in the Company's Carrier Networks business since joining the Company in 1995.

27.     Defendant Michael Foliano ("Foliano") has been the Senior Vice President of Finance/Chief Financial Officer ("CFO") of the Company since March 2019.  According to the Company's website, Defendant Foliano has responsibility for all financial aspects of the Company's operations as well as oversight responsibility for ADTRAN's global facilities, human resources, and legal teams.  Foliano has had various senior management roles at ADTRAN since joining the Company in 2006, including Senior Vice Present - Global Services and Support (June 2018 – March 2019) and Senior Vice President – Global Operations (June 2006 – January 2019).

28.     Defendant Roger D. Shannon ("Shannon") was the CFO and Senior Vice President of Finance of the Company from November 2015 to March 2019.  After leaving his post as CFO, Shannon had a brief stint as ADTRAN's Treasurer and Head of Corporate Development until he left the Company in June 2019.   As CFO and Senior Vice President of Finance for ADTRAN, Shannon was responsible for the Company's accounting, treasury, tax, investor relations, legal, financial planning & analysis, and business transactions functions. Shannon was also a member of the executive team, responsible for developing and implementing strategies to profitably grow the company's business, including M&A, international expansion, and strategic business analysis.  During the Class Period, while in possession of material non-

- 11 -

public information, Defendant Shannon sold 11,901 shares of ADTRAN common stock in

market transactions for total proceeds of $160,824.42.  These sales represented 48.2% of his total

holdings of ADTRAN common stock.

29.     Defendants ADTRAN, Stanton, Foliano and Shannon are herein collectively

referred to as "Defendants."  Defendants Stanton, Foliano and Shannon are collectively referred

to herein as the "Individual Defendants."

30.     During the Class Period, the Individual Defendants, as senior executive officers

and/or directors of ADTRAN, were privy to confidential and proprietary information concerning

ADTRAN, its operations, finances, financial condition and present and future business prospects.

The Individual Defendants also had access to material adverse non-public information

concerning ADTRAN, as discussed in detail below.  Because of their positions with ADTRAN,

the Individual Defendants had access to non-public information about its business, finances,

products, markets and present and future business prospects via internal corporate documents,

conversations and connections with other corporate officers and employees, attendance at

management and/or board of directors meetings and committees thereof, and via reports and

other information provided to them in connection therewith.  Because of their possession of such

information, the Individual Defendants knew or recklessly disregarded that the adverse facts

specified herein had not been disclosed to, and were being concealed from, the investing public.

31.     The Individual Defendants are liable as direct participants in the wrongs

complained of herein.  In addition, the Individual Defendants, by reason of their status as senior

executive officers and/or directors, were "controlling persons" within the meaning of Section

20(a) of the Exchange Act and had the power and influence to cause the Company to engage in

the unlawful conduct complained of herein.  Because of their positions of control, the Individual

Defendants were able to and did, directly or indirectly, control the conduct of ADTRAN's business.

32.     During the Class Period, the Individual Defendants, because of their positions with ADTRAN, regularly spoke in public, at investor conferences and on earnings calls about the Company's reported financial results and other relevant subjects as discussed herein, possessed the power and authority to control the contents of ADTRAN's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and investors.  The Individual Defendants were each provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants each knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

33.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose securities were traded on the NASDAQ, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to ADTRAN's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of ADTRAN's securities would be based upon truthful and accurate

information.  The Individual Defendants' misrepresentations and omissions during the Class

Period violated these specific requirements and obligations.

34.     The Individual Defendants are liable as participants in a fraudulent scheme and

course of conduct that operated as a fraud or deceit on purchasers of ADTRAN's securities by

disseminating materially false and misleading statements and/or concealing material adverse

facts.  The scheme: (i) deceived the investing public regarding ADTRAN's business, operations

and management and the intrinsic value of ADTRAN's securities; (ii) allowed Individual

Defendant Shannon to sell nearly half of his shares at artificially inflated prices; and (iii) caused

Plaintiffs and members of the Class to purchase ADTRAN securities at artificially inflated

prices.

## II.     SUBSTANTIVE ALLEGATIONS

35.     Lead Plaintiffs' allegations are based on the investigation conducted by counsel,

which included, among other things, reviews of ADTRAN's public filings with the SEC, press

releases, transcripts of the Company's conference calls with Wall Street analysts, publicly

available trading information, and articles in the general and financial press.

36.     Lead Plaintiffs' allegations are also based upon information provided by former

employees of ADTRAN with knowledge of the facts alleged herein, including, but not limited to,

the confidential witnesses listed below.

37.     Confidential Witness No. 1 ("CW1") is a former employee of ADTRAN who

worked as a pricing administrator in the Company's corporate headquarters in Huntsville,

Alabama from March 2012 through January 2019.  From June 2016 until CW1's departure in

January 2019, CW1 was the lead pricing administrator at ADTRAN, where CW1 was one of five

people on the pricing team, which was under the sales operations department.  In this position,

CW1 prepared pricing reports, worked closely with sales staff to produce bids for work projects,

and prepared reports that summarized shipments and cost data.  During this time, CW1 reported directly to ADTRAN's Pricing Manager.  As part of CW1's duties, CW1 also responded to financial requests from the sales department.  CW1 has personal knowledge of ADTRAN's internal computer and software systems managing ADTRAN's inventory, as CW1 worked with the Company's computer system that managed inventory to ensure accurate pricing was inputted. In this position, CW1 was in a position to know, and does know, about the deficiencies in ADTRAN's internal controls over financial reporting, including its use of the Baan 4.0 ERP software.  In addition, CW1 personally participated in discussions with Defendant Stanton regarding the inadequacies of the Company's accounting software, as detailed herein.

38.     Confidential Witness No. 2 ("CW2") is a former employee of ADTRAN who worked as a Product Support Engineer from May 2013 through October 2019 at its corporate headquarters in Huntsville, Alabama.  At ADTRAN, CW2 worked in the managed services group, one of five product support teams at ADTRAN.  CW2 reported directly to ADTRAN's Product Support Managers.  CW2 had personal knowledge regarding the inventory ADTRAN had on-hand, as CW2 was primarily responsible for working with clients to troubleshoot problems they reported with ADTRAN equipment and on occasion helped to develop network solutions for prospective jobs the Company was pursuing.  CW2 further has personal knowledge of ADTRAN's inventory systems and software tools.  For example, CW2 used ADTRAN's internal invoicing system to track the transfer of equipment from one department to the next where products that had serial numbers were tracked using "zero-dollar invoicing" to allow the various departments at ADTRAN to "purchase" the equipment.  CW2 explained if CW2 needed a specific piece of equipment to check its usability because a customer was having problems with it, CW2 would issue a ticket through the invoicing system requesting it.  Likewise, sales

staff could request equipment to use as a demo.  Thus, in this job, CW2 was in a position to know, and does know, about the accounting and internal control issues arising at ADTRAN with respect to the Company's E&O Reserves calculations.

39.     Confidential Witness No. 3 ("CW3") is a former employee of ADTRAN who worked as a Senior Director of MSO sales (Multiple Systems Operations) from March 2018 until July 2019.  At ADTRAN, CW3 worked remotely out of a home office, but traveled frequently to the corporate headquarters in Huntsville, Alabama and to meet with key clients of ADTRAN. CW3 reported directly to ADTRAN's Vice President of Sales.  Apart from CW3's time at ADTRAN, CW3 also has significant industry experience, working both now and previously with competitors of ADTRAN and as the VP of Sales of North America for a company acquired by ADTRAN in the areas of business development and acting as a liaison to Tier 1 communications clients.  Now and previously, CW3 has worked closely with Deutsche Telekom.  Based upon CW3's industry experience and time at ADTRAN, CW3 was in a position know, and does know, about the Company's relationship with its Tier 1 European customer Deutsche Telekom, ADTRAN's visibility into Deutsche Telekom's spending on ADTRAN's products and forecasting of future sales to Deutsche Telekom.

40.     Confidential Witness No. 4 ("CW4") is a former employee of ADTRAN who worked as Vice President of Sales-Latin America for ADTRAN from October 2018 until November 2019.  CW4 reported to ADTRAN's Senior Vice President of Sales.  CW4 worked remotely from home; however, CW4 traveled frequently to Latin America to meet with ADTRAN's Latin American Tier 1 customer, Telmex.  At ADTRAN, CW4 was responsible for overseeing the relationships with customers in Latin America and worked directly with the customers and ADTRAN executive leadership.  In this job, CW4 was in a position know, and

does know, about the Company's relationship with its Tier 1 Latin American customer Telmex, ADTRAN's visibility into shipments to Telmex products and forecasting of future sales to Telmex.

**A.     Background Information**

**1.     ADTRAN's Business and Operations**

41.     ADTRAN is a global telecommunications equipment provider.  The Company offers a portfolio of networking and communications products covering broadband, optical, WAN, LAN, and unified communication areas.  The Company has sales in the United States, Europe, the Middle East and Africa, Asia-Pacific, and Latin America.

42.     ADTRAN was founded in 1985 with a focus on supplying ADvanced TRANsmission products for high-speed digital communications.  ADTRAN went public in 1994 driven by the early growth in deployment of high speed copper (XDSL) access technologies at US local telephone carriers, led by High-bit-rate digital subscriber line (HDSL) technologies at the Regional Bell operating companies, which eventually consolidated to become today's AT&T, Verizon and CenturyLink.

43.     ADTRAN services a domestic and international customer base that includes Tier 1, 2, and 3 communications service providers, cable companies, and distributed entities.[1] ADTRAN's distribution of sales has been fairly consistent, with an average of 65% of sales traditionally derived from the Tier 1 major service providers such as AT&T, Verizon, Qwest, and Century Link along with Tier 2 companies.  The remainder of sales comes from a network of 1,400 so-called "value-added" resellers.

---

[1] The Internet is comprised of several service providers that are categorized hierarchically. Tier 1 providers form the backbone of the Internet and exchange free access and information with other Tier 1 providers. Tier 2 providers connect between Tier 1 and 3 providers, oftentimes for a fee. Examples of Tier 1 service providers include AT&T Inc. and CenturyLink, Inc. ("CenturyLink").

- 17 -

44.     The majority of ADTRAN's revenues come from broadband access infrastructure. ADTRAN enjoyed a solid market position in copper-based networks in the 2000s.  But as communication technologies evolved away from copper toward fiber and wireless, the Company has struggled to generate growth.  In the period since the great recession, ADTRAN achieved peak revenue of $717 million in 2011.  However, since this time through 2017, ADTRAN's sales remained relatively flat, with revenues oscillating around $600 million annually.

45.     Over the past several years, ADTRAN has faced a major drop in revenue contribution from its leading North American Tier 1 customer, CenturyLink, and has sought to make up this shortfall by increasing sales to international customers.

46.     The Company operates and reports revenue under two business segments: (i) Network Solutions; and (ii) Service and Support.  ADTRAN's Network Solutions segment generates the majority of the Company's revenues.  The Network Solutions segment consists of software and hardware products that provide solutions supporting fiber-, copper- and coaxial-based infrastructures and more recently wireless solutions.  ADTRAN offers both chassis-based networks solutions, such as ADTRAN's Total Access 5000 (TA5000) and hiX families, as well as disaggregated network solutions which leverage ADTRAN's Software Defined Access (SD-Access) architecture.

47.     ADTRAN's Service and Support segment complements its Network Solutions.  It consists of consulting, managed services, solutions integration, network implementation and maintenance services.

48.     ADTRAN further categorizes its sales into three groups: (i) access and aggregation; (ii) customer devices; and (iii) traditional and other products.  The overall trend of sales distribution across these groups reflects the direction of technology evolution in the

network field.  The traditional and other products group represents a set of mature technologies such as TDM/ATM/HDSL, which are being replaced by newer technologies.

### a.    The Importance of ADTRAN's Inventory Management

49.    ADTRAN has positioned itself as a low-cost provider to remain competitive in this industry.  However, competing on the basis of lower-cost requires a tightly run operation with strong cost controls.

50.    A substantial portion of the Company's shipments in any fiscal period relates to orders received and shipped within that fiscal period for customers under agreements containing non-binding purchase commitments.  Further, a significant percentage of orders require delivery within a few days.

51.    To support this type of customer demand, the Company must maintain substantial inventories of raw materials for long lead-time components, as well as substantial finished goods inventories to assure prompt delivery of ADTRAN's products.  ADTRAN's business model of having substantial inventory on hand increases the risk of having excess or obsolete inventory that is unsalable, which requires ADTRAN to write down the value of its inventory, which has an adverse effect on ADTRAN's operating results.

52.    To account for excess and obsolete inventory, the Company establishes E&O Reserves equal to the difference between the cost of inventory and the estimated fair value of the inventory based upon assumptions about future demand, market conditions, and life.  Disposals of inventory are charged against the E&O Reserves.

### b.    ADTRAN's Sharp Decline in Business from CenturyLink

53.    As noted above, over the past several years, ADTRAN has faced a major drop in revenue contribution from its leading North American Tier 1 customer, CenturyLink.

- 19 -

54.     Before the second half of 2017, CenturyLink was the largest purchaser of ADTRAN's products and had engaged the Company in significant projects, including deploying ADTRAN's vectoring solutions across their entire footprint.  In turn, CenturyLink alone contributed 24% of ADTRAN's total sales in 2016 and nearly 40% in 2017.

55.     However, in May 2017, CenturyLink bought rival Level 3 Communications, Inc., which acquisition was completed on November 1, 2017.  After the merger was completed, CenturyLink commenced a strategic review of its spending and operations, which immediately caused a downturn in purchases from CenturyLink.  In a conversation with reporters, Defendant Stanton referred to the CenturyLink strategic review as a "holiday surprise," explaining that after the Company had gone through three consecutive quarters of record revenue, CenturyLink abruptly paused its partnership with ADTRAN.  Defendant Stanton noted, "That was when the Level 3-CenturyLink merger happened, and at that point in time we were headlong into a very large-scale vectoring program with CenturyLink, and all of that kind of got put on hold."[2]

56.     CenturyLink's strategic review ultimately resulted in vectoring demand moving from CenturyLink's entire footprint to a case-by-case basis.  While CenturyLink still maintains business with ADTRAN, both for effective use-cases for vectoring and for CAF-related business, CenturyLink's business with ADTRAN has come nowhere close to returning to past levels.

57.     Indeed, given this customer downsizing, ADTRAN's total U.S. revenue for 2018 fell a startling 43% from 2017, and total revenue declined over 40% from $639 million in 2017 to $529 million in 2018.

---

[2] *See* "Adtran CEO: CenturyLink Rebuilding Investment After Level 3-Induced Pause," Channel Partners (Aug. 23, 2018) https://www.channelpartnersonline.com/2018/08/23/adtran-ceo-centurylink-rebuilding-investment-after-level-3-induced-pause/.

c.     **ADTRAN's Pivot to the International Market**

58.     In the wake of the CenturyLink downsizing, ADTRAN has sought to replace CenturyLink's business, as well as significantly diminished business with other Tier 1 U.S. carriers, with a stronger international exposure.  Indeed, by 2018, international sales made up 47% of ADTRAN's total, an increase of 99% year-over-year.

59.     One of the principal drivers for ADTRAN's growth in international sales is business generated from German telecommunications monolith, Deutsche Telekom.  Each year since 2016, Deutsche Telekom alone has comprised more than 10% of ADTRAN's annual revenue.  Moreover, the Company has entered into several large infrastructure projects with Deutsche Telekom.  For example, in mid-2017, ADTRAN announced a multi-year project in which the Company would assist Deutsche Telekom in replacing its existing vectoring technology with a roll out of super-vectoring which is up to 350-meg speeds.  At a February 16, 2018 conference with analysts, Defendant Shannon confirmed that this Deutsche Telekom project was "a very important project for [ADTRAN]."

60.     Later, ADTRAN announced that Deutsche Telekom had awarded ADTRAN a copper-to-the-basement project to commence in 2019 and going forward where ADTRAN would assist Deutsche Telekom in taking bonded super-vectoring from the node to the basement, installing ADTRAN's G.fast DPU in the basement and then go from a super-vectoring feed into G.fast into multi-dwelling units using installed copper or coax.

61.     ADTRAN has also benefited from recent contributions from Telmex, a Tier 1 telecommunications company headquartered in Mexico City with operations throughout Latin America.  Although Telmex has been a long-time customer of ADTRAN, between at least 2016 and the latter half of 2018, Telmex had been the subject of antitrust and competition review by Mexican regulators.  As a result of this regulatory uncertainty, Telmex had effectively eliminated

- 21 -

all of its spending and, particularly, capital growth expenditure.  However, by the fourth quarter of 2018, Telmex's business returned.

62.     On January 24, 2019, the Company released its fourth quarter 2018 financial results, in which the Company boasted about strong international revenue growth, particularly from the Latin America region.  On the earnings call that same day with analysts, Defendant Stanton explain, "I think we're going to see a little more strength out of Latin America than what we have seen over the last couple of years.  As you know, they'd been through kind of a regulatory hold, which seems to have unlocked."  Defendant Stanton confirmed that a material portion of this Latin American business came from its longtime customer in Mexico, Telmex.

63.     Further, in response to analyst inquiry regarding Telmex's potential for 2019, Defendant Stanton confirmed that Telmex had ramped back up and would be a significant contributor for the balance of the year and beyond, stating:

> So they typically -- as you followed us for a while, they typically buy in chunks that are fairly large and they deliver over a period of time. And then there's typically work on the services side associated with that. And I'd say the pattern seems similar to that, yet we would expect them to be material this year at this point in time. That is not the easiest customer to forecast and they're very demanding on when they do actually decide if they want to do something, so it typically accelerates supply chains and things. But the direct answer to your question is, we expect them to be a meaningful contributor this year.

64.     Although ADTRAN's recent efforts to gain more international exposure has succeeded, it did not completely offset the loss of business from CenturyLink and other North American Tier 1 carriers.  In particular, in 2018, ADTRAN's reported sales had declined to $458.3 million, down 15% year-over-year.  Equally important is the fact that large international customers ADTRAN has wooed wield significant bargaining power, which has caused significant margin compression.  For instance, while ADTRAN's Deutsche Telekom vectoring

project holds the promise of a steady revenue stream over the next several years, at the same time it is a low-margin business.

65.     These factors, combined with recent costly acquisitions by the Company, caused the Company to operate at a significant loss in 2018.  Specifically, the Company reported an operating loss of $45.422 million, compared to operating income of $37.386 million in 2017. Accordingly, it was important for ADTRAN to prove to the market that it could return to profitability by generating net income and positive earnings per share.

**2.     ADTRAN's Faulty Systems of Internal Accounting Control for its Inventory**

66.     Unbeknownst to investors, at all relevant times during the Class Period, in determining the current value of its inventory, ADTRAN relied on an outdated and obsolete accounting and Enterprise Resource Planning system manufactured by the Baan Corporation, which ADTRAN employees referred to as "Baan."  Specifically, ADTRAN used Baan product version 4.0, which was released in approximately 1996, and has been subsequently replaced by at least ten newer versions of this software by Baan and its successor companies.

67.     Multiple former ADTRAN employees confirmed the inadequacy of ADTRAN's internal inventory accounting system, Baan, and internal controls and process.  For example, CW1 described the Baan software as "clunky and unreliable" and stated that CW1 was aware that the Company had wanted to update this software for some time, but had failed to do so because of cost concerns.

68.     ADTRAN's Baan inventory management system was so defective that the Company's staff was forced to create their own workarounds to the system.  According to CW1, ADTRAN staff would try to update to Baan themselves and create workarounds to get the information they needed from the system.  However, according to CW1 the ADTRAN employee homegrown fixes were ineffective since the software was so clunky and unreliable.

69.     CW2 corroborated CW1's account regarding Baan's inadequacies and similarly stated that the Baan software used by ADTRAN was widely known by Company employees to be "ancient."  CW2 said although there was talk at ADTRAN about a need to replace it, there were other systems that were all tied to Baan, such as the Company's inventory ticketing software, Remedy, which was also old and outdated.

70.     ADTRAN's senior executives knew Baan was inadequate, but refused to invest sufficient resources in a proper inventory management system since this process would adversely impact earnings and not raise the Company's share price.  According to CW1, the Company had been wanting to update Baan for a while with a new systems, but CW1 explained that a new system was millions of dollars to implement and that the expense of implementing it was not financially feasible as the Company balanced the demands of meeting sales goals, making earnings that would please investors, and compensating its employees.

71.     Defendant Stanton himself admitted to ADTRAN employees the inventory accounting system was inadequate.  CW1 described an ADTRAN employee meeting occurring in either 2017 or 2018 in which Defendant Stanton met with CW1 and several other ADTRAN employees at Company headquarters at which Defendant Stanton discussed the need to update ADTRAN's accounting system.

72.     Defendant Stanton took undisclosed steps to address the Company's problematic inventory control system.  According to CW1, Defendant Stanton created a task force to help him assess which software program ADTRAN should purchase to replace the antiquated Baan 4.0 system.  Defendant Stanton informed CW1 that this team had solicited bids from ERP software firms for a replacement system and would evaluate which replacement would be most suitable for the Company.  But no change was made during the relevant time period.

- 24 -

73.     ADTRAN's preliminary efforts to replace the Baan system were a complete failure.  Consistent with CW1's account, CW2 said that there were promises from ADTRAN managers that the company planned to replace Baan.  CW2 learned from someone in the engineering department that the Company bought a new system, which CW2 said cost in excess of $1 million, which was "woefully inadequate" to handle ADTRAN's needs.  According to CW2, the Company halted implementing the new system when they saw how it would not work and went back to the old system, Baan.  The engineering employee further told CW2 that the ADTRAN employee who selected the Baan replacement system had an unethical relationship with the salesperson who sold the replacement software and consequently was fired as a result of the conflict of interest.

74.     ADTRAN's deficient inventory accounting and control systems were apparent at the Company's headquarters.  According to CW2, excess old and obsolete inventory was littered across ADTRAN's corporate headquarters and was everywhere you looked.  CW2 explained that old routers, switches and other hardware were used as monitor stands, used to prop up other equipment, stacked in corners, and filled cabinets and shelves.

75.     By way of example, CW2 explained that toward the end of CW2 tenure (October 2019), CW2 was asked to clean out one testing lab room to move it to a different building.  In that room, there were seven network racks full of equipment.  After CW2 sorted out the obsolete equipment, only two were full.  These racks are approximately six feet by three feet wide.  The equipment included items that were so old that CW2 could not even identify them and equipment that the Company had never used since CW2 had started at the company six years prior.  One example CW2 cited was a piece of equipment referred to as a "3130," which was a deployment device for a small office that facilitated an internet connection that CW2 described as a "step

down from ethernet." CW2 stated that ADTRAN also made a special model of the product

called a "3133" that was made for only one customer, a small regional service provider in the

southwestern United States, that did not have a console port so that customers could not get into

the box. A significant number of this one product, using outdated internet and for a small

customer and with limited capability, were all over the building, filling cabinets and stacked in

corners, according to CW2.

   3.   **ADTRAN's Knowledge of Problems Impacting its Tier 1 Customer Deutsche Telekom**

   76.   On or about November 26, 2018, as part of its initiative to have 5G connectivity

across Germany by 2025, German network regulator The Federal Network Agency (German:

Bundesnetzagentur or BNetzA) announced that it would be conducting an auction on fifth-

generation mobile licenses, setting a deadline of January 25, 2019, for submissions and saying

the auction would begin in early 2019. It was widely reported that Germany's three main

network operators, which included ADTRAN's most important Tier 1 client, Deutsche Telekom,

would be submitting bids.[3]

   77.   Significantly, in conference calls with analysts, Defendants noted that it is

Deutsche Telekom's practice to give spending forecasts to ADTRAN as get towards the end of

the year.

   78.   The conditions of the 5G auction drew very public protests from Germany's three

network operators, including Deutsche Telekom. Indeed, Deutsche Telekom filed a lawsuit

against Germany's Federal Network Agency protesting among other conditions, a mandate

---

[3] "German regulator sets ball rolling for 5G auctions," *Reuters* (Nov. 26, 2018, located at
https://www.reuters.com/article/us-germany-telecoms/german-regulator-sets-ball-rolling-for-5g-auctions-
idUSKCN1NV1KJ.

require participating operators to commit to providing 5G network coverage covering 98% of households by 2022 to qualify for the process, arguing that such conditions would dramatically increase the expense for network providers in developing the next-generation mobile network.[4]

79.     Despite Deutsche Telekom's reservations about the auction process, in annual report to investors, Deutsche Telekom targeted massive spending in the March 5G spectrum auction.  The target was consistent with security analysts' projection, who had estimated the auction would raise €3bn-€5bn.

80.     On March 15, 2019, media outlets reported that Deutsche Telekom's (and other network providers) suit to halt the German 5G auction had failed and the auction would be going forward on March 19, 2019.[5]

81.     On March 19, 2019, Germany launched its 5G mobile spectrum auction with four companies competing for a total of 41 blocks of spectrum in the 2 GHz and 3.6 GHz bands: Germany's three mobile operators – Deutsche Telekom, Vodafone and Telefonica Deutschland, as well as 1&1 Drillisch, a virtual mobile operator controlled by United Internet.[6]  Under the rules of the auction, the auction was conducted in rounds of bids and would continue until no new bids were received on any of the 41 blocs of spectrum up for sale.

82.     During the bidding process, Deutsche Telekom was publicly critical of the auction, claiming its structure artificially created a shortage of spectrum that would force up costs and leave operators short of cash for future capital expenditures.  Deutsche Telekom CEO

---

[4] "Deutsche Telekom sues German government over 5G auction: Welt," Reuters (Jan. 1, 2019), available at https://www.reuters.com/article/us-deutsche-telekom-auction/deutsche-telekom-sues-german-government-over-5g-auction-welt-idUSKCN1OV1ND.

[5] "Deutsche Telekom, Telefónica and Vodafone fail to halt German 5G auction," *Financial Times* (Mar. 15, 2019), available at https://www.ft.com/content/af1f0a84-4702-11e9-b168-96a37d002cd3.

[6] "Germany kicks off 5G spectrum auction," RCR Wireless News (Mar. 19, 2019), available at https://www.rcrwireless.com/20190319/5g/germany-kicks-off-5g-spectrum-auction.

010865-11/1260990 V1

Tim Hoettges was quoted by media outlets on March 28, 2019, as stating, "An artificial shortage of public resources is being created, which may push up the price.  In the end, there is no money for the build-out."[7]  Indeed, by April 10, 2019, it was reported that the total value of the bids from Deutsche Telekom, Vodafone, Telefónica and Drillisch – the four operators admitted to the auction, which had gone on for 169 rounds over three weeks — stood at €5.06 billion.[8]

83.     On June 13, 2019, after 497 bidding rounds, BNetzA announced the results of its 5G spectrum auction, with Deutsche Telekom winning the most lots in the 2GHz and 3.6GHz bands.  In total, 420MHz was purchased for €6.55 billion.  Deutsche Telekom paid the most with €851.5 million for 40MHz in the 2GHz band and €1.3 billion for 90MHz in the 3.6GHz band.[9]

84.     Deutsche Telekom expressed mixed emotions about securing the 5G access given the excessive costs.  "The auction leaves a bitter aftertaste," Deutsche Telekom CEO Dirk Woessner said in a statement.  "The result is a dampener on our network buildout.  Spectrum, again, is much more expensive in Germany than elsewhere.  Network operators now lack the money to expand their networks."

85.     As noted above, CW3 worked as ADTRAN's Senior Director of MSO sales (Multiple Systems Operations) from March 2018 until July 2019 and reported directly to ADTRAN's Vice President of Sales.  Moreover, CW3 had significant industry experience, working both now and previously with competitors of ADTRAN and as the VP of Sales of North America for a company acquired by ADTRAN in the areas of business development and acting

---

[7] "German 5G auction design could force up spectrum costs: D.Telekom," Reuters (Mar. 28, 2019), available at https://uk.reuters.com/article/uk-deutsche-telekom-agm/german-5g-auction-design-could-force-up-spectrum-costs-d-telekom-idUKKCN1R90XU.

[8] "Bids in Germany's 5G spectrum auction pass €5bn," Financial Times (Apr. 10, 2019), available at https://www.ft.com/content/6a5b7a98-5b9a-11e9-9dde-7aedca0a081a.

[9] "Deutsche Telekom, Vodafone, Telefonica Germany, and Drillisch win 5G spectrum," ZdNet (June 13, 2019), available at https://www.zdnet.com/article/deutsche-telekom-vodafone-telefonica-germany-and-drillisch-win-5g-spectrum/.

as a liaison to Tier 1 communications clients.  Now and previously, CW3 has worked closely

with Deutsche Telekom.  Based upon CW3's experience in working with Deutsche Telekom,

CW3 said ADTRAN should have been aware that the launch of 5G had the potential to "be

disruptive" to their forecasts.

### 4.     ADTRAN's Knowledge of Problems Impacting its Tier 1 Customer Telmex

86.     Deutsche Telekom was not the only major Tier 1 customer with which ADTRAN

was having a problem.  Multiple knowledgeable former employees of ADTRAN confirmed that

by early 2019, ADTRAN was also experiencing business disruptions with its major Tier 1 Latin

American customer, Telmex.

87.     CW4 explained that in late 2018, ADTRAN landed a large project with Telmex

that greatly surpassed previous sales to the Company, which had totaled $10 million for 2018.

According to CW4, the new Telmex project was initially valued at $102 million, although it was

adjusted down 20% to 30% because Telmex had overestimated its need.  CW4 said that

Telmex's total capital spending budget is between $1 billion and $2 billion and ADTRAN was a

small piece of it.  However, for ADTRAN, the Telmex account was one of its largest accounts.

88.     CW4 stated that the project charged ADTRAN with expanding Telmex's DSL

network, as CW4 said Telmex was "sweating out" its copper network, or maximizing its

efficiency, in lieu of switching to fiber.  CW4 said Telmex's use of copper was not unusual for

the region because of a substantive lower demand on bandwidth in Mexico.  Even with copper

technology that was a few steps behind what is being used in the United States or elsewhere, the

residential bandwidth demands in Mexico were at the time about five to 10 mgs per household

and the technology Telmex wanted installed provided for 300 mgs, according to CW4.

89.     Telmex, however, was left upset with ADTRAN by ADTRAN's hard-bargain

contract negotiation tactics.  CW4, who was directly involved in the "lengthy" negotiations with

Telmex's head purchasing agent, Consuelo Gomez, stated that when Telmex approached ADTRAN for the work, Telmex wanted ADTRAN to bundle the installation and product and be paid upon installation, but ADTRAN refused due to the perceived upfront cost.  CW4 stated that although Telmex would threaten that it had other vendors and would then ask for extra services, CW4 said ADTRAN did not budge on its insistence to be paid for the hardware upfront.  CW4 stated after further negotiations, a deal was reached.  CW4 said the purchase order for the work came in a week before Christmas in 2018 and was valued at $102 million. Approximately three weeks later, however, Telmex adjusted it down by about 20% to 30% because they had overshot their number, cutting the contract to about $80 million to $90 million.  Based on the hard bargain ADTRAN had drove, CW4 stated, "I'm sure she (Ms. Gomez of Telmex) was furious signing the purchase order."

90.     ADTRAN's refusal to provide installation services caused major problems in execution of the project.  According to CW4, Telmex had retained a third-party technician to handle the installation.  CW4 stated that Telmex's third-party installation technicians were not installing the devices from ADTRAN fast enough, which was supposed to be at about 500 units per week, CW4 said.  CW4 stated these issues came to the forefront in mid-2019.

91.     ADTRAN and its management were aware of the third-party technician's delay in installing the products.  CW4 stated that all throughout 2019, ADTRAN offered to help with the installations, but the two companies could not agree on a rate to pay for the installation work.

92.     The slow pace of the third-party technician installing ADTRAN's products was not the only issue delaying the progress of the Telmex project.  CW4 stated that the installation delays also occurred because of a need to replace some of the equipment that was installed during the first half of 2019 and subsequently damaged.  CW4 said that during the first half of

2019, Telmex reported to ADTRAN that ADTRAN products were failing in the field.  For example, CW4 said that instead of losing one subscriber, Telmex would lose all that were connected to the box, which would be 192 subscribers.

93.     CW4 stated that Telmex's immediate reaction, specifically Ms. Gomez of Telmex, was that it blamed the problem on faulty ADTRAN equipment and asked that it be replaced.  CW4, however, said that ADTRAN analyzed the problem and realized that Telmex's third-party installation workers were installing them incorrectly and not grounding the hardware. When electrical storms passed through the area, the equipment was ruined.

94.     Defendants had direct knowledge of the product damage issues causing the delay in installation.  CW4 said that Defendant Stanton kept updated on all aspects of the work for Telmex and had a relationship with Ms. Gomez in which Gomez would call Defendant Stanton directly on his cell phone and go over CW4's head to try to get things done her way.  In fact, CW4 stated that once CW4 and ADTRAN's Senior Vice President for Global Sales had flown to Mexico for a meeting with Ms. Gomez to discuss a Telmex demand that he would not agree to because of a need to adhere to ADTRAN's internal margins, but Ms. Gomez refused to see CW4 and the Senior Vice President for Global Sales and instead called Defendant Stanton directly.

95.     In addition, CW4 participated in regular calls with Telmex representatives, sometimes as often as every day, which included Defendant Stanton on the call.  CW4 said the attempt to sell Telmex on ADTRAN's installation services was discussed on these calls and went on for the whole year (2019).

96.     CW4 further stated that Defendant Stanton would regularly call CW4 to ask how things were going with Telmex and asked CW4 to call and report to him about any calls CW4 had with Gomez.

97.     Indeed, Defendant Stanton even met personally with Telmex officials to discuss the project installation issues.  CW4 stated that CW4 arranged a business review meeting sometime between spring and July 2019 with CW4, Defendant Stanton, Ms. Gomez, Telmex's CEO Hector Slim, and Telmex's Chief Technology Officer.  CW4 said that ADTRAN prepared for at least two months in advance of the business review meeting.  The business meeting began with Ms. Gomez alleging it was ADTRAN's problem because of faulty equipment, but eventually Telmex executives agreed with ADTRAN's research that supported the assertion that the hardware had been installed incorrectly.

98.     As a result of these discussions, ADTRAN set up a training session for those installing the work in Guadalajara, Mexico so that the equipment would be properly installed. However, the repair of the products ruined in the electrical storms further delayed the installation timeline of the large order.

99.     CW4 stated that the delay in the installation and damaged parts caused Telmex to order ADTRAN to pause shipments by summer 2019 so that Telmex could "digest the product" that Adtran had bought through the first of the year.

**B.     Defendants' False and Misleading Statements During the Class Period**

100.     Throughout the Class Period, Defendants made material misrepresentations and omitted to disclose material facts concerning the Company's reported financial results and its system of accounting internal controls, and also regarding its status with Tier 1 customers Deutsche Telekom and Telmex.

101.     The Class Period begins on February 13, 2019, when ADTRAN presented at the Goldman Sachs Technology & Internet Conference in San Francisco, California.  In a dialogue with Goldman Sachs analyst Roderick B. Hall, Defendant Shannon emphasized the increased interest ADTRAN was seeing in Europe.  Moreover, despite the news of Deutsche Telekom's

Spectrum bidding, Defendant Shannon assured investors that ADTRAN's large European Tier 1 customer (Deutsche Telekom) would continue its spending on existing ADTRAN projects and that business in the European region would remain consistent with 2018 levels.

> **Question – Roderick B. Hall:** Okay. We talked a little -- we touched on Germany a little bit on fixed wireless. I wonder if we could expand to Europe and European revenue expectations as you've been picking up some Tier 2s there. And what do you think happens with revenue in Europe in 2019? I mean, do we see – what's the trajectory?

> **Answer – Roger D. Shannon:** Well, we certainly saw material international growth over the course of 2018. A part of that was the impact of our U.S. Tier 1 being down in 2018, but we have been very pleased with the growth we had, both from our large European Tier 1 and across these new opportunities. So our super-vectoring upgrade kind of continued -- certainly continued across 2018, but -- it could be the largest year that we had with that customer. That super-vectoring rollout will continue over the course of 2019. I don't expect the large Tier 1 customer would be at the same level as 2018 just because 2018 was so large. As we kind of continue through the super-vectoring -- finish that project up, the next initiative there is a project where we've been awarded the trial, which is a bonded super-vectoring then G.fast into the premises. There's also their access 4.0 and Fiber-to-the-Home as well as potential fixed wireless initiatives, all of which we are involved in. But we're -- what we do see across Europe is, we expect European business to be consistent with where we were last year.

102.    Defendants' February 13, 2019 statements were materially false and misleading and omitted material facts.  At the time of making the statements, Defendants knew that given Deutsche Telekom's significant expected expenditures in the upcoming German 5G Spectrum action, Deutsche Telekom would have to substantially reduce capital spending on its existing projects at ADTRAN, including the projects Defendant Shannon referenced at the February 13, 2019 conference, and that normal spending would not resume until at least 2020.  As such, Defendants knew that European business in 2019 would not be consistent with ADTRAN's business in 2018.

103.    Thereafter, on February 28, 2019, ADTRAN filed its annual report on Form 10-K

for the period ended December 31, 2018 (the "2018 Form 10-K") with the SEC.  In the 2018

Form 10-K, ADTRAN described its inventory accounting policies as follows:

> Inventory
>
> We carry our inventory at the lower of cost and net realizable value,
> with cost being determined using the first-in, first-out method. We
> use standard costs for material, labor, and manufacturing overhead
> to value our inventory. Our standard costs are updated on at least a
> quarterly basis and any variances are expensed in the current period;
> therefore, our inventory costs approximate actual costs at the end of
> each reporting period. We write down our inventory for estimated
> obsolescence or unmarketable inventory by an amount equal to the
> difference between the cost of inventory and the estimated fair value
> based upon assumptions about future demand and market
> conditions. If actual future demand or market conditions are less
> favorable than those projected by management, we may be required
> to make additional inventory write-downs. Our reserve for excess
> and obsolete inventory was $30.0 million and $23.4 million at
> December 31, 2018 and 2017, respectively. Inventory disposals
> charged against the reserve were $0.4 million, $8.3 million and $4.7
> million for the years ended December 31, 2018, 2017 and 2016,
> respectively.

104.    This disclosure was materially false and misleading when made because it

omitted to disclose that: (1) that there were material weaknesses in the Company's internal

control over financial reporting; (2) that, as a result, certain E&O reserves had been improperly

reported; (3) that, as a result, the Company's financial results (including cost of goods sold, net

income, inventory, assets and net equity) for these periods were misstated.

105.    The 2018 Form 10-K also included a section entitled "Management's Report on

Internal Control Over Financial Reporting," in which the Company disclosed that ADTRAN's

CEO and CFO had determined that its accounting internal controls were effective as of

December 31, 2018:

**MANAGEMENT'S REPORT ON INTERNAL CONTROL
OVER FINANCIAL REPORTING**

Management of ADTRAN, Inc. is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended. ADTRAN's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. ADTRAN's internal control over financial reporting includes those policies and procedures that:

• pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of ADTRAN;

• provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of ADTRAN are being made only in accordance with authorizations of management and directors of ADTRAN; and

• provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of ADTRAN's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of ADTRAN's internal control over financial reporting as of December 31, 2018. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework (2013). **Based on our assessment and those criteria, management has concluded that ADTRAN maintained effective internal control over financial reporting as of December 31, 2018**. [Emphasis added.][10]

---

[10] ADTRAN, Inc. 2018 Form 10-K, p. 94.

106.   Indeed, both Defendants Stanton and Shannon each signed sworn certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they had personally evaluated the effectiveness of ADTRAN's internal controls over financial reporting prior to making the conclusion noted above.[11]

107.   These SOX certifications were materially false and misleading when made because, as ADTRAN would be forced to later publicly admit, the Company suffered from a "material weakness" in its internal controls over financial reporting.

108.   On April 17, 2019, following the close of the market, ADTRAN announced its reported financial results for the quarter ended March 31, 2019 ("1Q2019") over the Business Wire.  This press release disclosed, in pertinent part:

> HUNTSVILLE, Ala.--(BUSINESS WIRE) -- ADTRAN, Inc. (NASDAQ:ADTN) reported results for the first quarter 2019. For the quarter, sales were $143.8 million compared to $120.8 million for the first quarter of 2018. Net income was $0.8 million compared to a net loss of $10.8 million for the first quarter of 2018. Earnings per share, assuming dilution, were $0.02 compared to a loss per share of $0.22 for the first quarter of 2018.

109.   The next day, on April 18, 2019, Defendants hosted an earnings conference call with analysts to discuss ADTRAN's first quarter 2019 financial results.  On the call, Defendant Foliano emphasized the Company's "progress in the first quarter of 2019," headlined by the Company's purported GAAP net income for quarter of $770,000 compared to a loss of $8.4 million last quarter and a loss of $10.8 million for the first quarter of last year, which Defendant Foliano attributed "to higher sales volumes with higher gross margins in both our products and services portfolios domestically and internationally and lower operating expenses."  Defendant Foliano further highlighted the Company's positive earnings per share on a GAAP basis of $0.02

---

[11] *Id.*, Exhibit 31.

compared to a loss of $0.18 per share last quarter and a loss of $0.22 per share in the first quarter of 2018.

110.    In response to an MKM Partners' analyst's question about how the Company vastly improved gross margins, Defendants Stanton and Foliano falsely attributed the improvement to "product mix" and "efficiency gains":

> **Answer – Thomas R. Stanton:** Yes. Well, I think there's 2 things. One is product mix. So there are certain products, regardless if they're international or domestic, that actually just sell at a higher gross margin than other products. So mix helped us this quarter. And then the other is actually just efficiency gains. I think, the -- our factories across the world, when we saw an uptick in that volume, and as you get -- although inventories came down, we're expecting a fairly solid second quarter as well. So I think we saw some improvements in efficiency gains that really helped. Mike, I can't think of anything else.

> **Answer – Michael K. Foliano:** Those are the 2 big things.

111.    Defendants' April 18, 2019 statements about ADTRAN's positive first quarter 2019 financial results and their principal drivers were false and misleading, and omitted material facts.  As ADTRAN would later admit, ADTRAN's actual first quarter 2019 results were not as represented, including its purported net income of $770,000, EPS of $0.02, and improved gross margins.  In truth, ADTRAN was inadequately accounting for its inventory E&O reserves, which the Company ultimately admitted required an $800,000 charge.  Accordingly, ADTRAN actually posted a loss for 1Q 2019 and a negative EPS.  Thus, ADTRAN failed to disclose that its reported profit, positive EPS, and improved gross margins were driven from its improper E&O Reserve Accounting.

112.    On the same April 18, 2019 conference call, Defendants emphasized their international customer revenue of $73.1 million, noting that "key customer infrastructure projects resulted in nearly 50% of our revenue for the quarter coming from international markets," and that the Company "finished the quarter with 3 10%-of-revenue customers located

in 3 different markets," including "Lat Am [and] Europe," "underscoring the impact ADTRAN is having as we help our customers build their best networks."  Based on these contributions, Defendant Stanton projected that ADTRAN's "second quarter 2019 revenue will be in the range of $154 million to $158 million."

113.    After further explained the material contributions the Latin American (*i.e.* Telmex) and EMEA markets provided to ADTRAN's positive first quarter 2019 results, Goldman Sachs Group Inc., Research Division - Equity Analyst Go Ashwin Kesireddy was interested in hearing from management "about visibility heading into second half of this year, particularly in . . Lat Am," noting "we understand that the customer there is probably a little bit more lumpy than other customers."  Defendant Stanton, however, quickly dispelled this analyst's concern about visibility, stating that Telmex had shared its plans with ADTRAN confirming their "buildout" and "push for Vectored VDSL and for 35b VDSL," so much so that second half 2019 sales would exceed the first half with "solid strength through the year":

> [W]e actually expect it to be up in the second half versus the first half. Lat Am, same thing, that we're going to build out right now with a large customer in Lat Am. We have other customers in Lat Am other than that one, but that one is definitely oversized compared to the rest. There is ongoing -- there is a push for Vectored VDSL and for 35b VDSL. They have shared with us their plans. And right now, we're expecting kind of solid strength through the year with that customer.

114.    Defendant Stanton repeated the same positive refrain about Telmex in an exchange with an analyst at Cowen and Company, emphasizing the customer's "clear and strong plans to increase their broadband," how ADTRAN was "well-positioned" to meet this demand, and "good job" ADTRAN was doing in supplying the customer:

> I feel the same way [i.e., "feel good"] about Latin America. That customer -- the big customer there has been kind of closed up for a period of time, and they had very clear and strong plans to increase their broadband. So I feel good about the opportunity there. I'm not saying that we've got everything inked down because it's

a large customer with a lot of plans, but we're very well positioned there. And I think right now we're doing a good job.

115.    Defendants' statements on this April 18, 2019 conference call concerning its relationship with Latin American customer Telmex were false and misleading, and omitted material facts.  Though Telmex had in fact shared its plans with Defendants, contrary to Defendant Stanton those plans did not confirm Telmex's intent to continue its "buildout" and "push for Vectored VDSL and for 35b VDSL" with ADTRAN.  Similarly, ADTRAN was neither "well-positioned" to meet Telmex's demand nor conducting a "good job" on the Telmex project.   As confirmed by CW4, the Telmex project was plagued by a third-party contractor's severe delays in product installations as well as improper installations that led to damaged products or massive product failures.  Moreover, as a result of ADTRAN's refusal to add installation services onto the Telmex contract, ADTRAN's relationship with Telmex was fractured.  Accordingly, Defendants had no reason to believe Telmex's demand for products would be strong throughout the entire year, but instead knew the Company would have to put a pause on orders until the installation issue was rectified and Telmex could digest ADTRAN's products.

116.    On this April 18, 2019 conference call, in response to analyst inquiry, Defendant Stanton affirmed that the Company's growing revenues with "large historical European customer" Deutsche Telekom would not only continue but "pick-up" and ADTRAN would see "more strength" in the second half of 2019:

> **Question – Richard Frank Valera:** Tom, I'm not sure if you have given an update on your large historical European customer, but it sounds like they were strong this quarter. But can you give a sense of how you see them for the balance of the year?
>
> **Answer – Thomas R. Stanton:** Yes. Actually, it's going to be a little different this year. We're actually expecting more strength in the second half of the year than in the first half. First quarter was not a bad quarter. Second quarter, we kind of see to be kind of in line-ish with the first quarter, and then we actually see a little pickup

in the third. Fourth is still kind of far out there, but -- I think I answered your question.

117.    Taken back by Defendant Stanton's comments of ADTRAN "expecting more strength in the second of the year," the analyst questioned Defendant Stanton's positive statement noting "the traditional kind of falloff in 3Q from [ADTRAN's] European customers:"

> **Question – Richard Frank Valera**: Yes. So just you've mentioned, I guess, at least a couple of customers that -- or engagements you expect to be up in the second half versus first. So I'm just wondering if you'd be willing to say anything about seasonality relative to the Q2 levels. It sounds like you're not expecting that traditional kind of falloff in 3Q from your European customers, so maybe would at least be looking more like flattish sequentially from Q2.

> **Answer – Thomas R. Stanton**: Yes. From the European customer, you're correct. We have -- at this point in time -- and we typically don't give guidance that far out, but at this point in time, we're seeing probably an uptick in our European customer. We typically see in the U.S. an uptick as well. The -- so those 2 will be the biggest drivers.

118.    Defendants' statements on this April 18, 2019 conference call concerning Deutsche Telekom were false and misleading, and omitted material facts.  At the time of making the statements, Defendants knew that given Deutsche Telekom's significant expected expenditures in the upcoming German 5G Spectrum action, Deutsche Telekom would have to substantially reduce capital spending on its existing projects at ADTRAN.  As such, Defendants knew that second quarter 2019 sales to Deutsche Telekom would not be "in line" with first quarter 2019 and that there would not be "more strength" or "an uptick" in business from Deutsche Telekom in the second half of 2019.

119.    Defendants' false representations about the Company's true financial results and relationship with Telmex and Deutsche Telekom worked.  Analysts were quick to applaud the Company, as an analyst at MKM remarked, "Strong Start To 2019 w/ All Growth Drivers Contributing, Improving Margins & Good Visibility," and also noted "Telmex (TELMEXA MM, not rated) was a 10+% customer in 1Q19 for the first time in many years. Adtran says it

believes Telmex will be at least as strong in 2H19 as 1H19. DT in Germany was also a 10%

customer in 1Q19, per usual. Adtran says it expects DT (DTE GY, not rated) sales to be higher

in 2H19 than 1H19, which is against the normal seasonal trend at the carrier."  Similarly,

Northland Capital Markets referred to ADTRAN's Q1 2019 results and outlook as "solid,"

noting that the Company had "reported a surprise profit in Q1, reflecting a solid overall demand

backdrop for copper and fiber bases broadband access technologies both in the US and global,

aided by solid bottom line execution."

120.     The market similarly rewarded ADTRAN, as the Company's share price

increased 10% the next trading day following its unexpected 1Q19 net profit, rising from $15.00

to close at $16.59.  Altogether, ADTRAN's share price was up 35% in 2019 versus 19% for its

peers.

121.     Defendant Shannon was able to cash-in on the Company's new-found success, as

on April 23, 2019, Shannon disposed of 5,701 personally held shares at an average price of

$17.65 for $100,597 in gross proceeds.  This transaction alone reduced Shannon's directly

owned shares by 23%.  Moreover, Shannon's timing on this open-market transaction, made

without a 10b-5 plan, was impeccable as he sold the shares after ADTRAN share price had

gained 24% in the past month.  The sale was not in line with Shannon's previous trade history.

Indeed, according to SEC records, Shannon had made no sales of ADTRAN in the previous four

years preceding this transaction.

122.     On May 7, 2019, the Company filed its quarterly report on Form 10-Q for the

period ended March 31, 2019 (the "1Q2019 Form 10-Q"), affirming the previously reported

financial results.  The 1Q2019 Form 10-Q made the following disclosure regarding reserves for

obsolete inventory:

> We establish reserves for estimated excess, obsolete, or unmarketable inventory equal to the difference between the cost of the inventory and the estimated fair value of the inventory based upon assumptions about future demand and market conditions. At March 31, 2019 and December 31, 2018, raw materials reserves totaled $17.1 million and $17.6 million, respectively, and finished goods inventory reserves totaled $12.8 million and $12.4 million, respectively.

123.   These disclosures were each materially false and misleading when made because they omitted to disclose that: (1) that there were material weaknesses in the Company's internal control over financial reporting; (2) that, as a result, certain E&O reserves had been improperly reported; (3) that, as a result, the Company's financial results (including cost of goods sold, net income, inventory reserves, assets and net equity) for these periods were misstated by a material amount.

124.   On May 16, 2019, ADTRAN presented at the JPMorgan Global Technology, Media and Communications Conference in Boston, Massachusetts.  During the conference, an analyst at JPMorgan noted the "more of a healthy spending pattern from the Tier 1 service providers" and asked Defendant Stanton's impression "of overall business with them and how you're thinking about them, their spend through the rest of the year."  In response, Defendant Stanton suggested this trend would continue at ADTRAN given the "significant build-out" it was making with ADTRAN's equipment:

> If I look at the Tier 1s, I expect Tier 1s in the telco space to be up or the carrier space to be up just because of some additional things that we've added to the portfolio and some wins that are fairly new. NBN is an example of that. Telmex, the leading -- the major provider in Mexico, has started a significant build-out with our equipment. So I would expect carrier space to be up.

125.   Thereafter, Defendant Stanton emphasized ADTRAN's international growth, stating, "And I do expect international to grow even stronger in the second half than in the first

half.  So I would say if you look at the Latin America marketplace and Europe, both of those

have kind of good, strong potentials."

126.    Defendant Stanton reiterated the continuing growth potential of Mexico through

its client Telmex, stating, "There's stuff that's going on in Mexico today.  We expand to -- they

have a long catch-up to do.  They've been frozen for about 3 years now.  So that started off this

year as a strong customer.  We expect that to carry on."

127.    Defendants' May 16, 2019 statements concerning the Company's relationship and

prospects with Telmex were false and misleading, and omitted material facts.  As confirmed by

CW4, the Telmex project was plagued by a third-party contractor's severe delays in product

installations as well as improper installations that led to damaged products or massive product

failures – problems about which Defendants were aware.  Moreover, as a result of ADTRAN's

refusal to add installation services onto the Telmex contract, ADTRAN's relationship with

Telmex was fractured.  Accordingly, Defendants had no reason to believe Telmex's sales would

continue to grow or that it would carry on as a strong customer of ADTRAN.

128.    Analysts took note of the Company's statements concerning its large Tier 1

international clients.  For example, in a June 3, 2019 report, Jeffries offered a "bull case"

scenario for ADTRAN's stock, noting the "New Project Opportunities & a Set-up for 2H'19

strength."  The report stated, "The bull case argues that the organization is set up for some nice

growth over the balance of the year.  . . . Telmex seems to be deploying very strongly.  They

expect that their business at both accounts – NBN and Telmex – to be up in 2H'19 versus

1H'19. . . . Also, they expect the Deutsche Telekom business to improve going forward.  Overall,

they have a lot of customer activity that's expected to grow over the course of the year."

129.    Following the close of the market on July 17, 2019, ADTRAN issued a press release announcing "preliminary" earnings for second quarter 2019.  These reported financial results were designated as "preliminary" due to the surprising disclosure of ADTRAN's investigation into its accounting for inventory reserves and possible internal control deficiencies:

Preliminary Financial Results

The Company's reported results for the quarter and year to date ended June 30, 2019 are preliminary due to the Company's ongoing assessment of the reasonableness of its current and previously reported excess and obsolete inventory reserves ("E&O reserves"). The Company is working diligently to finalize its assessment and evaluate the materiality of adjustments to the reserve, if any, and determine the appropriate method of correction to its current and previously reported financial results, as necessary. In addition to assessing the reasonableness of its E&O reserves, the Company is also assessing inventory related internal control deficiencies which may result in the identification of material weaknesses. If material changes to our preliminary results do occur, an updated press release will be issued.

130.    The same day, the Company held a conference call to discuss its second quarter 2019 results.  On the call, Defendant Foliano was immediately asked by analysts to provide further explanation for the impetus for the Company's assessment of the reasonableness of its current and previously reported E&O reserves:

**Question – Ashwin Kesireddy, Goldman Sachs Group Inc., Research Division - Equity Analyst:** This is Ashwin on behalf of Rod. I was wondering if you could comment further on the internal control deficiencies you're currently assessing. Any sort of comments on what triggered the process, and your worst-case expectations? I guess what I'm trying to understand is whether or not this could result in just like onetime impact or are we talking about some potential structural cost increases? And then I have a follow-up.

**Answer – Michael K. Foliano:** Okay. Ashwin, this is Michael. Let me start with just a little bit of background. For quite a while here, we've used a fairly detailed method and a tool to develop our excess and obsolete inventory reserves. It looks at more than 20,000 SKUs that we use throughout the business, everything from raw materials through all of our finished goods. And on a realtime basis, it calculates what we believe that the reserve for that inventory to be that would bring it back to net realizable value. What that tool actually requires because it is

fairly complicated is a significant number of inputs. When we went back and looked at the inputs, we did not have on all of those inputs the validation level that may have been necessary to make sure that all of those were exactly right. Now the output of the tool is a reserve at a high level for all of our inventories. And we believe by looking at what we've seen out in the market for other companies in our space that, that reserve is reasonable. But we are not certain at this time as we simplify the tool and move to a process that is much more like what other companies do, that there won't be some fluctuations in the inventory value. So that's kind of the background on it. And I think your other question was around whether or not it would be a long-term issue versus just a onetime. I don't see the amount that would be reserved in any period changing significantly from what we've seen in the past.

131. On the call, Defendants explained that the Company had slashed projected revenues the next quarter to $130-$150 million.  Specifically, Defendants Foliano stated, "Our current expectations include the effect of a temporary slowdown in capital spending for access at a Tier 1 European carrier customer.  We have been informed that normal spending will resume at the beginning of 2020.  As the full effect of this slowdown has not yet been determined, we have widened the range of our current revenue expectations to accommodate this variability."

132. Nevertheless, Defendants attempted to mitigate investors' concerns by touting the continued perceived demand from the Company's 10% revenue customer in Latin America, Telmex.  For example, during the call, an analysis questioned Defendant Stanton about the Company's Tier 1 Latin American customer (Telmex) plans for purchasing in future quarters.  In response, Defendant Stanton affirmed Telmex's demand for ADTRAN's products and ADTARN's consistency in meeting their demand and specified timelines:

**Question – Richard Frank Valera, Needham & Company, LLC:** . . . So your Latin American customer, it looks like they've been strong now for a couple of quarters in a row. And it didn't sound like there was anything in your comments to suggest they're slowing. But can you give us any sense of how things look in Latin America for the second half of this year? And any sense at all you have of the continuity of that since they kind of turned on recently, but have been historically kind of an on and off customer?

**Answer – Thomas R. Stanton:** Well, our history with that customer would tell you that they are different in the way that they plan their demand, but they have a

goal of -- a specific goal of VDSL Vectored footprint expansion. I would tell you they are not to that goal. They have to buy significantly more amount of material in order to meet that, which is their first phase goal. So we're just continuing to operate with them and try to meet their demand and their time lines and things like that.

133.   Defendants' July 17, 2019 statements concerning the Company's relationship and prospects with Telmex were false and misleading, and omitted material facts.  As confirmed by CW4, the Telmex project was plagued by a third-party contractor's severe delays in product installations, as well as improper installations that led to damaged products or massive product failures.  Moreover, as a result of ADTRAN's refusal to add installation services onto the Telmex contract, ADTRAN's relationship with Telmex was fractured.  Having spoken directly on the subject of Telmex, its demand, and ADTRAN work in meeting Telmex's demand and timelines, Defendants were duty bound to disclose this news.

134.   After the call, at least one analyst questioned the Company's statements concerning Telmex's purported demand and whether ADTRAN's dim prospects in Q3 2019 were limited to the spending slowdown at ADTRAN's Tier 1 European client, Deutsche Telekom.  In a July 18, 2019 report, analysts at Jeffries questioned, "Is it Just Deutsche Telekom?"  The analyst noted Defendants' previous statements that "they expected their business at Telmex to be up in 2H'19 versus 1H'19."  But with the "disappointing" Q3 2019 guidance, the Jeffries analyst concluded, "It seems that projects at NBN, Telmex, CenturyLink, and the Cable MSOs aren't back-filling for the softer DT spending."

135.   On this news, the Company's share price fell $3.69 per share, over 23%, to close at $12.13 per share on July 18, 2019, thereby injuring investors.

136.   ADTRAN shares fell for a second straight session on Friday, July 19, 2019, building on the previous day's 23% plummet as analysts continued to digest the company's recent results and outlook.  At least two firms cut their price targets, citing the impact of a major

customer's lower spending.  For example, Needham reportedly cut expectations for both

ADTRAN's earnings and revenue, for both 2019 and 2020, citing "uncertainty around the

timing and magnitude of a rebound in DT spending," a reference to Deutsche Telecom.

Similarly, Cowen reportedly stated that there was now a "lack of visibility as to meaningful

sustained improvement" at ADTRAN.

137.   Analysts were also disturbed by the Company's disclosure of its E&O inventory

reserve review.  For example, in July 19, 2019 report to clients, analysts at MKM Partners

remarked, "[ADTRAN' has become a show-me story because . . . Its accounting practices to

determine excess and obsolete inventory reserves are under review and there could be

restatements."  Similarly, in July 19, 2019 research report, analysts at Argus concluded, "The

slowdown in business with a major European customer, and the reexamination of E&O

reserves, underscore the risks in Adtran's go-to-market model."

138.   On this news, the Company's share price fell $0.60 per share, or 5%, to close at

$11.53 per share on July 19, 2019, thereby injuring investors.

139.   On August 12, 2019, the Company filed Form 12b-25 with the SEC in which it

disclosed that ADTRAN confirmed its earlier disclosures regarding its internal accounting

controls, admitting that certain "material weaknesses" existed in its internal control over

financial reporting that may have resulted in a misstatement of E&O reserves in previous

accounting periods that would prevent the Company from timely filing its quarterly report for the

second quarter of 2019 with the SEC:

> On August 8, 2019, subsequent to the issuance of the Company's
> Annual Report on Form 10-K for the year ended December 31, 2018
> ("2018 Form 10-K"), the Company's management, in consultation
> with the Audit Committee of the Board of Directors, concluded that
> **there were two material weaknesses related to internal control**
> **deficiencies that existed as of December 31, 2018 and that**

**continued through the end of the second quarter of 2019**. Specifically, the Company's management has determined that the Company did not, as of December 31, 2018 and through June 30, 2019, design and maintain effective internal control over certain aspects of its valuation and existence of inventory.  As a result, Management's Report on Internal Control Over Financial Reporting included in Item 9A of the 2018 Form 10-K and the opinion of PricewaterhouseCoopers LLP ("PwC") relating to the effectiveness of the Company's internal control over financial reporting as of December 31, 2018 included in the 2018 Form 10-K should no longer be relied upon. Additionally, the statements within "Evaluation of disclosure controls and procedures" included in Part II, Item 9A of the 2018 Form 10-K regarding the effectiveness of the Company's disclosure controls and procedures for the period presented are no longer accurate due to the material weaknesses described above.  The Company has determined to prepare and file an amendment to the 2018 Form 10-K (the "Form 10-K/A") in order to address the material weaknesses and related disclosures.

Although the identified material weaknesses did result in a misstatement of the Company's previously reported E&O Reserves, management of the Company currently believes that such misstatements did not result in a material misstatement of the Company's previously issued financial statements.  However, the Company has not yet completed its assessment and, therefore, is **unable to affirmatively conclude at this time that the completion of such assessment will not result in a material misstatement of its previously issued financial statements** or that the out-of-period correction of such misstatement would not be material to the Company's financial results for the three and six months ended June 30, 2019 or forecasted 2019 financial results.  [Emphasis added.]

140.  On September 20, 2019, the Company filed its amended 2018 annual report on

Form 10K/A with the SEC.  This Form 10K/A stated the following about the Company's internal

controls:

Material Weaknesses

On August 8, 2019, the Company's management, in consultation with the Audit Committee of the Board of Directors, concluded that there were two material weaknesses related to internal control deficiencies that existed as of December 31, 2018 and that continued through the end of the second quarter of 2019. Specifically, the Company's management determined that the Company did not

design and maintain effective internal control over certain aspects of the existence and valuation of inventory:

• Management determined that controls were not effectively designed, documented, and maintained to verify that the existence of all inventories subject to our cycle count program were included and counted at the frequency required under the Company's internal policies, and that the key reports and related data used to monitor the results of this program were not validated to ensure completeness and accuracy.

• Management determined that controls were not effectively designed and maintained over the determination of the estimated reserve for excess and obsolete inventory including the review of significant inputs and assumptions used to determine our estimated excess and obsolete inventory reserve, and to ensure the completeness and accuracy of key reports and related data used in the calculation of this reserve.

Despite the existence of these material weaknesses, we believe that the consolidated financial statements included in the Original Filing present fairly, in all material respects, our financial position, results of operations, and cash flows for the periods presented, in conformity with accounting principles generally accepted in the United States of America.

141. On September 20, 2019, the Company also filed its quarterly report for the second quarter 2019 (ended June 30, 2019) on Form 10-Q with the SEC. This Form 10-Q confirmed the previously disclosed accounting and control issues, and quantified the amount of understated reserves that had been wrongfully excluded from the Company's previously reported first quarter 2019 financial results:

*Correction of Immaterial Misstatements.*

During the three months ended June 30, 2019, the Company determined that there was an immaterial misstatement of its excess and obsolete inventory reserves in its previously issued annual and interim financial statements. The Company corrected this misstatement by recognizing a $0.8 million out-of-period adjustment during the three months ended June 30, 2019, which increased its excess and obsolete inventory reserve and cost of goods sold for the period. For the six months ended June 30, 2019, the out-of-period adjustment was a cumulative $0.2 million reduction in its

excess and obsolete inventory reserve and cost of goods sold. In addition, the Company determined that a $1.0 million cash inflow related to an insurance recovery was incorrectly classified as a cash flow from operations instead of a cash flow from investing activities within the unaudited Condensed Consolidated Statement of Cash Flows for the three months ended March 31, 2019. The accompanying Unaudited Condensed Consolidated Statement of Cash Flows for the six months ended June 30, 2019 correctly reflects the $1.0 million insurance recovery as a cash inflow from investing activities. Management has determined that these misstatements were not material to any of its previously issued financial statements and that correction of the misstatements is also not material to the current or estimated annual 2019 financial results on both a quantitative and qualitative basis.

142.   While ADTRAN characterized the ultimate $800,000 adjustment to inventory reserves as to the Company's overall financial position, the adjustment had a significant impact on key metrics important to investors, such as operating income and earnings per share.  For example, in Q1 2019, the Company had operating income of only $770K and had an EPS of only $.03.  Had the Company properly accounted for E&O reserves, the Company would have been unprofitable and posted a negative EPS for Q1, the last quarter reported before the admission of material weakness and inability to file their financials on time.  This conclusion is further bolstered by ADTRAN's restated results for Q-2 2019, when the Company took the out of period adjustment.  In particular, ADTRAN reduced its previously reported operating income from $1.821 million to $562,000, or by nearly 70%, and decreased earnings per share from $0.11 to $0.08 (or 27%).

143.   On October 9, 2019, following the close of the market, the Company announced "preliminary" estimates of certain financial results for the third quarter ended September 30, 2019.  Specifically, the Company lowered its third quarter revenue and non-GAAP EPS estimates to $114mn and $0.06, respectively, from previous revenue guidance of $130mn-$150mn and consensus EPS at $0.03.  The Company further disclosed that it expected fourth

quarter 2019 revenues to be flat to slightly down sequentially.  The Company explained the reason for the release of the preliminary results and dismal outlook was that its "revenue this quarter has been significantly impacted by a pause in shipments to a Tier 1 customer in Latin America and the continued slowdown in the spending at an international Tier 1 customer," as well as a further slowdown in orders from Deutsche Telekom.  The press release announcing preliminary third quarter 2019 financial results, the Company stated, in relevant part:

> Based upon preliminary information, revenue for the quarter is expected to be approximately $114 million. Earnings per share for the quarter, assuming dilution, is expected to be a loss of approximately $0.96. Non-GAAP earnings per share for the quarter, assuming dilution, is expected to be a loss of approximately $0.06. Earnings per share is expected to be affected by a one-time, non-cash, valuation allowance of approximately $37 million, that will be recorded to income tax expense in the Company's consolidated income statement to reduce the carrying value of the Company's deferred tax assets.

> ADTRAN Chief Executive Officer Tom Stanton stated, "Our revenue this quarter has been significantly impacted by a pause in shipments to a Tier 1 customer in Latin America and the continued slowdown in the spending at an international Tier 1 customer. With the exception of these two large customers, revenues generated from the rest of our business grew 20% over the previous quarter. Although we expect our Latin American customer sales to rebound, our current visibility regarding timing is limited. For the international Tier 1 customer, we expect that sales should resume with the new capital cycle in 2020."

> Our current expectation for revenue for the fourth quarter of 2019, is that it will be flat to slightly down from the third quarter. Additionally, we plan for our non-GAAP operating expenses during the fourth quarter to be approximately 10% below our second quarter non-GAAP expense rate.

144.   Analysts immediately reacted to the Company's disclosure of the preliminary estimates.  For example, in an October 9, 2019 report, MKM Partners downgraded its rating of ADTRAN from "Buy" to "Neutral," stating "ADTN was already a show me story after 2Q19 earnings when it said DT spending was slowing for the back half of the year.  Now, with another

big downtick at another 10% customer, we think many investors may stay on the sidelines for longer."

145.    On this news, the Company's share price fell $2.10 per share, over 19%, to close at $8.81 per share on October 10, 2019, on unusually high trading volume.  Nevertheless, as explained in further detail below, the Company had not yet fully revealed the fraud and artificial inflation remained in ADTRAN's share price.

146.    On October 16, 2019, just two weeks before ADTRAN was scheduled to host an earnings call to discuss its anticipated disappointing third quarter 2019 financial results and address questions from market analysts, Defendant Shannon sold 6,200 ADTRAN shares, or about one-third his personally held shares, at $9.71 for total proceeds of $60,227.

147.    On October 31, 2019, the market learned the full extent of Defendants' fraud. After releasing third quarter financial results in line with its October 9, 2019 preliminary estimates, ADTRAN hosted an earnings call.  In response to analyst inquiry, Defendant Stanton provided further color on the reason for the pause in shipments to Telmex, noting that the downturn stemmed from a lack of visibility or insight into Telmex's ordering patterns and current inventory:

> There's still a little bit of cloud in us about and (*sic*) Latin America, there is a multi-year project going on and we expect that to continue on through next year at least.
>
> Our problem with that customer has been the variability in ordering pattern in inventory levels that of course plagued us this last quarter, but that doesn't at all change the trajectory of the program itself.
>
> . . .
>
> I have visibility to plans and so there are fairly vocal about what it is they are wanting to do on a macro level down to a number of ports. The visibility, where the visibility gets more difficult is timing of purchase orders. So they may draw down their inventory before they order. Sometimes they don't draw down their inventory before

the order, so it's not about the macro level on a kind of on a broader time basis. The issues we have with them are typically more around individual quarter by quarter plans.

148.    An analyst at Jeffries followed up on Stanton's commentary about the Latin American customer, noting "obviously, the step down was pretty significant from June to September."  In response, Stanton again referred to Telmex's inventory build-up and contract negotiations regarding installing and moving forward with Telmex's network build plan:

Latin America is similar big drop from Q2 to Q3 that is more about ordering inventory levels and contract negotiations and just for that customer. Then it is about any demand profile change at all. They are still absolutely going out and installed in these things and moving forward their network build plan.

149.    Analysts regarded the Company's disclosures as new and material information and were largely able to piece together the installation problem at the Telmex project.  For example, in November 1, 2019 report, analysts at Jeffries stated, "As with last quarter, management noted that they'll have a better view into DT's spending plans at some point during Q4 as they'll get a forecast for next year.  The Telmex situation is a bit more difficult to handicap.  Adtran noted that it's difficult to get insight into their ordering patterns and current inventory levels. ***It's likely they had built up an inventory of Adtran equipment***."

150.    In response to the truth regarding the problems at the Telmex project finally being revealed, ADTRAN's share price declined from a closing price of $9.58 on October 30, 2019, to a closing price of $8.81 on October 31, 2019 – a loss of $0.77 per share (more than 8%).

C.    **ADTRAN's Financial Statements Failed to Comply with GAAP**

151.    At all relevant times, Defendants represented that ADTRAN's financial statements were prepared and issued in conformity with GAAP, which are recognized by the accounting profession and the SEC as the set of conventions, rules and procedures which constitute the professional standards of the accounting profession.  Regulation S-X (17 C.F.R. §

- 53 -

210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading or inaccurate.

152.     These improper accounting practices and manipulations were in direct violation of GAAP and SEC rules, as described below, and resulted in materially overstated financial results for the quarter ended March 31, 2019.

153.     ADTRAN's press release announcing its Q2019 financial results, as well as the financial statements contained in its 1Q2019 Form 10-Q filed with the SEC contained financial information presented in a manner that violated GAAP, including the following principles:

a.      The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

b.      The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

c.      The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

d.      The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

e.      The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners

(stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

f.      The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

g.      The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

h.      The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

154.     In addition, ADTRAN's accounting and financial reporting for 1Q2019 violated ASC 450[12], which requires that a loss contingency associated with obsolete inventory "shall be accrued by a charge to income," thereby reducing earnings by an equal amount in the current period.  Such a charge shall be taken if: (i) [information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.  ASC 450-25-2.  Even if the loss cannot be considered "probable" as of the measurement date, GAAP requires that financial statements disclose contingencies when it is at least reasonably possible (i.e., anything greater than a slight chance) that a loss may have been incurred.  ASC 450-50-3.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made.  ASC 450-50-4.

---

[12] Accounting Standards Codification ("ASC") 450, *Contingencies*, Financial Accounting Standards Board.

155.    Indeed, ADTRAN's own reported accounting policies promised that inventory would be expensed in the period in which it becomes obsolete:

> Inventory
>
> Inventory is carried at the lower of cost and net realizable value, with cost being determined using the first-in, first-out method. Standard costs for material, labor and manufacturing overhead are used to value inventory. Standard costs are updated at least quarterly; therefore, inventory costs approximate actual costs at the end of each reporting period. We establish reserves for estimated excess, obsolete or unmarketable inventory equal to the difference between the cost of the inventory and the estimated fair value of the inventory based upon assumptions about future demand, market conditions and life. When we dispose of excess and obsolete inventories, the related disposals are charged against the inventory reserve.

156.    ADTRAN violated GAAP (ASC 450) and its own stated accounting policies by failing to write its obsolete inventory down to its fair market value as of March 31, 2019, thus understating reported E&O reserves and cost of goods sold and overstating income by approximately $1 million in its reported 1Q2019 financial results.

**D.    Loss Causation**

157.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

158.    Throughout the Class Period, as set forth above, the market price of ADTRAN securities was inflated by the material omissions and false and misleading statements made by the Company and the Individual Defendants, which were widely disseminated to the securities markets, investment analysts and the investing public.  The false and misleading statements materially misrepresented to the market the Company's financial results and future prospects, and caused ADTRAN securities to trade at prices in excess of their true value.

- 56 -

159.    As a result, Lead Plaintiffs purchased ADTRAN securities at artificially inflated prices.  When the truth about ADTRAN's financial results and prospects was revealed to the market through several partial disclosures, the price of ADTRAN securities declined in response, as the artificial inflation caused by Defendants' misrepresentations and omissions was removed from the price of ADTRAN securities, thereby causing substantial damages to the Lead Plaintiffs and the Class.

160.    Immediately prior to the Class Period, ADTRAN shares closed trading at $14.58 per share on February 12, 2019.

161.    With the market unaware of ADTRAN's undisclosed material weaknesses in internal control, ADTRAN continued trading in a range between $13.58 and $15.30, closing trading at $14.08 per share on April 17, 2019.

162.    When ADTRAN announced its materially false financial results for 1Q2019 after the close of business on April 17, 2019, its shares closed trading the next day on April 18, 2019, at $16.05 – a gain of approximately 14%.

163.    With the market unaware of the falsity of the 1Q2019 reported financial results or the undisclosed weaknesses in ADTRAN's internal controls, the Company's stock continued to close trading each day between April 22, 2019 and July 17, 2019 between $14.78 and $17.20 per share, closing trading at $15.39 on July 17, 2019.

164.    After the close of trading on July 17, 2019, ADTRAN announced financial results for the quarter ended June 30, 2019, but cautioned that these strong reported results were only "preliminary" because the Company was investigating possible weaknesses in its accounting controls that may have led to a misstatement of inventory reserves in previously reported accounting periods.  Additionally, the Company disclosed on a July 18, 2019 conference call that

- 57 -

estimated third quarter 2019 revenues had been adjusted down in the range of $130 million to $150 million due to "a temporary slowdown in capital spending for access at a Tier 1 European carrier customer," which analysts immediately identified as Deutsche Telekom.  These disturbing disclosures caused ADTRAN shares to drop significantly to close at $11.80 on July 18, 2019. – **a loss of more than 23% from the closing price of $15.39 on July 17, 2019.**

165.    After the close of trading on July 18, 2019, analysts published reports providing new and material information concerning the implications of the Company's recent financial results, outlook and disclosures, including challenging Defendants' statements regarding Telmex's purported demand for ADTRAN's products.  These disclosures caused the Company's share price to fall $0.60 per share, or 5%, to close at $11.53 per share on July 19, 2019.

166.   ADTRAN shares continued trading in a range between $9.90 and $11.47 for the next three months, closing trading at $10.70 on October 9, 2019.  Following the close of trading on October 9, 2019, ADTRAN disclosed disappointing "preliminary" estimated earnings for the third quarter of 2019, including that "revenue for the quarter is expected to be approximately $114 million."  The Company stated that "[o]ur revenue this quarter has been significantly impacted by a pause in shipments to a Tier 1 customer in Latin America and the continued slowdown in the spending at an international Tier 1 customer."  The Company further disclosed reduced projected fourth quarter 2019 revenue, stating "[o]ur current expectation for revenue for the fourth quarter of 2019, is that it will be flat to slightly down from the third quarter."  In response, ADTRAN shares dropped significantly to close trading at $8.64 on October 10, 2019 – a loss of $2.06 (19.25%) from the previous day's closing price.

167.    ADTRAN shares continued to trade at a similar price the next few weeks, closing trading each day at prices between $8.86 per share and $9.31 per share, closing trading at $9.39 per share on October 30, 2019.

168.    On October 31, 2019, ADTRAN hosted an earnings call for the third quarter of 2019, and provided the true reason for the pause in shipments to Telmex, including Telmex's build-up of ADTRAN inventory and contract negotiations stemming from their installation.  In response, ADTRAN shares dropped $0.77 per share to close trading at $8.881 per share on October 31, 2019 – a decline of more than 8.0%.

E.    **Additional Scienter Allegations**

169.    Numerous facts, in addition to those set forth above, give rise to a strong inference that Defendants knew, or were deliberately reckless in not knowing, that their inventory accounting for ADTRAN and statements about ADTRAN's relationship with its major Tier 1 international customers were false and misleading or omitted material facts necessary to make them not misleading when made.  Such facts include, but are not limited to, the following.

170.    ***Defendants' admissions to their colleagues regarding the inadequacy of ADTRAN's inventory accounting systems support of a strong inference of scienter***.  The Executive Defendants admitted the deficiencies in ADTRAN's inventory accounting systems to subordinates well in advance of publicly disclosing the internal control deficiencies.  For example, in 2017 or 2018, Defendant Stanton met with the members in the pricing group and the pricing manager at Company headquarters, during which Defendant Stanton discussed the need to update the Baan system and how it had been something the Company needed to do for a while.  Defendant Stanton further admitted to the group that ADTRAN had solicited bids from a few different companies and would evaluate which one to select.  Nevertheless, Defendants never upgraded the Baan system due to financial reasons.

171. ***Defendants took undisclosed steps that show their knowledge of the significant deficiencies in ADTRAN's inventory accounting systems***.  At the same time Defendants were affirming the accuracy of their reported inventory amounts and the adequacy of internal controls over financial reporting, the Company was secretly working for years to obtain a new inventory accounting system to replace the defective Baan platform.  In particular, in or around 2017 or 2018, Defendant Stanton had created a task force, which included CW1's supervisor, to help Defendant Stanton determine the best ERP system to use.  Indeed, ADTRAN had solicited bids from a few different companies and would evaluate which one to choose.  Moreover, unbeknownst to investors, the Company bought a new system, which cost in excess of $1 million, but it was later determined to be "woefully inadequate" to handle ADTRAN's needs.  Specifically, the Company halted implementing it when they saw how it would not work and went back to the old Baan system.

172. ***The significant deficiencies in ADTRAN's inventory accounting system was widely known at ADTRAN and its adverse implications were apparent***.  It was widely agreed among ADTRAN employees that ADTRAN was using an outdated inventory system, which "basically had been around before email started."  ADTRAN's software to track its inventory, called Baan, was widely known by company employees to be "ancient."  Indeed, ADTRAN staff would try to update their systems and create workarounds to get the information they needed from the system, but that the Baan software was clunky and unreliable.  According to numerous former employees, there was talk around ADTRAN about a need to replace Baan and promises from managers that the Company planned to replace Baan.  As a result of the deficient inventory controls, excess old and obsolete inventory littered ADTRAN corporate headquarters everywhere one looked, including old routers, switches and other hardware that were used as

monitor stands, used to prop up other equipment, stacked in corners, and filled cabinets and shelves.

173.    ***The fundamental inventory accounting principle at issue is straightforward and was known by Defendants***.  As explained in detail above, the fundamental accounting principle at issue in this case is a straightforward GAAP principle and a represented accounting policy of ADTRAN.  Further, Defendants Stanton, Shannon, and Foliano have decades of professional experience in accounting and finance and would understand this concept.  Moreover, ADTRAN employed many other experts and highly qualified personnel in accounting and finance whose knowledge and experience they could readily draw upon.

174.    ***Defendants themselves affirmed ADTRAN's internal control over financial reporting and signed SOX certifications***.  In ADTRAN's 2018 annual report on Form 10-K, along with each Form 10-Q filed during the Class Period, the Executive Defendants represented that: (i) they were responsible for establishing and maintaining adequate internal control over financial reporting; (ii) they had conducted an evaluation of the effectiveness of ADTRAN's financial reporting; and (iii) they had concluded that ADTRAN's internal controls over financial reporting were effective at the reasonable assurance level throughout the Class Period. Moreover, in their certifications pursuant to SOX Sections 302 and 906, submitted with the Company's 2018 annual report on Form 10-K, along with each Form 10-Q filed during the Class Period, Defendants represented that (i) they had reviewed the Company's respective filings; (ii) the reports did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; (iii) the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows" of ADTRAN; and (iv) the "information contained in the Report fairly presents, in all material

respects, the financial condition and results of operations of the Company."  These types of

public comments – through which Defendants held themselves out as knowledgeable on these

subjects – further support a strong inference of Defendants' scienter.

175.    ***ADTRAN's unremedied deficiencies in its internal controls over financial***

***reporting with respect to inventory persists.***  As noted above, on August 12, 2019, Defendants

admitted that on August 8, 2019, the Company's management, in consultation with the Audit

Committee of the Board of Directors, concluded that there were two material weaknesses related

to internal control deficiencies that existed as of December 31, 2018, and that continued through

the end of the second quarter of 2019.  Since this time, Defendants have consistently represented

in its public filings that management has been working to further strengthen the Company's

internal controls relating to inventory, including redesigning, enhancing and adding certain

controls and procedures related to the review of significant inputs and assumptions used to

determine the Company's excess and obsolete inventory reserve, and to ensure the completeness

and accuracy of key reports and related data used in the calculation of the excess and obsolete

inventory reserve.  Nevertheless, in ADTRAN's subsequent quarterly filings and Annual Report

covering the period through December 31, 2019, Defendants have admitted that implementation

of these measures remain ongoing and that management concluded that, as of December 31,

2019, ADTRAN's controls related to the Company's excess and obsolete inventory reserve were

not effectively designed and maintained, and the material weakness related to these controls

continued to exist.

176.    Executives of public companies committed to accurate financials do not allow

material weaknesses in internal controls to exist, let alone remain unremediated for at least eight

consecutive quarters.  The Executive Defendants' failure to institute effective internal controls

prior to, during, and beyond the Class Period and to allow a material weakness to persist for eight straight quarters further strengthens the inference that Defendants knew, or were deliberately reckless in not knowing, of their misstatements and omissions.

177.   ***Defendants were informed at a face-to-face meetings with the problems impacting the Telmex project.***  Defendant Stanton met personally with Telmex officials to discuss the project installation issues sometime in between spring and July 2019.  ADTRAN prepared at least two months in advance of this meeting.

178.   ***Defendants' direct and extensive involvement in the negotiations and managing of the Major International Tier 1 Customer Projects***.  Defendant Stanton kept updated on all aspects of the work for the Tier 1 customers.  Defendant Stanton maintained relationships with the representatives of the Tier 1 customers such that they would call Defendant Stanton directly on his cell phone.  In addition, Stanton participated in regular calls with customer representatives.  Defendant Stanton would also regularly call ADTRAN sales/customers to ask how things were going on the project and asked them to call and report to him about any calls he had with the customer representatives.

179.   ***Defendants took undisclosed steps that show their knowledge of the significant installation delays and problems at the Telmex project***.  During the first half of 2019, Telmex reported that ADTRAN products were failing in the field.  Instead of losing one subscriber, Telmex would lose all that were connected to the box, which would be 192 subscribers. ADTRAN independently analyzed the problem and realized that Telmex's third-party installation workers were installing them incorrectly and not grounding the hardware such that when electrical storms passed through the area, the equipment was ruined.  Telmex executives agreed with ADTRAN's research that supported the assertion that the hardware had been

installed incorrectly.  As a result of these discussions, ADTRAN set up a training session for those installing the work in Guadalajara, Mexico so that the equipment would be properly installed.

180.    ***It is absurd to suggest that Defendants were not aware of the problems impacting their Major Tier 1 International Customers because these projects affected ADTRAN's core operations***.  Throughout the Class Period, ADTRAN repeatedly identified Deutsche Telekom and Telmex as customers that individually contributed more than 10% of the Company's quarterly revenues.  Thus, the problems impacting ADTRAN's relationship with these customers were so prominent to the Company's business, financial performance and prospect that it is not plausible that Defendants did not know about the problems impacting these integral clients when making the alleged misrepresentations and omissions.

181.    ***Defendants' false denials in response to analyst questions***.  In response to analyst inquiry, Defendants refuted any suggestion that demand from these customers were declining.  Such false denials, in response to pointed analyst commentary, are further evidence of scienter.

182.    ***Defendant Shannon's insider sales during the Class Period were unusual and suspicious in both timing and amount***.  While in possession of material non-public information regarding ADTRAN's reported financial condition, internal accounting control system and relationships with important European and Latin American Tier 1 customers, Defendant Shannon sold his personal shares.  In particular, on April 23, 2019, Defendant Shannon sold 5,701 shares at the price of $17.65 per share for total proceeds of $100,597.  This transaction represented the sale of 23.1% of his total holdings as of that date.  The sale was made only several days after the Company had delivered positive financial results, which were artificially enhanced due to

Defendants inaccurate inventory accounting, but in the midst of the quarter during which Defendants were conducting an investigation assessing the reasonableness of ADTRAN's E&O reserves and inventory related internal control deficiencies.  Similarly, on October 16, 2019, Defendant Shannon sold 6,200 shares at the price of $9.71 per share for total proceeds of $60,227.42.  This transaction represented the sale of 32.6% of his total holdings as of that date. The sale was made just two weeks before the Company would ultimately disclose the true reasons for the pause in shipments to its Tier 1 Latin American customer Telmex.

183.    These sales are further suspicious in terms of amount and timing when compared with Defendant Shannon's stock transactions during a period of similar length.  Indeed, according to SEC records, between April 2015 up to the alleged sale on April 23, 2019, Defendant Shannon had made no sales of his personally held stock.

184.    ***The temporal proximity between Defendants' false statements and omissions and revelations of the truth supports an inference of scienter***.  In mid-April, 2019, ADTRAN announced its financial results for the first quarter of 2019 through SEC filings and an earning call with investors.  These communications to investors: (i) contained false and misleading statements concerning the Company's reported inventory; (ii) falsely stated that the Company's internal control over financial reporting were effective; and (iii) misrepresented and omitted to disclose material facts adversely impacting the Company's business prospects with its major international Tier 1 customers, Deutsche Telekom and Telmex.  Defendants would later go on to tout Deutsche Telekom's and Telmex's strong demand for ADTRAN's products at an industry conference in May 2019.  Just months later, in mid-July 2018, however, the truth started to emerge when ADTRAN disclosed: (i) the existence of an ongoing assessment of the reasonableness of its E&O reserves and inventory related internal control deficiencies, which

010865-11/1260990 V1

may result in the identification of material weaknesses; and (ii) a steep reduction in estimated revenues in the third quarter of 2019 given "the effect of a temporary slowdown in capital spending for access at a Tier 1 European carrier customer."  The close temporal proximity between the above-referenced Spring 2019 false statements and the July 2019 disclosure supports a strong inference of Defendants' scienter.

185.    ***Defendants repeatedly spoke on the subject matters misrepresented***.  The Executive Defendants made repeated statements to investors about ADTRAN's inventory accounting, internal control over financial reporting, and relationship with its major Tier 1 international customers throughout the Class Period in a multitude of SEC filings signed by and/or approved by the Executive Defendants, as well as on earnings calls. Having spoken on these subjects so many times, the Executive Defendants knew, or were deliberately reckless in not knowing, that the statements about ADTRAN's inventory accounting, internal control over financial reporting, and relationship with its major Tier 1 international customers were false and misleading and omitted material information.

## IV.    APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

186.    At all relevant times, the market for ADTRAN common stock was an efficient market for the following reasons, among others:

(a)    ADTRAN common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, ADTRAN filed periodic public reports with the SEC and the NASDAQ;

(c)    ADTRAN regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     ADTRAN was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

187.    As a result of the foregoing, the market for ADTRAN common stock promptly digested current information regarding ADTRAN from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of ADTRAN securities during the Class Period suffered similar injury through their purchase of ADTRAN common stock at artificially inflated prices and/or their purchase of ADTRAN call options or sale of ADTRAN put options at prices tied to the artificially inflated price of ADTRAN's common stock, and a presumption of reliance applies.

## V.     NO SAFE HARBOR

188.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of ADTRAN who knew that those statements were false when made.

## VI.    CLASS ACTION ALLEGATIONS

189.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased securities issued by ADTRAN between February 28, 2019 and October 31, 2019, inclusive (the "Class Period"), and who suffered losses as a result of these purchases (the "Class").  Excluded from the Class are Defendants, the officers and directors of ADTRAN, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

190.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ADTRAN common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ADTRAN or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

191.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

192.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

- 68 -

193.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of ADTRAN;

(c)   whether the price of ADTRAN securities was artificially inflated during the Class Period; and

(d)   to what extent the members of the Class have sustained damages and the proper measure of damages.

194.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.   CLAIMS BROUGHT UNDER THE EXCHANGE ACT

### COUNT I

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

195.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

- 69 -

196.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase ADTRAN's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

197.     Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for ADTRAN's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

198.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about ADTRAN's financial well-being and prospects, as specified herein.

199.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ADTRAN's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state

material facts necessary in order to make the statements made about ADTRAN and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

200.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

201.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ADTRAN's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by

- 71 -

Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

202.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ADTRAN securities.  Plaintiffs and the Class would not have purchased ADTRAN securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

203.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of ADTRAN securities during the Class Period.

204.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

205.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206.    The Individual Defendants acted as controlling persons of ADTRAN within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of ADTRAN, and their ownership of ADTRAN stock, the Individual Defendants had the power and authority to cause ADTRAN to engage in the wrongful conduct

complained of herein, and did, in fact, influence and control, directly or indirectly, the decision-making of the Company.  Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.  The Individual Defendants also had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## VIII.      PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## IX.     JURY DEMAND

Plaintiffs hereby demand a trial by jury.

010865-11/1260990 V1

DATED:  April 30, 2020                    Respectfully submitted,

                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**


                                          By: /s/ Lucas E. Gilmore
                                                Lucas E. Gilmore (Admitted *Pro Hac Vice*)
                                          Reed R. Kathrein (Admitted *Pro Hac Vice*)
                                          715 Hearst Avenue, Suite 202
                                          Berkeley, CA  94710
                                          Telephone: (510) 725-3000
                                          Facsimile: (510) 725-3001
                                          reed@hbsslaw.com
                                          lucasg@hbsslaw.com


                                          Robert V. Prongay (Admitted *Pro Hac Vice*)
                                          Ex Kano S. Sams II (Admitted *Pro Hac Vice*)
                                          Charles H. Linehan (Admitted *Pro Hac Vice*)
                                          Casey E. Sadler (Admitted *Pro Hac Vice*)
                                          Kevin F. Ruf (Admitted *Pro Hac Vice*)
                                          **GLANCY PRONGAY & MURRAY LLP**
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, CA  90067
                                          Telephone: (310) 201-9150
                                          Facsimile: (310) 201-9160
                                          rprongay@glancylaw.com
                                          esams@glancylaw.com
                                          clinehan@glancylaw.com
                                          csadler@glancylaw.com
                                          kruf@glancylaw.com

                                          Co-Lead Counsel for the Class

                                          Patrick C. Cooper
                                          James S. Ward
                                          **WARD & COOPER, LLC**
                                          2100 Southbridge Parkway, Suite 645
                                          Birmingham, AL 35209
                                          Telephone: 205-871-5404
                                          Fax: 205-871-5758
                                          patrickcooper@yahoo.com
                                          jward@wardcooperlaw.com

                                          Liaison Counsel for Counsel for the Class

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

/s/ Lucas E. Gilmore
Lucas E. Gilmore

010865-11/1260990 V1