FILED

2020 Jul-17  PM 02:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| MICHAEL BURBRIDGE, Individually and On Behalf of All Others Similarly Situated, <br><br>             Plaintiff, <br><br> v. <br><br> ADTRAN INC., THOMAS R. STANTON, MICHAEL FOLIANO, and ROGER D. SHANNON, <br><br>             Defendants. | Case No. 5:20-cv-00050-LCB <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

616790.1

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.   STATEMENT OF FACTS ....................................................................3

III.  ARGUMENT ........................................................................................8

    A.    Defendants Made Materially False and Misleading Statements ...........9

        1.    Defendants Published False Financial Results ...........................9

        2.    Defendants Misrepresented the Company's Internal Controls .12

        3.    Defendants Made False Statements Concerning Key Customers ....................................................................................13

        4.    The Safe Harbor Provision Does Not Immunize Defendants' Misrepresentations ...................................................................15

        5.    Defendants' Other Falsity Arguments Are Meritless ...............18

    B.    Plaintiffs Adequately Allege that Defendants Acted with Scienter ....20

        1.    Defendants' Hands-On Management Style and Access to Information That Contradicted Their Public Statements Support a Strong Inference of Scienter....................................................21

        2.    The Content and Context of Defendants' Misrepresentations Support a Strong Inference of Scienter....................................22

        3.    The Confidential Witnesses Support a Strong Inference of Scienter......................................................................................23

        4.    Defendants' Admissions Bolster the Strong Inference of Scienter Alleged......................................................................24

        5.    The Company's GAAP Violations Support a Strong Inference of Scienter ..............................................................................24

6.      Defendants' SOX Certifications Support a Strong Inference of Scienter........................................................................25

7.      Because the Issues Alleged Affect the Company's Core Operations, a Strong Inference of Scienter is Alleged .............26

8.      Defendant Shannon's Insider Sales Support a Strong Inference of Scienter .................................................................26

C.      Plaintiffs Adequately Allege Loss Causation ....................................28

IV.    CONCLUSION...........................................................................................30

# TABLE OF AUTHORITIES

<u>CASES</u>

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)........................................................................ 12, 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................................... 8

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)....................................................................................... 30

*Batwin v. Occam Networks, Inc.*,
   2008 WL 2676364 (C.D. Cal. July 1, 2008) ................................................. 27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................... 8

*Blue v. Doral Fin. Corp.*,
   123 F. Supp. 3d 236 (D.P.R. 2015) ............................................................... 12

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ....................................................................... 9

*Bryant v. Dupree*,
   252 F.3d 1161 (11th Cir. 2001) ..................................................................... 30

*Carpenters Health & Welfare Fund of Philadelphia v. Coca-Cola Co.*,
   2002 WL 34089163 (N.D. Ga. Aug. 20, 2002)......................................... 24, 27

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) ..................................................................... 16

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 23, 2013)................................................ 17

*City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*,
   41 F. Supp. 3d 1369 (S.D. Fla. 2011) .................................................................. 21

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................................. 28

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
   594 F.3d 783 (11th Cir. 2010) ............................................................................. 25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804, (2011) ............................................................................................ 29

*FindWhat Inv'r Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ................................................................ 15, 20, 29

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wisc. 2003) .............................................................. 19

*Gross v. Medaphis Corp.*,
   977 F. Supp. 1463 (N.D. Ga. 1997) ...................................................................... 15

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010) ................................................................... 15

*In re CV Therapeutics, Inc.*,
   2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ....................................................... 18

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) .................................................................. 25

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006) ..................................................................... 27

*In re Flowers Foods, Inc. Sec. Litig.*,
   2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ................................................ 23, 26

*In re HD Supply Holdings, Inc. Sec. Litig.*,
   341 F. Supp. 3d 1342 (N.D. Ga. 2018) ........................................... 18, 21, 27, 30

*In re HomeBanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010).................................................................... 23

*In re Illumina, Inc. Sec. Litig.*,
2018 WL 500990 (S.D. Cal. Jan. 22, 2018) ........................................................ 17

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008)................................................................ 12

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................... 25

*In re Netbank, Inc. Sec. Litig.*,
2009 WL 2432359 (N.D. Ga. Jan. 29, 2009) ........................................... 18, 23, 26

*In re Paincare Holdings Sec. Litig.*,
541 F. Supp. 2d 1283 (M.D. Fla. 2008) ............................................................... 28

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
No. C 99-00109 SBA, 2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ............... 17

*In re STEC Inc. Sec. Litig.*,
2011 WL 2669217 (C.D. Cal. June 17, 2011)...................................................... 17

*In re: Ebix, Inc. Sec. Litig.*,
898 F. Supp. 2d 1325 (N.D. Ga. 2012)........................................................... 13, 28

*Institutional Investors Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ................................................................................ 22

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-CV-02393-MGL,
2016 WL 3981236 (D.S.C. July 25, 2016)........................................................... 23

*Keippel v. Health Ins. Innovations, Inc.*,
2019 WL 5698329 (M.D. Fla. Nov. 4, 2019)....................................................... 18

*Lehocky v. Tidel Techs., Inc.*,
220 F.R.D. 491 (S.D. Tex. 2004) ........................................................................ 29

*Litwin v. Blackstone Group, L.P.*,
  634 F.3d 706 (2d Cir. 2011) ................................................................ 11

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin.
  Corp.*,
  2011 WL 12855820 (N.D. Ala. June 7, 2011) .................................. 18, 19, 24, 25

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................ 16, 21

*Luczak v. Nat'l Beverage Corp.*,
  2020 WL 2111947 (11th Cir. May 4, 2020) ................................................. Passim

*Masel v. Villarreal*,
  924 F.3d 734 (5th Cir. 2019) ................................................................ 24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ............................................................................ 10, 21

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
  2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) ......................................... 13, 14, 15

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ............................................................. 29

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ............................................................. 26

*Monroe Cty. Employees' Ret. Sys. v. S. Co.*, No. 1:17-CV-241-MHC,
  2018 WL 1558577 (N.D. Ga. Mar. 29, 2018) .......................................... 19

*New Orleans Employees Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ............................................................. 10

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding
  Corp.*,
  320 F.3d 920 (9th Cir. 2003) ................................................................ 27

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................ 10

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..................................................................................... 19

*Palazzolo v. Fiat Chrysler Automobiles N.V.*,
  2017 WL 6389573 (E.D. Mich. Dec. 14, 2017) ..................................................... 11

*Plymouth Cty. Ret. Sys. v. Carter's Inc.*,
  No. 1:08-CV-02940-JOF, 2011 WL 13124501 (N.D. Ga. Mar. 17, 2011).......... 29

*Pritchard v. Apyx Med. Corp.*,
  2020 WL 1180731 (M.D. Fla. Mar. 11, 2020) ............................................... 18, 30

*Robbins v. Koger Properties, Inc.*,
  116 F.3d 1441 (11th Cir. 1997) .............................................................. 29

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
  2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ..................................................... 25

*Rougier v. Applied Optoelectronics, Inc*,
  2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) ..................................................... 27

*Schultz v. Applica Inc.*,
  488 F. Supp. 2d 1219 (S.D. Fla. 2007)........................................................ 21, 25

*SEB Inv. Mgmt. AB v. Symantec Corp.*, No. C,
  2019 WL 4859099 (N.D. Cal. Oct. 2, 2019) ..................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................... 8, 20, 21, 28

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)........................................................................ 11

*Tung v. Dycom Indus., Inc.*,
  2020 WL 1865765 (S.D. Fla. Apr. 14, 2020).............................................. 17, 23

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
  672 F. Supp. 2d 596 (S.D.N.Y. 2009) ............................................................... 10

## STATUTES

15 U.S.C. §78u-4(b)(1)(B) ........................................................................................ 9

15 U.S.C. §78u-4(b)(2) ........................................................................................... 20

15 U.S.C. §78u-4(b)(4) ........................................................................................... 28

15 U.S.C. §78u–5(c)(1)(B)(i) .................................................................................. 18

## I.    INTRODUCTION

This securities class action arises from Defendants' material misrepresentations and omissions about ADTRAN's accounting for excess and obsolete ("E&O") inventory, the effectiveness of the Company's internal controls over financial reporting, and ADTRAN's relationship with its most important Tier 1 international telecommunication clients, Deutsche Telekom and Telmex.[1]

Between February 13, 2019 and October 31, 2019 ("Class Period"), Defendants confirmed ADTRAN's compliance with its stated inventory accounting policies and affirmed the effectiveness of its internal controls over financial reporting.   In reality, however, material deficiencies existed in ADTRAN's inventory accounting systems and processes.   Specifically, ADTRAN relied on an "ancient" inventory accounting system referred to as "Baan," which was outdated and obsolete.   As a result, ADTRAN struggled with documenting and verifying the existence of all inventories, which resulted in ADTRAN understating its E&O inventory reserve and overstating important financial metrics such as net income and earnings per share ("EPS").   In addition, contrary to Defendants' claims of receiving "very clear and strong" demand from its key customers, Deutsche Telekom in fact planned to dramatically reduce capital expenditures and the Telmex project was

---

[1]    Defendants are: (1) ADTRAN, Inc. ("ADTRAN" or the "Company"); (2) Chief Executive Officer ("CEO") Thomas R. Stanton ("Stanton"); (3) Michael Foliano, Senior Vice President ("SVP") of Finance/Chief Financial Officer ("CFO") since March 2019; and (4) Roger D. Shannon ("Shannon"), CFO and SVP from November 2015 to March 2019.

plagued by severe delays and problems.  Thus, ADTRAN's financial performance and outlook would be materially impacted.  When Defendants ultimately disclosed these adverse facts that corrected Defendants' prior misrepresentations and omissions, ADTRAN's share price collapsed 50% from its Class Period high, eliminating $430 million in market capitalization.

Years before the Class Period, Defendants knew about ADTRAN's faulty inventory accounting systems.  Indeed, CEO Stanton admitted to colleagues that ADTRAN's inventory accounting system was inadequate.  But Defendants chose not to replace ADTRAN's inventory systems to reduce the Company's capital costs and maintain ADTRAN's inflated share price.  Defendants also knew of the problems at the Telmex project through both internal updates and reports detailing massive product failures, installation delays, and a colossal buildup in inventory that ultimately halted shipments.  In fact, CEO Stanton met personally with Telmex officials in Mexico to discuss the installation issues between spring and July 2019.  Defendants also knew, and had access to, Deutsche Telkom forecasts of its 2019 planned spending that contradicted Defendants' public statements.

Rather than confront Plaintiffs' allegations, Defendants' Motion to Dismiss ("Motion") mischaracterizes their own misrepresentations as inactionable forward-looking statements or corporate fluff.  But Defendants' statements were of current or historical fact and verifiably false.  And, Defendants' generic warnings did

616790.1                                   2

nothing to inform investors that purported risks relating to ADTRAN's inventory accounting systems and key customers had already materialized. Similarly, in challenging scienter, Defendants ignore key allegations from confidential witnesses ("CWs") and attempt to offer an improper counter-factual narrative. Accepting Plaintiffs' well-pled allegations as true, and considering Plaintiffs' scienter allegations holistically, the Complaint creates a strong inference of scienter. Finally, Plaintiffs have adequately alleged loss causation by providing Defendants with an indication of the loss and the causal connection between Defendants' misrepresentations and Plaintiffs' losses. Nothing more is required.

## II.   STATEMENT OF FACTS

ADTRAN is a telecommunications equipment provider. ¶25.[2] Over the past decade, the Company experienced a significant decline in revenue due to the loss of business from American Tier 1 clients. ¶¶45, 53-57. In turn, ADTRAN became a more global company and positioned itself as a low-cost provider. ¶¶49, 58. To support customer demand, ADTRAN had to maintain substantial inventories of raw materials and finished goods. ¶51. This model increased the risk of having E&O inventory that was unsalable, which would have an adverse effect on ADTRAN's operating results. *Id*. To account for E&O inventory, the Company purportedly

---

[2]   Unless otherwise indicated, all paragraph ("¶") references are to Plaintiffs' Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Complaint"), all emphasis is added, and all internal citations and quotations are omitted.

established reserves equal to the difference between the cost of inventory and the estimated fair value of the inventory.  ¶52.

Deutsche Telekom and Telmex are among ADTRAN's most important clients, repeatedly individually contributing more than 10% of ADTRAN's quarterly revenue.  ¶¶59-64.  However, projects at these international carriers offered low margins.  ¶64.  These factors, combined with recent acquisitions, caused ADTRAN to operate at a significant loss in 2018. ¶65.  Thus, ADTRAN's return to profitability depended on effective inventory controls and project execution.  ¶3.

Unbeknownst to investors, ADTRAN's internal controls were ineffective. ¶¶66-75.  ADTRAN relied on an "ancient" inventory system internally referred to as "Baan."  *Id*.  Baan was so defective that the Company's staff had to create their own workarounds to the system.  ¶67.  As a result, ADTRAN struggled with documenting and verifying the existence of all inventories.  *Id*.  Key reports and related data were incomplete and inputs and assumptions used to determine E&O inventory reserve were inaccurate.  *Id*.  Consequently, Defendants understated ADTRAN's E&O reserves and overstated important financial metrics dependent upon the E&O reserves, including net income and EPS.  *Id*.

Defendants knew about ADTRAN's unreliable inventory accounting system. ¶¶76-85.  According to CWs, E&O inventory was littered across ADTRAN's headquarters.  ¶74.  Company employees considered Baan to be "ancient" and

widely discussed the need to upgrade. ¶¶66-70. In fact, CEO Stanton admitted at meetings that ADTRAN's inventory accounting system was inadequate, commissioned a task force to replace Baan, and elicited bids from software firms for a replacement system. ¶¶71-73. Defendants, however, elected not to replace Baan since the cost would adversely impact earnings. ¶¶67, 70, 73. Despite this knowledge, Defendants repeatedly confirmed ADTRAN's compliance with its stated inventory accounting policy. ¶6. Defendants further quantified ADTRAN's E&O reserves and confirmed the accuracy of reported financial performance. *Id.* Defendants also falsely attested to the effectiveness of the Company's internal controls over financial reporting. ¶¶6, 106, 174.

Separately, Defendants misrepresented and concealed material facts about Deutsche Telekom and Telmex. ¶¶7-9, 76-99. Based on Deutsche Telekom's very public participation in an expensive auction-bidding process in Q1 2019, Defendants knew that Deutsche Telekom intended to significantly decrease its capital expenditure for ADTRAN products until at least 2020. ¶¶76-79. Indeed, Defendants admitted to receiving Deutsche Telekom spending forecasts at the end of 2018, which according to a CW, would have revealed spending disruptions. ¶¶77, 85.

In addition, Defendants knew of severe problems plaguing the Telmex project, including severe delays in product installations and improper installations that led to damaged products and massive product failures. ¶¶90, 92. These issues

caused a buildup of excess ADTRAN inventory and ultimately resulted in Telmex pausing shipments of ADTRAN goods. ¶99. Defendants were aware of these problems through both internal updates and reports from Telmex. ¶¶91, 94-96. In fact, CEO Stanton met personally with Telmex officials for a meeting to discuss the project installation issues between spring and July 2019, for which ADTRAN prepared for at least two months in advance. ¶97. As a result of these discussions, ADTRAN set up a training session for those installing the work so that the equipment would be properly installed. ¶98. However, the repair of the products ruined in electrical storms further delayed the installation timeline, causing a halt in shipments in summer 2019. *Id.*

Despite this knowledge, Defendants assured investors that the Company's rosy guidance projecting strong revenue growth was justified given Deutsche Telekom's and Telmex's "very clear and strong plans" confirming their intent "to increase their broadband" with ADTRAN's products throughout 2019. ¶114. Defendants falsely claimed that Deutsche Telekom would continue its spending on existing ADTRAN projects and that business in the European region would "be consistent with where we were last year." ¶101. In fact, in response to analyst skepticism, Defendants refuted that there would be "a traditional kind of falloff in 3Q from [ADTRAN's] European customers," and instead claimed there would be an "uptick." ¶¶116-17. Similarly, Defendants falsely represented that "[Telmex]

616790.1                                6

ha[d] shared with us their plans. And right now, we're expecting kind of solid strength through the year with that customer." ¶113.

The market learned the truth through a series of disclosures beginning on July 17, 2019, when ADTRAN disclosed it was investigating the reasonableness of its E&O reserve reporting and inventory-related internal controls. ¶¶11-14; 129-38. The same day, the Company disclosed disappointing 3Q revenue guidance attributed to a "temporary slowdown in capital spending for access at a Tier 1 European carrier customer," which analysts identified as Deutsche Telekom. *Id.* Nevertheless, Defendants attempted to mitigate investors' concerns by touting the continued perceived demand from Telmex. ¶132. In response to this alarming news, ADTRAN's share price dropped more than 23%. *Id.* Over the next two trading days, the stock-price decline continued. ¶¶135-36.

In August and September 2019, ADTRAN admitted that it had a material weakness in its internal controls over its valuation and existence of inventory that led to the overstatement of its Q1 2019 financial results. ¶¶15, 139-142. On October 9, 2019, ADTRAN announced that revenue for the quarter was only expected to be $119 million, after guiding for $130-$150 million in July 2019. ¶¶16, 143-45. In addition to the continued spending slowdown at Deutsche Telekom, the Company attributed the sales miss to a pause in shipments to Telmex. *Id.* Overall, the Company's international business dropped from $81 million to $31 million quarter-

616790.1

7

over-quarter, ADTRAN's worst international top-line performance since June 2016. *Id.* On this news, the Company's share price fell over 19%. *Id.* Finally, on October 31, 2019, the Company admitted that Telmex paused shipments based on a build-up of inventory and that the parties were engaged in negotiations regarding the build-out of ADTRAN products. ¶¶17, 147-50. On this news, ADTRAN shares declined more than 8%. *Id.* All told, ADTRAN's stock lost over $430 million in shareholder value, down more than 50% from their Class Period high. ¶18.

## III.   ARGUMENT

To state a claim under the Securities Exchange Act of 1934 ("Exchange Act"), a plaintiff must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called loss causation." *Luczak v. Nat'l Beverage Corp.*, No. 19-14081, 2020 WL 2111947, at *3 (11th Cir. May 4, 2020). A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and must consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Courts must also construe the alleged facts "in the light most favorable to the plaintiff."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 n.1 (11th Cir. 1999).

### A.   Defendants Made Materially False and Misleading Statements

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).  "A statement is misleading if in the light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it."  *Luczak*, 2020 WL 2111947, at *7.

### 1.   Defendants Published False Financial Results

Defendants misrepresented ADTRAN's compliance with stated inventory accounting policies and its financial results.  The Company understated its E&O reserve and falsely represented "[w]e write down our inventory for estimated obsolescence or unmarketable inventory by an amount equal to the difference between the cost of inventory and the estimated fair value."  ¶103.  Defendants also inflated key financial metrics dependent upon ADTRAN's erroneous E&O reserve. Indeed, Defendants claimed ADTRAN's Q1 2019 Generally Accepted Accounting Principles ("GAAP") net income was $770,000 and GAAP EPS was $0.02.  ¶109.

616790.1

9

These statements were false.  ADTRAN inadequately accounted for its E&O reserves for all of 2018 and the first two quarters of 2019, which required an $800,000 charge, a loss for Q1 2019, and a negative EPS.  ¶¶111, 141-42. "Misreported financial information clearly amounts to a false statement of fact." *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009); *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

Defendants erroneously contend that ADTRAN's misstatements were immaterial since they did not result in a restatement, but rather an $800,000 out-of-period charge – a purportedly small amount in comparison to ADTRAN's total assets and annual revenues.  Motion at 20-21, 26.  However, a fact is material if there is a "substantial likelihood" that it "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).  Misstatements of key financial metrics, such as ADTRAN's net income and EPS based on incorrect E&O reserves, are material "because earnings reports are among the pieces of data that investors find most relevant to their investment decisions."  *New Orleans Employees Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (holding that inventory write offs, although "minuscule in comparison to Celestica's global assets and annual revenues" were material since they distorted company earnings).

Indeed, had the Company properly accounted for E&O reserves, it would have been unprofitable, posted a negative EPS, and disappointed analysts. ¶142. In Q1 2019, analysts noted that ADTRAN reported "a surprise profit" of $770K and an EPS of $.02, which Defendants falsely attributed to "product mix" and "efficiency gains." ¶¶110, 119. In contrast, for ADTRAN's restated results for Q2 2019 – when the Company took the out-of-period E&O reserve adjustment – ADTRAN reduced its previously reported operating income from $1.821 million to $562,000, or by nearly 70%, and decreased EPS from $0.11 to $0.08 (or 27%). Thus, ADTRAN's reported profit, positive EPS, and improved gross margins in Q1 2019 were driven by its improper E&O reserve accounting. *See SEB Inv. Mgmt. AB v. Symantec Corp.*, No. C 18-02902 WHA, 2019 WL 4859099, at *2 (N.D. Cal. Oct. 2, 2019) (holding company's $12 million revenue misstatement actionable because although it was immaterial when compared to company's total revenues, it materially affected operating income, an important metric to investors).[3]

---

[3] Defendants' argument also overlooks SEC guidelines dictating that materially should not be assessed solely upon quantitative factors. SEC Staff Accounting Bulletin No. 99 ("SAB No. 99") "provides relevant guidance regarding the proper assessment of materiality." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011). SAB No. 99 instructs that "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material." 1999 WL 1123073, at *3-4. The presence of these factors here demonstrates materiality. *See, e.g.*, *Litwin*, 634 F.3d at 716-23 (an analysis of materiality "must consider both quantitative and qualitative factors"); *Palazzolo v. Fiat Chrysler Automobiles N.V.*, No. CV 16-12803, 2017 WL 6389573, at *7–9 (E.D. Mich. Dec. 14, 2017) ("the Court cannot find that Defendants' purported false statements or omissions were immaterial as a matter of law" although they were "quantitatively insignificant" because "even relatively small financial errors *can* be material" since "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material") (italics in original). In any

Likewise, "the lack of a restatement does not mean that [ADTRAN] only engaged in legitimate conduct." *In re LDK Solar Sec. Litig*., 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008); *see also Aldridge v. A.T. Cross Corp*., 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the financial statements for the year in question were not restated does not end [plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA. To hold otherwise would shift to accountants the responsibility that belongs to the courts."). Accordingly, ADTRAN's decision to take an "out-of-period adjustment" does not immunize it from securities fraud. *Blue v. Doral Fin. Corp*., 123 F. Supp. 3d 236, 249 (D.P.R. 2015).

### 2.    Defendants Misrepresented the Company's Internal Controls

Defendants also misrepresented the effectiveness of the Company's inventory related internal controls over financial reporting. On February 28, 2019, ADTRAN described its inventory accounting policies and confirmed that ADTRAN's accounting internal controls were effective as of December 31, 2018. ¶¶103, 105. Indeed, CEO Stanton and CFO Shannon each signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the effectiveness of ADTRAN's internal controls over financial reporting. ¶¶6, 106, 174. These misrepresentations were false because: (1) there were material weaknesses in the Company's inventory

---

event, because assessing materiality is a fact-specific inquiry, "these assessments are peculiarly ones for the trier of fact." *TSC Industries, Inc. v. Northway, Inc*., 426 U.S. 438, 450 (1976).

related internal controls over financial reporting; (2) E&O reserves had been understated; and (3) the Company's financial results (including cost of goods sold, net income, inventory, assets and net equity) for these periods were inflated. ¶¶104, 107, 139, 140. Indeed, courts have consistently upheld identical claims.[4]

### 3. Defendants Made False Statements Concerning Key Customers

Defendants also misrepresented the demand that ADTRAN was receiving from Deutsche Telekom and Telmex, and ADTRAN's execution on those key projects. CFO Shannon represented that Deutsche Telekom would continue spending on existing ADTRAN projects and that business would remain consistent with 2018 levels. ¶101. CEO Stanton also affirmed that the Company's revenue from Deutsche Telekom would not only continue but "pick-up," and that ADTRAN would see "more strength" in the second half of 2019. ¶116. When analysts questioned CEO Stanton's statement noting "the traditional kind of falloff in 3Q from [ADTRAN's] European customers," Stanton said "we're seeing probably an uptick in our European customer" in the second half of 2019. ¶117. These representations were false and misleading because Defendants knew that Deutsche

---

[4] *See, e.g.*, *In re: Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1341 (N.D. Ga. 2012) (sustaining claims based on false statements regarding effectiveness of corporation's internal controls); *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 619CV619ORL40LRH, 2019 WL 5394011, at *11 (M.D. Fla. Oct. 16, 2019) (holding that plaintiff "has sufficiently alleged that the SOX certifications were rendered materially misleading" which "could form an actionable basis for a securities fraud claim").

Telekom would have to substantially reduce spending on existing ADTRAN projects and that normal spending would not resume until at least 2020.  ¶102.

Similarly, as to Telmex, on April 18, 2019, CEO Stanton dispelled analysts' concern about ADTRAN's historic lack of visibility, stating that Telmex had shared its plans with ADTRAN confirming its "buildout" and "push for Vectored VDSL and for 35b VDSL," so much so that second half 2019 sales would exceed the first half with "solid strength through the year."  ¶113.  Defendant Stanton also emphasized Telmex's "clear and strong plans to increase their broadband," how ADTRAN was "well-positioned" to meet this demand, and the "good job" ADTRAN was doing in supplying the customer.  ¶114.  CEO Stanton further represented that Telmex's "healthy spending pattern" would "carry on" given the "significant build-out" it was making with ADTRAN's equipment.  ¶¶124, 127. Similarly, Defendant Stanton affirmed Telmex's demand for ADTRAN's products and ADTARN's consistency in meeting Telmex's demand and timeline.  ¶132.

Defendants' statements concerning the Telmex project were also false and misleading.  ¶115.  Although Telmex had, in fact, shared its plans with Defendants, those plans did not confirm Telmex's intent to continue its "buildout" and "push for Vectored VDSL and for 35b VDSL" with ADTRAN.  *Id*.  Similarly, ADTRAN was neither "well-positioned" to meet Telmex's demand nor conducting a "good job" on the Telmex project.  *Id*.  As confirmed by CW4, the Telmex project was plagued by

severe delays in product installations as well as improper installations that led to damaged products or massive product failures. *Id*. Moreover, as a result of ADTRAN's refusal to add installation services onto the Telmex contract, ADTRAN's relationship with Telmex was fractured. *Id*. Accordingly, Defendants had no reason to believe Telmex's demand for products would be strong throughout the entire year, but instead knew the Company would have to pause orders until the installation issue was rectified. *Id*. Thus, "Defendants allegedly knowingly made false and misleading statements about the progress of some of its major projects." *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997). Accordingly, Plaintiffs have adequately alleged falsity.[5]

### 4. The Safe Harbor Provision Does Not Immunize Defendants' Misrepresentations

Defendants' attempt to invoke the PSLRA's safe harbor provision fails. First, many of the challenged statements are statements of current or historical fact, not forward looking.[6] The safe harbor provision does not apply to such statements. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011).

---

[5] Defendants' falsity argument (Motion at 17-19) "erroneously presupposes that plaintiffs must show that defendants were clairvoyant." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237–38 (S.D.N.Y. 2010). Plaintiffs allege that Defendants knew – or were severely reckless in not knowing – information that demonstrated two of the Company's largest customers planned to dramatically reduce expenditures and suffered from severe installation delays and problems.

[6] *See, e.g.*, Ex. 12 at 1 ("we certainly *saw* material international growth"); 12-13 ("[w]e *carry* our inventory at the lower of cost and net realizable value . . . [w]e *write* down our inventory for estimated obsolescence or unmarketable inventory . . . [o]ur reserve for excess and obsolete inventory *was* $30.0 million and $23.4 million . . . [i]nventory disposals charged against the reserve

Second, the Eleventh Circuit has directly rejected Defendants' argument that, as to mixed present/future statements, "the arguably present tense components cannot meaningfully be distinguished from the future projection of which they are a part." (Motion at 12); *see Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1328 (11th Cir. 2019) ("To the extent that a lengthy statement includes distinct present-tense and forward-looking components, it makes sense to afford safe-harbor protection to the forward-looking portion (if applicable) and then evaluate the present-tense statement on its own."). Thus, the safe harbor provision is inapplicable to the present-tense portions of Defendants' mixed statements.[7]

Third, to the extent any of Defendants' statements are forward-looking, they were not accompanied by "meaningful" cautionary language. *Lormand v. US*

---

*were* $0.4 million, $8.3 million and $4.7 million . . . ."); 23 ("[The timing of] key customer infrastructure projects *resulted* in nearly 50% of our revenue for the quarter coming from international markets. [We] *finished* the quarter with 3 10%-of-revenue customers located in 3 different markets . . . [o]ur international revenue for quarter 1 of 2019 *was* $73.1 million . . . ."); 24 ("[w]e *have* other customers in Lat Am other than that one . . . *we're* very well positioned there . . . ."); 25 ("We *have -- at this point in time* -- and we typically don't give guidance that far out, but *at this point in time*, *we're seeing* probably an uptick in our European customer."); 26 ("We *establish* reserves for estimated excess, obsolete, or unmarketable inventory equal to the difference between the cost of the inventory and the estimated fair value of the inventory . . . At March 31, 2019 and December 31, 2018, raw materials reserves *totaled* $17.1 million and $17.6 million, respectively, and finished goods inventory reserves *totaled* $12.8 million and $12.4 million, respectively."); 27 ("Telmex, the leading -- the major provider in Mexico, has started a significant build-out with our equipment.").

[7] *See, e.g.*, ¶110 ("when we saw an uptick in that volume, and as you get -- although inventories came down, we're expecting a fairly solid second quarter as well"); ¶117 ("We have -- at this point in time -- and we typically don't give guidance that far out, but at this point in time, we're seeing probably an uptick in our European customer. We typically see in the U.S. an uptick as well. The -- so those 2 will be the biggest drivers."); ¶124 ("Telmex, the leading -- the major provider in Mexico, has started a significant build-out with our equipment. So I would expect carrier space to be up.").

*Unwired, Inc.*, 565 F.3d 228, 243-48 (5th Cir. 2009).  Defendants' boilerplate disclaimers that results may change because of "fluctuations in demand for our products and services," and "changes in sales and implementation cycles for our products and reduced visibility into our customers' spending plans and associated revenue" (Motion at 12-13) were inadequate.[8] The same is true for ADTRAN's warnings that "[o]ur revenue for a particular period can be difficult to predict, and a shortfall in revenue may harm our operating results" and that "the loss of any of these customers would significantly reduce our revenues and net income."  *Id*.[9] "Under the cautionary statement exception, meaningful cautionary language must be more than mere boilerplate language." *Tung v. Dycom Indus., Inc.*, No. 19-CV-81448, 2020 WL 1865765, at *7 (S.D. Fla. Apr. 14, 2020).

Fourth, ADTRAN's disclaimers were misleading because the generalized risks identified had materialized and were of greater magnitude than portrayed. "[C]autionary language of future risks does not protect defendants if the risks warned

---

[8] *See, e.g.*, *In re Illumina, Inc. Sec. Litig.*, No. 3:16-CV-3044-L-KSC, 2018 WL 500990, at *4 (S.D. Cal. Jan. 22, 2018) (warning that "[w]hen we introduce or announce new or enhanced products, we face numerous risks relating to product transitions, including the inability to accurately forecast demand" was ineffective); *City of Providence v. Aeropostale, Inc*., No. 11 Civ. 7132 (CM) (THK), 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 23, 2013) (disclaimers regarding "consumer spending patterns" did not constitute meaningful cautionary language).

[9] *See, e.g*., *In re Splash Tech. Holdings, Inc. Sec. Litig*., No. C 99-00109 SBA, 2000 WL 1727377, at *10 (N.D. Cal. Sept. 29, 2000) (disclaimer that "there can be no assurance that the Company's revenue will continue to grow at similar rates" involves "language too general to link specifically with any forward-looking statement"); *In re STEC Inc. Sec. Litig*., No. CV09-08536-JVS MLGX, 2011 WL 2669217, at *10 (C.D. Cal. June 17, 2011) (warning that "the loss of any key customer could materially reduce [the company's] revenues" was inadequate).

against had already occurred." *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, No. CV 10-2847-IPJ, 2011 WL 12855820, at *6 (N.D. Ala. June 7, 2011); *Pritchard v. Apyx Med. Corp.*, No. 819CV00919SCBAEP, 2020 WL 1180731, at *7 (M.D. Fla. Mar. 11, 2020). Finally, Plaintiffs adequately allege that Defendants had actual knowledge that their statements were false and misleading, which eviscerates safe harbor protection. *See, e.g.*, ¶¶5; 37-40; 67-75; 85-99; 115, 127, 133, 171; 15 U.S.C. §78u–5(c)(1)(B)(i).[10]

### 5.    Defendants' Other Falsity Arguments Are Meritless

Defendants erroneously claim that statements such as being "very well positioned" constitute puffery. Motion at 14-15. "[W]hile certain statements might be considered puffery in one context, they may be found actionable in another, especially when defendants know or recklessly disregard facts contradicting their statements." *Keippel v. Health Ins. Innovations, Inc.*, No. 8:19-CV-421-02CPT, 2019 WL 5698329, at *7 (M.D. Fla. Nov. 4, 2019). Defendants' statements are

---

[10] Moreover, Defendants' safe harbor argument raises factually-disputed issues improper for resolution at the pleading stage. *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1355 (N.D. Ga. 2018); *In re Netbank, Inc. Sec. Litig.*, No. CIV.A.1:07-CV-2298-B, 2009 WL 2432359, at *8 (N.D. Ga. Jan. 29, 2009). Additionally, Defendants submitted a 30-page "Forward-Looking Statements" chart and a 20-page "Statements Challenged" chart to support their Motion. *See* Exs. 12-13. Courts, however, have declared that they will not use "scarce resources to scour 50 pages of filings in the hopes of finding which cautionary language Defendants intended." *HD Supply*, 341 F. Supp. 3d at 1359; *see also In re CV Therapeutics, Inc.*, No. C 03-03709 SI, 2004 WL 1753251, at *12 (N.D. Cal. Aug. 5, 2004) (refusing to consider "charts, prepared by defense counsel" submitted with a motion to dismiss in a securities case).

actionable because "the quoted portions are selective phrases within larger statements that, when read in their entirety and in context, are not mere corporate puffery." *Monroe Cty. Employees' Ret. Sys. v. S. Co.*, No. 1:17-CV-241-MHC, 2018 WL 1558577, at *13, 21 (N.D. Ga. Mar. 29, 2018) (statements that company was "well-positioned" and that "[w]e continue to make tremendous progress" were actionable).

Defendants also falsely assert that several of their misrepresentations constitute immaterial opinions. Motion at 15-16. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), the Supreme Court held that opinions, even if sincerely held and otherwise true, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading. *Id*. at 194. Plaintiffs adequately allege that Defendants' representations regarding product mix, efficiency gains, and internal controls over financial reporting were false and misleading because Defendants failed to disclose that ADTRAN was inadequately accounting for its inventory E&O reserves and that there were material weaknesses related to internal controls.  ¶¶110, 140.[11]

---

[11]    *See Local 703*, 2011 WL 12855820, at *7 (statements such as "[w]e believe that we are prudently managing our credit risk" were "more than puffery"); *Friedman v. Rayovac Corp*., 295 F. Supp. 2d 957, 990 (W.D. Wisc. 2003) ("a statement is not immaterial as a matter of law simply because the speaker prefaces it with 'I believe' or 'I think.'").

Defendants also wrongly suggest that after speaking about Telmex, they had no duty to disclose known problems. Motion at 19 n.13. "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead." *FindWhat*, 658 F.3d at 1305. Plaintiffs adequately allege falsity.

## B.   Plaintiffs Adequately Allege that Defendants Acted with Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. In this Circuit, scienter is defined as intentional or severely reckless conduct. *Luczak*, 2020 WL 2111947, at *7. "The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (italics in original). A strong inference arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324-26. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-

culpable inference.  *Id.* at 324.  Where two equally compelling inferences can be drawn, "a tie favors the plaintiff."  *Lormand*, 565 F.3d at 254.

1.    **Defendants' Hands-On Management Style and Access to Information That Contradicted Their Public Statements Support a Strong Inference of Scienter**

Allegations that defendants closely monitored a company's operations and had access to information that contradicted their statements support a strong inference of scienter.  *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1397 (S.D. Fla. 2011); *HD Supply*, 341 F. Supp. 3d at 1354-55.  Further, where executives claim to be knowledgeable about internal controls, they are deemed to have knowledge of related problems.  *Schultz v. Applica Inc.*, 488 F. Supp. 2d 1219, 1226 (S.D. Fla. 2007).  These principles apply here.  CEO Stanton monitored all aspects of the Company's work for Telmex through regular ADTRAN team calls and spoke frequently about the project and installation issues directly with Telmex representatives.  ¶¶94, 96.  In fact, CEO Stanton personally met with Telmex officials.  ¶¶97, 177.  Telmex also provided reports to ADTRAN management describing massive product failures.  ¶115.  Additionally, CEO Stanton took undisclosed steps to address the Company's problematic inventory control system and solicited bids from software firms for a replacement system.  ¶171; *Matrixx*, 563 U.S. at 50 (undisclosed steps support scienter).  Defendants also knew that Deutsche

616790.1                                    21

Telekom intended to significantly decrease its capital expenditure for ADTRAN access and products. ¶¶82-85. These facts add to a strong inference of scienter.

### 2. The Content and Context of Defendants' Misrepresentations Support a Strong Inference of Scienter

The "content and context" of misrepresentations can provide "powerful evidence of scienter." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (defendants' denials in response to analysts supported a strong interference of scienter). Here, CEO Stanton dispelled an analyst's concern about visibility, stating that Telmex had shared its plans with ADTRAN confirming its "buildout" and "push for Vectored VDSL and for 35b VDSL," so much so that second half 2019 sales would exceed the first half with "solid strength through the year." ¶113. In an exchange with another analyst, CEO Stanton also emphasized Telmex's "clear and strong plans to increase their broadband" and how ADTRAN was "well-positioned" to meet this demand. ¶114. In response to analyst skepticism, CEO Stanton also affirmed that the Company's growing revenues with Deutsche Telekom would not only continue, but would "pick-up" and that ADTRAN would see "more strength" in the second half of 2019. ¶¶116-117. Similarly, CEO Stanton responded to an analyst's question about spending patterns by suggesting that a trend would continue at Telmex given the "significant build-out" with ADTRAN's equipment. ¶¶124-26. Moreover, in response to an analyst's question about Telmex's purchasing plans, CEO Stanton affirmed Telmex's demand for

ADTRAN's products and ADTARN's consistency in meeting its demand.  ¶132. Thus, "[t]he most powerful evidence of scienter is the content and context of [defendants'] statements themselves, and when a defendant is specifically asked, directly and repeatedly about these core operations, denials of any issues can support a strong inference of scienter."  *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 0:15-CV-02393-MGL, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016).

> **3.    The Confidential Witnesses Support a Strong Inference of Scienter**

Plaintiffs can establish scienter through CW allegations by describing the witnesses with sufficient particularity to establish their reliability and by demonstrating that the statements attributed to such witnesses are indicative of scienter.  *Luczak*, 2020 WL 2111947, at *8.  First, Plaintiffs describe the CWs with sufficient particularity to establish their reliability.  ¶¶37-40.  Second, the statements attributed to the CWs are indicative of scienter.  ¶¶5; 37-40; 67-75; 85-99; 115, 127, 133, 171.  The corroborating nature of the accounts also bolsters the strong inference of scienter alleged.  *Tung*, 2020 WL 1865765, at *8.[12]

---

[12]    Defendants claim that CW1 and CW3 do not have sufficient Class Period knowledge. Motion at 17 n.10, 22.  However, a witness' "statements are not rendered irrelevant merely because [the witness] was not employed during the Class Period." *In re Flowers Foods, Inc. Sec. Litig*., No. 7:16-CV-222 (WLS), 2018 WL 1558558, at *15 (M.D. Ga. Mar. 23, 2018).  Additionally, Defendants' reliance upon *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336 (N.D. Ga. 2010) is misplaced because unlike in *HomeBanc*, Defendants here admitted that the problems alleged by the CWs were occurring.  ¶¶5, 7, 17, 67-75, 85, 87-99, 147, 168, 170.  Moreover, Defendants' factual assertions (Motion at 17 n. 11; 19; 23 n.15) are "factual disputes" that "have no place in a motion to dismiss." *Netbank*, 2009 WL 2432359, at *5.

### 4.   Defendants' Admissions Bolster the Strong Inference of Scienter Alleged

"[E]vidence of later events can provide useful circumstantial evidence that a given representation was false when made." *Masel v. Villarreal*, 924 F.3d 734, 750 (5th Cir. 2019), *as revised* (June 6, 2019); *Aldridge*, 284 F.3d at 76-83.  Here, CEO Stanton admitted that the Company's inventory accounting system was inadequate. ¶¶5, 71, 170.  ADTRAN also admitted that Telmex paused shipments and that the Company was inadequately accounting for its inventory E&O reserves, which led to an $800,000 charge, a posted a loss for Q1 2019, and a negative EPS.  ¶¶7, 16-17, 111, 142-43, 147, 168.   ADTRAN further admitted that there were material weaknesses related to internal control deficiencies.  ¶¶139-40, 175.  Thus, these admissions contribute to the strong inference of scienter alleged.

### 5.   The Company's GAAP Violations Support a Strong Inference of Scienter

Defendants' GAAP violations also support the strong inference of scienter alleged.  "Although allegations of GAAP violations are not alone sufficient to raise a strong inference of scienter, courts have found them to be extremely probative of scienter." *Carpenters Health & Welfare Fund of Philadelphia v. Coca-Cola Co.*, No. 1:00-CV-02838-WBH, 2002 WL 34089163, at *15 (N.D. Ga. Aug. 20, 2002); *Local 703*, 2011 WL 12855820, at *8.   Plaintiffs allege that ADTRAN's

announcement of its Q2 019 financial results violated specific GAAP and SEC rules. ¶¶151-56. Additionally, Plaintiffs allege that ADTRAN's accounting and financial reporting for Q1 2019 violated ASC 450. ¶¶154-56.

The simplicity of the relevant accounting standards and Defendants' violation of ADTRAN's internal policies further bolster a strong inference of scienter. *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc*., 594 F.3d 783, 792 (11th Cir. 2010); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000). Here, Defendants' improper accounting practices violated basic GAAP and SEC rules. ¶¶151-56, 173; *see In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 631 (S.D. Tex. 2002) (describing APB No. 28, ¶10, and FASB Statement of Concepts No. 1, ¶¶34, 40, 42, 79, and 95 as "general, fundamental accounting principles"). Defendants also violated ADTRAN's own accounting policies (¶¶155-56), and a "violation of a company's internal policy" further supports a strong inference of scienter. *Schultz*, 488 F. Supp. 2d at 1225-26.

### 6. Defendants' SOX Certifications Support a Strong Inference of Scienter

SOX certifications can support a strong inference of scienter where the signatories are alleged to have been severely reckless. *Local 703*, 2011 WL 12855820, at *9; *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, No. 8:07-cv-1952-T-26MAP, 2009 WL 3853592, at *6 (M.D. Fla. Mar. 30, 2009). CEO Stanton and CFO Shannon signed SOX certifications falsely attesting to the accuracy of

ADTRAN's financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. ¶¶6, 106-107, 174. When signing, Defendants knew or were severely reckless in failing to disclose that the Company suffered from material weaknesses in its internal controls. *See, e.g.*, ¶¶5, 15, 37-40, 67-75, 85-99, 107, 115, 127, 129, 133, 139, 140, 175-76.

### 7. Because the Issues Alleged Affect the Company's Core Operations, a Strong Inference of Scienter is Alleged

Allegations that relate to the company's core business can bolster a strong inference of scienter. *Flowers Foods*, 2018 WL 1558558, at *14; *Netbank*, 2009 WL 2432359. Here, inventory related controls and project execution were integral to ADTRAN's profitability. ¶3. Moreover, Deutsche Telekom and Telmex each contributed more than 10% of the Company's quarterly revenues. ¶¶59, 62-63, 119, 132, 180. Because Defendants were severely reckless regarding problems impacting ADTRAN's core operations, they support a strong inference of scienter. *See, e.g.*, ¶¶5, 37-40, 67-75, 85-99, 115, 127, 133, 171.

### 8. Defendant Shannon's Insider Sales Support a Strong Inference of Scienter

The suspicious timing and scope of CFO Shannon's stock sales also bolster the strong inference of scienter alleged. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 (11th Cir. 2008). On April 23, 2019, CFO Shannon sold 5,701 shares for proceeds of $100,597, which represented 23.1% of his holdings. ¶¶121, 182. On

October 16, 2019, he also sold 6,200 shares for proceeds of $60,227.42, which represented 32.6% of his holdings. ¶182. Sales of lesser percentages of holdings support a strong inference of scienter.[13] CFO Shannon also sold his shares: (1) without a Rule 10b5-1 trading plan; (2) after the Company's share price had gained 24%; (3) several days after ADTRAN issued positive financial results; (4) during ADTRAN's investigation of the Company's E&O reserves and inventory; and (5) two weeks before the Company disclosed the true reasons for the pause in shipments to Telmex. ¶¶121, 182; *see HD Supply*, 341 F. Supp. 3d at 1362 (stock sales that occurred "after having reassured investors about the Company's" operations supported a strong inference of scienter). Furthermore, CFO Shannon made no sales in the previous four years. ¶121; *see HD Supply*, 341 F. Supp. 3d at 1362 (the fact that defendant "had not sold any stock in the prior twelve months, supports a strong inference of scienter"). "Such allegations of a personal financial motive" weigh "heavily in favor of a scienter inference." *HD Supply*, 341 F. Supp. 3d at 1362.[14]

---

[13]    *See, e.g.*, *Rougier v. Applied Optoelectronics, Inc*, No. 4:17-CV-2399, 2019 WL 6111516, at *13 (S.D. Tex. Mar. 27, 2019) (holding that sales that constituted 18% of an insider's total holdings supported a strong inference of scienter); *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 WL 2676364, at *14-15 (C.D. Cal. July 1, 2008) (holding that sales constituting 7% of holdings to be suspicious).

[14]    Defendants claim that CFO Shannon's sales are not unusual because he departed the Company and because other executives did not sell. Motion at 27. "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *see also In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006) ("The fact that there might be an innocent explanation for the timing of [defendant's] sale is not enough to defeat the inference of scienter"). Additionally, "[a]lthough not sufficient of itself to raise a strong inference of scienter, a short-time frame between an

Contrary to Defendants' contention (Motion at 27-29), "while it is *plausible* that the Defendants truly did not know that they were using inappropriate accounting methods . . . it is equally *plausible* that Defendants took great care *not* to know . . . ." *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008) (italics in original). Collectively, these allegations support a strong inference of scienter. *Tellabs*, 551 U.S. at 322-23.

## C. Plaintiffs Adequately Allege Loss Causation

The PSLRA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §78u-4(b)(4). To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Thus, loss causation pleading requirements "are not meant to impose a great burden upon a plaintiff." *Dura*, 544 U.S. at 347. Plaintiffs have adequately alleged that the Company's stock price dropped when the

---

allegedly fraudulent statement and a later disclosure of seemingly inconsistent information can be probative of fraudulent intent in a securities case." *Carpenters*, 2002 WL 34089163, at *15-16. Here, Defendants made many of their misrepresentations in April and May, 2019, just months before ADTRAN revealed the truth. ¶¶108-118, 124-31, 184.

market learned the true facts about ADTRAN's accounting systems and relationship with Tier 1 customers.  ¶¶11-17, 129-50, 164-68.[15]

Defendants claim that a company's announcement of financial results cannot serve as a corrective disclosure misses the mark.  Motion at 29.  "A corrective disclosure can come from any source, and can take any form from which the market can absorb [the information] and react . . . ."  *FindWhat*, 658 F.3d at 1312 n.28.  Defendants are also wrong to suggest that a corrective disclosure must "reveal[] fraud to the market."  Motion at 29.  The Eleventh Circuit held that a district court erred in ruling that a disclosure did not "constitute either proof of fraud or proof of liability."  *Luczak*, 2020 WL 2111947, at *6.  Indeed, "a disclosure need not precisely mirror the earlier misrepresentation in order to have a corrective effect" as long as it "relate[s] back to the misrepresentation and not to some other negative information about the company."  *Id.* at *4; ¶¶11-18, 129-49, 157-68.  Whether or not Plaintiffs held shares on July 17, 2019 also does not defeat loss causation.  "Loss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812, (2011).[16]

---

[15]     Although the Eleventh Circuit has not decided whether the PSLRA applies to loss causation allegations (*Luczak*, 2020 WL 2111947, at *4), district courts in this Circuit have declared that "[l]oss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA."  *Ebix*, 898 F. Supp. 2d at 1347.

[16]     Defendants' assertion appears to be a standing or class certification argument masquerading as a loss causation argument.  Even in those contexts, moreover, Defendants'

Finally, Defendants' assertion that ADTRAN's stock price decline on July 19, 2019 cannot serve as a basis for loss causation also fails.  Plaintiffs not only attribute that decline to new information (¶¶137-38, 165), but also to the fact that ADTRAN shares continued to decline from its July 17, 2019 **after-market** announcement. ¶¶11, 129, 136.  In *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court refused to "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price."  *Id*. at 249 n.28.  Thus, even in an efficient market, plaintiffs can allege loss causation on disclosures that cause stock drops "over the next two days" or more.  *HD Supply*, 341 F. Supp. 3d at 1363.  Thus, Plaintiffs have adequately alleged loss causation.[17]

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, Plaintiffs respectfully request leave to amend.  *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

---

argument still fails.  *Plymouth Cty. Ret. Sys. v. Carter's Inc.*, No. 1:08-CV-02940-JOF, 2011 WL 13124501, at *10-11 (N.D. Ga. Mar. 17, 2011); *Lehocky v. Tidel Techs., Inc.,* 220 F.R.D. 491, 501–02 (S.D. Tex. 2004).  Defendants cite to *Dura*, *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013), and *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997) (Motion at 29-30), but none of these cases support Defendants' argument.

[17]   Defendants argue that the Company's August and September 2019 disclosures are irrelevant because "following each disclosure ADTRAN's stock price traded up, not down." Motion at 30.  However, "defendants can be liable for knowingly and intentionally causing a stock price to **remain** inflated by preventing preexisting inflation from dissipating from the stock price." *FindWhat*, 658 F.3d at1314-15 (emphasis in original).  Plaintiffs have also adequately alleged control person liability.  ¶¶26-34, 205-206; *Pritchard*, 2020 WL 1180731, at *7.

Dated:  July 17, 2020           Respectfully submitted,


By:  *s/ Ex Kano S. Sams II*
Robert V. Prongay (*Admitted Pro Hac Vice*)
Ex Kano S. Sams II (*Admitted Pro Hac Vice*)
Charles H. Linehan (*Admitted Pro Hac Vice*)
Casey E. Sadler (*Admitted Pro Hac Vice*)
Kevin F. Ruf (*Admitted Pro Hac Vice*)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
esams@glancylaw.com
clinehan@glancylaw.com
csadler@glancylaw.com
kruf@glancylaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Lucas E. Gilmore (*Admitted Pro Hac Vice*)
Reed R. Kathrein (*Admitted Pro Hac Vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Co-Lead Counsel for the Class*

616790.1                                       31

Patrick C. Cooper
James S. Ward
WARD & COOPER, LLC
2100 Southbridge Parkway, Suite 645
Birmingham, AL 35209
Telephone: 205-871-5404
Fax: 205-871-5758
patrickcooper@yahoo.com
jward@wardcooperlaw.com

*Liaison Counsel for Counsel for the Class*

616790.1                                                32

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On July 17, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Alabama, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 17, 2020.


*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II