## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL BURBIDGE, et al,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 5:20-cv-50-LCB** |
| | ) | |
| **ADTRAN, INC., et al,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

Michael Burbidge and Reza Adhami, PhD ("Plaintiffs") claim they've been swindled. Between February 1 and October 1, 2019, Plaintiffs bought stock in ADTRAN, Inc. ("AT") based on statements that AT management made about the company's financial performance and prospects. (Doc. 82 at 12). These statements, Plaintiffs claim, were materially false or misleading, and the company's true prospects were grim. Only once the extent of management's deception was uncovered was the true value of AT's stock realized—leaving Plaintiffs and others holding the bag.

Plaintiffs' Consolidated Class Action Complaint, filed April 30, 2020, alleges that these statements violated Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, implemented by 17 C.F.R. § 240.10b-5. (Doc. 82 at 11). This matter is before the Court on Defendants' Motion

to Dismiss and Brief in Support (Doc. 85; Doc. 86), Plaintiffs' Response in Opposition (Doc. 87), and Defendants' Reply. (Doc. 88). For the reasons stated herein, Defendants' Motion is **GRANTED** and Plaintiffs' Amended Complaint (Doc. 82) is **DISMISSED WITHOUT PREJUDICE.**

## FACTS

### I.    **ADTRAN's Business**

Founded in 1985, AT is a global telecommunication equipment provider headquartered in Huntsville, Alabama. (Doc. 82 at 12 and 19). Its name derives from the company's focus on supplying ADvanced TRANsmission products for high-speed digital communication. *Id.* at 19. Thomas Stanton is AT's CEO. *Id.* at 13. Michael Foliano is AT's current Senior Vice President. *Id.* Roger Shannon was AT's CFO and Senior Vice President until March 2019. *Id.*[1]

AT's business is split into two major divisions. The first concerns sales of telecommunication component parts, e.g., hardware and software. The second division provides complementary service and support products for AT's hardware and software. (Doc. 82 at 19–20). AT's service and support branch provides customers with consulting, implementation, integration, maintenance, management,

---

[1] Shannon left these positions in March of 2019, and briefly served as AT's Treasurer and Head of Corporate Development before leaving AT altogether in June 2019. (Doc. 82 at 13).

and network services. *Id*. AT brings in more money from sales of the former than the latter. *Id*. at 20.

AT has a domestic and international customer base, (Doc. 82 at 20), and it is considered a "low-cost provider" in the telecommunications market. *Id*. at 21. This status requires AT to keep its costs low and review of those costs tight. *Id*. AT often works with customers in accordance with non-binding purchase commitments. So, orders and inventory placed and received by AT during any fiscal period are typically based on a customer's purely speculative needs. (Doc. 82 at 21). And when customers need AT's products, they require fast delivery. *Id*. To meet demand, AT keeps an amount of inventory on-site to assure timely delivery. *Id*. This inventory includes completed component parts and raw materials. *Id*. AT maintains an accounting system to track its on-site inventory. *Id*. To provide a valuation for this inventory and to account for excess and obsolete inventory ("E&O"), AT established an E&O Reserve that is equal to the difference between the cost of inventory and the estimated fair market value of the inventory based on future demand assumptions, market conditions, and product life. *Id*. Inventory disposed of is charged against the E&O Reserve. (Doc. 86-2 at 12).

AT's customers include communications service providers, cable companies, and distributed entities. In the telecommunications industry, these service providers are organized into three tiers. (Doc. 82 at 19). About 65% of AT's sales revenue has

consistently come from Tier-1 and Tier-2 providers, their customers including AT&T, Verizon, Qwest, and CenturyLink. (Doc. 82 at 19). In the past, AT's top domestic Tier-1 customer was CenturyLink. (Doc. 82 at 21–22). In 2016, for instance, CenturyLink alone drove 24% of AT's sales, and in 2017 that number reached nearly 40%. That changed in November 2017, however, when CenturyLink completed a merger with a rival company called Level 3 Communications. After that, CenturyLink began purchasing fewer AT products. *Id.* at 22. Losing so much business from CenturyLink caused a serious blow to AT's domestic market presence and bottom line, and this led AT to push further into the international market. *Id.* at 22.

By 2018, AT's international business made up 47 % of its total sales. (Doc. 82 at 23). Particularly relevant to this lawsuit are two of the companies that drove those sales: Deutsche Telekom and Telmex. Deutsche Telekom ("DT") is a Tier-1 German telecommunications provider. Since 2016, AT's sales to DT have comprised 10% of DT's total revenue. *Id.* The relationship has been so amicable that DT was known to share its spending forecasts with AT near the end of each year. (Doc. 82 at 28).

In 2017, DT awarded AT a multi-year contract, whereby AT was to replace DT's existing vectoring technology with a roll out of super-vectoring technology. (Doc. 82 at 23). AT landed a second deal with DT in 2019. *Id.* In this project, AT

4

was to assist DT by "taking bonded super-vectoring from the node to the basement, [by] installing ADTRAN's G.fast DPU in the basement and then go from a super-vectoring feed into G.fast into multi-dwelling units using installed copper or coax." *Id*.

The second company, Telmex ("TM") is a Tier-1 Mexican telecommunications company. From 2016 to 2018, TM was under antitrust and competition review that effectively led to a freeze in company spending. (Doc. 82 at 23–24). However, once those issues were resolved, AT and TM reached a deal in late 2018 in which AT agreed to provide the copper components necessary for TM's DSL network build-out. AT was expected to earn several million dollars from this deal. (Doc. 82 at 31–32).

## II.   DT's Participation in Germany's 5G Auction

On November 26, 2018, the German network regulator Bundesnetzagentur, or BNetzA, known in English as The Federal Network Agency ("FNA"), announced that as part of its effort to provide 5G connectivity throughout the country, it would be holding a spectrum auction for 5G mobile licenses. (Doc. 82 at 28). The FNA set the bidding deadline at January 25, 2019. *Id*. When the FNA announced the auction, it was widely reported that DT would be among the bidders. *Id*. DT, however, complained that the auction's terms were unfair and filed suit against the FNA. *Id*. Through the litigation, DT objected to a number of the bidding terms, including the

FNA's requirement that participating operators commit to providing 5G network coverage for 98% of households by 2022 to qualify "would dramatically increase the expense for network providers in developing the next generation mobile network." *Id*. at 28–29. But the lawsuit notwithstanding, DT "targeted" significant spending for the 5G auction, estimating bids of around €3–€5 billion. *Id*. at 29.

The FNA began its auction on March 19, 2019, nearly two months after its original bid deadline. (Doc. 82 at 29). Forty-one blocks in the 2 GHz and 3.6 GHz bands were put to auction, with four companies bidding. DT participated in the auction but remained critical of the FNA's requirements, contending that they would create "[a]n artificial shortage of public resources . . . which may push up the price [of spectrum]" and "[i]n the end, there [would be] no money for the [planned] build out." *Id*. at 29–30. In other words, DT believed that committing the amount of money needed to win the FNA's auction would ultimately leave the victor with less capital to invest in existing services for customers.

Almost three months after bidding began, on June 13, 2019, the FNA announced that DT won the auction. As victor, DT won the most lots in each band, committing the company to spend € 851.5 million for 420 MHz in the 2GHz band and €1.3 billion for 90MHz in the 3.6GHz band. (Doc. 82 at 30). DT's CEO, Dirk Woessner stated that the result was "a dampener on [DT's planned] network

buildout" and that "[n]etwork operators [including DT] now lack the money to expand their networks." *Id.* at 30.

## III.   TM's Third-Party Installer Problems

When the Mexican authorities had finished with their antitrust review of the company's practices, TM cemented a deal with AT to provide the copper components necessary for TM's DSL network build-out. (Doc. 82 at 31). AT was expected to bring in $80–90 million dollars from this deal. *Id.* at 31–32. But the contract was for hardware alone, and AT refused to provide installation services as part of the agreement. In executing its build-out, TM was thus forced to hire a third-party installer, whose imperfect performance caused major problems with the project. Stanton was aware of this installation debacle. *Id.* at 32–33. In addition to improper installation problems, some executives at TM were unhappy with AT's refusal to include installation services into their agreement. *Id.* at 32. Ultimately, due to the third-party contractors' failures to properly install AT's equipment, and the parties' inability to reach an agreement regarding installation services, AT agreed to provide TM's contractors a training course on proper installation methods for the equipment. *Id.* at 33–34.

## IV.   Plaintiffs' Confidential Witnesses

Plaintiffs allegations are sourced in part from four several confidential witnesses. The information provided by these witnesses allegedly establish that the

Defendants' putatively fraudulent and misleading statements were made with the requisite scienter .

Plaintiffs' first confidential witness ("CW1") is a former AT employee who worked as a pricing administrator in AT's corporate headquarters in Huntsville, Alabama from March 2012 to January 2019. From 2016 until his departure, CW1 was AT's lead pricing administrator and one of five people on AT's pricing team; the pricing team worked in the sales operations department. (Doc. 82 at 16). CW1 was responsible for preparing pricing reports, working closely with sales staffs to procure bids for work projects, and summarizing shipments and cost data. *Id.* at 16–17. CW1 also responded to financial requests from the sales department. *Id.* at 17.

CW1 reported to AT's pricing manager, and, in his role as lead pricing administrator, was familiar with the internal computer and software systems managing AT's inventory. (Doc. 82 at 17). CW1 knows about the alleged deficiencies in the internal controls over AT's financial reporting, including its use of the Baan 4.0 ERP software, and he spoke with Stanton about the software's purported inadequacies directly. *Id.*

CW1 alleges that the Baan software was completely inadequate. (Doc. 82 at 17). Baan was known to be so deficient, according to CW1, that employees would try to develop work-arounds, which ordinarily proved unreliable. (Doc. 82 at 24–25). CW1 alleges, too, that Baan's deficiencies were so well-known that Stanton

8

acknowledged the problems Baan created in a meeting that occurred in 2017 or 2018, and that he developed a task force to help him assess which software AT should purchase to replace Baan. *Id.* at 26.

Plaintiffs' second confidential witness ("CW2") is a former AT product support engineer. (Doc. 82 at 17). He worked for AT from May 2013 to October 2019 in AT's corporate headquarters. In that role, he worked in the managed services group, which is one of five product support teams at AT. He reported directly to AT's product support managers. As a product support engineer in the Hunstville office, CW2 has personal knowledge related to AT's on-hand inventory and inventory software tools. *Id*. Most relevant to the case at bar, CW2 confirmed CW1's allegations that AT management agreed to replace the Baan software and that E&O inventory was "littered across [AT's] corporate headquarters and was everywhere you looked." (Doc. 82 at 27).

CW3, Plaintiffs' third confidential witness, was a multiple systems operations ("MSO") senior director at AT from March 2018 until July 2019. Although the witness worked remotely, CW3 made frequent trips to AT's Huntsville headquarters. CW3 also has significant industry experience, which includes closely working with DT. (Doc. 82 at 18).

Plaintiffs' fourth confidential witness ("CW4") was AT's Vice President of Sales–Latin America from October 2018 until November 2019. (Doc. 82 at 18).

CW4 reported to AT's Senior Vice President of Sales, oversaw relationships with customers in Latin America, worked directly with AT customers and AT executive leadership, and traveled frequently to Latin America to meet with TM officials. *Id.*

## V.    Defendant Shannon

Shannon cashed-out company stock on April 23, 2019, approximately a month and a half before he left AT, and only five days after Stanton and Foliano's remarks at an April 18, 2019 earnings call. (Doc. 82 at 43). That day, he sold 5,701 shares of AT stock, at an average price of $17.65 for $100,597 in gross proceeds. *Id.* This reduced the percentage of his directly owned shares by 23%. *Id.* He had not sold any AT stock in the four years prior to this transaction. *Id.* He also sold this stock without a 10b5-1 plan. *Id.* He sold more stock on October 16, 2019. (Doc. 82 at 67). "This transaction represented the sale of 32.6% of his total holding as of that date. The sale was made just two weeks before [AT] ultimately disclose[d] the true reasons for the pause in shipments to its Tier-1 Latin American customer[,] Telmex." (Doc. 82 at 67).

## LEGAL STANDARDS

## I.    Plaintiffs' Pleading Obligations Under the PSLRA

Generally, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To withstand a motion to dismiss made in accordance with Fed. R. Civ. P. 12(b)(6), "a complaint

must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ray v. Spirit Airlines, Inc*., 836 F.3d 1340, 1347 – 1348 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts which allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

For a 10b-5-securities-fraud claim to survive a motion to dismiss, the claim must satisfy two additional layers of pleading standards. This triple-layered standard, articulated clearly by the Eleventh Circuit in *Carvelli v. Ocwen Financial Corporation*, 934 F.3d 1307, 1317 (11th Cir. 2019), requires strict compliance with Fed. R. Civ. P 8's general requirements, Fed. R. Civ. P. 9(b)'s special pleading requirements, and the further, more stringent special-pleading requirements imposed by the Private Securities Litigation Reform Act of 1995. *Carvelli*, 934 F.3d at 1317–1318.

To satisfy their Rule 9(b) obligations, Plaintiffs must "state with particularity the circumstances constituting fraud or mistake." *Carvelli*, 934. F.3d at 1318 (citing *Findwhat Investor Grp. V. FindWhat.com*, 658 F.3d 1282, 1296) (11th Cir. 2015). In the securities-fraud context, this means that Plaintiffs must specifically allege "(1) which statement or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the

case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." *Id.*

To clear the additional hurdle imposed by the special-pleading standards of the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," and they must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. at 1318. (quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)(1)(B) and (b)(2)(A)).

## DISCUSSION

Plaintiffs have sued under Sections 10(b) and 20(a) of the Securities Exchange Act and SEC rule 10b-5 to recover for a price drop in AT's stock for the period between February 1 and October 1, 2019.

A prima facie case of securities fraud under 10b-5 requires allegations of: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, also known as loss causation. *Carvelli,* 934 F.3d at 1317 (quoting *Mizzaro v. Home Depot, Inc.,* 544 F.3d 230, 1236–1237 (11th Cir. 2008)). When alleging a misrepresentation, a plaintiff must explain why the statement was

misleading. *Carvelli*, 934 F.3d at 1318 (citing *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011)).

Omissions are actionable only if they are material. "[A]n omission is material if 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'" *Carvelli*, 934 F.3d at 1317 (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011). "In other words, materiality depends on whether a 'substantial likelihood' exists that a 'reasonable investor' would have viewed a misrepresentation or omission as 'significantly alter[ing] the 'total mix' of information made available.'" *Id.* (quoting *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012)). Finally, "when it comes to omissions specifically, the Supreme Court has clarified that silence absent a duty to disclose is not misleading under Rule 10b-5. Rather, absent a duty, material information needn't be disclosed unless its omission would render misleading other information that an issuer has disclosed." *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, (2011)) (cleaned up).

The PSLRA has a heightened pleading standard for its scienter requirement. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999). This burden is satisfied by pleading facts which demonstrate either an intent to deceive, manipulate, or defraud, or severe recklessness. *Mizzaro*, 544 F.2d at 1238 (quoting *Bryant*, 187 F.3d

at 1282). When considering whether a plaintiff has alleged facts which give rise to a strong inference of scienter, the Court must examine the entire complaint, not scrutinize individual allegations. *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)). When considering the complaints in its entirety, any "omission[] [or] ambiguit[y] counts against inferring scienter." *Id.* (quoting *Tellabs* at 326). In sum, a plaintiff's allegations must be such that a reasonable person would deem the inference of scienter at least as strong as any opposing inference. *Id.* (quoting *Tellabs* at 326).

As noted in Defendants' brief, Plaintiffs' claims are based on two separate theories of fraud. Under the first of these, Plaintiffs' "demand theory," Defendants knowingly misrepresented the expected demand for AT's products from DT and TM, its two principal international Tier-1 customers. Plaintiffs thus allege that Defendants made statements materially misrepresenting the status of AT's projects with both companies. Under the second, the "E&O theory," Plaintiffs contend that Defendants knowingly misrepresented AT's financial health. Here, Plaintiffs allege that Defendants made materially false statements concerning AT's purportedly favorable financial condition and the adequacy of AT's accounting and internal controls systems and software.

Plaintiffs offer 19 allegedly actionable statements. For the reasons that follow, none of them are actionable.

14

I.     **Plaintiffs' Section 10(b) claim fails because none of the alleged misstatements are actionable.**

    A.     **Statement 1 is not actionable because Plaintiffs fail to adequately allege the statement's misleading character.**

The first statement upon which Plaintiffs rely occurred on February 13, 2019. (Doc. 82 at 34). On that day, Defendant Shannon was invited to present at the Goldman Sachs Technology & Internet Conference held in San Francisco, California. After discussing fixed wireless access opportunities for AT in North America (Doc. 86–16 at 6), how fixed wireless internet access might affect the North American 5G industry *Id.*, and European interest in fixed wireless internet access (*Id.* at 7–8), Shannon was asked to comment on AT's European revenue expectations:

> **Hall**: Okay. We talked a little – we touched on Germany a little bit on fixed wireless. I wonder if we could expand to Europe and European revenue expectations as you've been picking up more Tier 2s there. And what do you think happens with revenue in Europe in 2019? I mean, do we see – what's the trajectory?

> **Shannon**: Well, we certainly saw material international growth over the course of 2018. A part of that was the impact of our U.S. Tier 1 being down in 2018, but we have been very pleased with the growth we had, both from our large European Tier 1 and across these new opportunities. So, our super-vectoring upgrade kind of continued – certainly continued across 2018, but – it could be the largest year that we had with that customer. That super-vectoring rollout will continue over the course of 2019. I don't expect the large Tier 1 customer would be at the same level as 2018 just because 2018 was so large. As we kind of continue through the super-vectoring – finish that project up, the next initiative is a project where we've been awarded the trial, which is a bonded super-vectoring then G.fast into the premises. There's also their

access 4.0 and Fiber-to-Home as well as potential fixed wireless initiatives, all of which we are involved in. But we're – what we do see across Europe is, we expect European business to be consistent with where we were last year. So any potential downside from the large European Tier 1, we expect to be at least offset by these opportunities that we've talked about across other Tier 2s and other Fiber-to-Home opportunities that we're involved in right now.

(Doc. 86–16 at 12–13). Plaintiffs have failed to adequately allege facts which show that this statement was misleading as required under the first element outlined in *Carvelli*.

Plaintiffs allege that "Defendants knew that given [DT]'s significant *expected* expenditures in the upcoming German 5G Spectrum action, [DT] would have to substantially reduce capital spending on its existing projects at [AT], including projects [] Shannon referenced" and that "[DT]'s normal spending would not resume until at least 2020." (Doc. 82 at 35) (emphasis added). In other words, Plaintiffs maintain that Statement 1 was materially misleading because Shannon and AT *knew* that DT would *have* to decrease capital spending on its existing projects at the time Shannon gave this statement. Based on this and CW3's industry knowledge (Doc. 82 at 31),[2] Plaintiffs contend that AT *should have* known that DT absolutely would

_____

[2] CW3 merely alleges AT "should have been aware that the launch of 5G has the *potential* to 'be disruptive' to [DT's] forecasts." (Doc. 82 at 31). This allegation is speculative at best. CW3's allegations fall short of saying that the auction *would have* disrupted DT's projections or that Germany's 5G launch would disrupt those projections. This speculation fails not only to demonstrate how Shannon's statement was misleading, but also fails to lend any weight to a strong inference of scienter. In fact, absent from CW3's allegations are any indication that Shannon or AT management knew or were severely reckless in disregarding a risk associated with the 5G auction. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (explaining that

have been unable to work with AT as Defendant Shannon had described. These arguments are unavailing, and Plaintiffs' allegations fall short of satisfying the PSLRA's stringent pleading standards.

According to Plaintiffs' allegations, when Shannon made the statement-at-issue, DT was still involved in litigation with the FNA concerning the 5G auction. And this litigation had stalled the auction. No party could have known the outcome of that matter at the time, nor when the auction could have resumed. Moreover, as Plaintiffs alleged, DT was highly critical of FNA's requirements throughout the auction. It was only one month *after* Shannon made the statement that litigation ended and the auction began. And after bidding commenced, the auction stayed open another three months.

It strains credulity, on these allegations, that Shannon misrepresented AT's plans with DT because he knew they would stall or that he acted with severe recklessness in failing to make such a determination. The allegations imply that Shannon's statements were misleading simply because DT might win the auction. In other words, Plaintiffs assert with the clarity of hindsight that DT's participation in an auction—one held up by litigation and delayed for months— necessarily meant that it could not follow through on its obligations with AT. At the time that Statement

---

scienter requires allegations demonstrating that "defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements.").

1 was made, however, the possibility was too remote to hold the statement misleading. And Plaintiffs have failed to allege facts which require a conclusion to the contrary. Accordingly, because Plaintiffs failed to allege the misleading character of this statement, it is non-actionable.

### B.      Statement 2 is not actionable because Plaintiffs failed to plead facts giving rise to a strong inference of scienter.

The second statement upon which Plaintiffs rely appears in AT's Form 10-K disclosure to the SEC from February 28, 2019. (Doc 86–2 at 29). At the end of the submission, AT detailed its inventory policy, stating:

> We carry our inventory at the lower of cost and net realizable value, with cost being determined using the first-in, first-out method. We use standard costs for material, labor, and manufacturing overhead to value our inventory. Our standard costs are updated on at least a quarterly basis and any variances are expensed in the current period: quarterly basis and any variances are expensed in the current period: therefore, or inventory costs approximate actual costs at the end of each reporting period. We write down our inventory for estimated obsolescence or unmarketable inventory by an amount equal to the difference between the cost of inventory and the estimated fair value based upon assumptions about future demand and market conditions. If actual future demand or market conditions are less favorable than those projected by management, we may be required to make additional inventory write-downs. Our reserve for excess and obsolete inventory was $30.0 million and $23.4 million at December 31, 2018 and 2017, respectively. Inventory disposals charged against the reserve were $0.4 million, $8.3 million and $4.7 million for the years ended [sic] December 31, 2018, 2017, and 2016, respectively.

(Doc. 86–2 at 29). Plaintiffs allege that this portion of the Form 10-K disclosure was materially misleading because AT had omitted: (1) that AT suffered from material

weaknesses in its internal controls over financial reporting; (2) as a result, certain E&O reserves had been improperly reported; and (3) as a result of the material in AT's internal controls over financial reporting, AT's financial results were misstated. (Doc. 82 at 36). In short, Plaintiffs allege a material omission: AT officials failed to disclose AT's actual inventory practices and amount in E&O reserves.

Defendants argue that this statement is non-actionable because it was either forward-looking or an opinion. (Doc. 86 at 11 n. 7, 22). But even if neither exception applies, Defendants contend that this statement is non-actionable because Plaintiffs have failed sufficiently to allege scienter.

The Court agrees with Plaintiffs that the statement is material. (Doc. 87 at 19). Courts have routinely found that financial reports like these contain precisely the information investors find significant. *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1420 n.9 (3rd Cir. 1997); *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 164 (2d Cir. 2000); *New Orleans Emples. Ret. Sys. v. Celestica, Inc*., 455 Fed. Appx. 10, 16 (2d. Cir. 2011) (citing *Ganino,* 228 F.3d at 164); *In re Kidder Peabody Sec. Litig*., 10 F. Supp. 2d 39, 410 (S.D.N.Y. 1998) (citing *Burlington*, 114 F.3d at 1420 n.9).

The statement's significance, however, does not end the Court's inquiry. The Court must also determine whether, under these particular facts, AT's alleged omission "render[ed] misleading other information that an issuer has disclosed."

*Carvelli*, 934 F.3d at 1317 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, (2011)). The Court finds that here it did. As alleged, the ultimate consequence of AT's omission here caused the misstatement of AT's financial condition. And this misstatement showed positive financial performance after years of inconsistent performance from AT. For instance, AT reported an operating loss of $45.42 million compared to an operating income of $37.86 million in 2017. (Doc. 82 at 25). Likewise, sales from AT's leading U.S. customer CenturyLink had been trailing off in previous years. Considering AT had been on shaky ground, the Court believes investors would view positive news from AT as significant. As a corollary, the Court also believes it would be significant to a reasonable investor that aged inventory with the potential to hurt AT's financial prospects had been stacking up in AT's corporate headquarters. *See Celestica*, 455 F. App'x. at 16 (finding company's misstated income related to the build-up of excess inventory material in part because the misstatement distorted the company's assets and earnings while concealing the company's failure to meet analysts' expectations). Considering the omission's materiality, the Court turns next to the issue of scienter.

      1.    **The Court will not consider CW1's allegation.**

Because they fall outside the class period and the information relayed is not in close proximity to the alleged offending conduct, the Court will not consider CW1's allegations. Eleventh Circuit precedent provides that courts should not

"eviscerate the weight" of a witness's allegations in a complaint simply because of their confidentiality. *Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1240 (11th Cir. 2015). To receive weighted consideration, the complaint must set forth facts which "fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame."

CW1's employment with AT ended in January 2019; the class period began one month later. (Doc. 81 at 16, 34). This and other courts have found that statements from confidential witnesses which fall outside the class period should not be considered for scienter purposes. *See Local 703, I.B. of T. Grocery & Food Emples. Welfare Fund v. Regions Fin. Corp.,* 2011 U.S. Dist. LEXIS 93873, *11 (N.D. Ala. August 23, 2011) (denying motion to reconsider while assuming arguendo that statements from a confidential witness falling outside the class period should not have been considered); *Wachovia Equity Sec. Litig. v. Wachovia Corp.,* 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011).

CW1's allegations also fail to set forth precisely when the activities described took place in relation to AT's purportedly materially misleading statements and omissions. For instance, CW1 merely alleges that Stanton and other officers "knew" the Baan software was "ancient" at some point during CW1's employment, that in 2017 or 2018 Stanton met with CW1 and others to discuss the need to update AT's

accounting software, and that Stanton set up a task force to make those changes. (Doc. 82 at 26). Not only did none of these activities take place during the class period (at best, they occurred one year before the year the class period began), CW1 also fails to specify the year in which they actually occurred. For these reasons, the Court shall not consider CW1's allegations.

### 2.     Plaintiffs have failed to establish a strong inference of scienter.

Considering CW1's exclusion and the remaining allegations in Plaintiffs' Amended Complaint, the Court concludes that Plaintiffs have failed to meet their burden of establishing a strong inference of scienter as to this statement—but just barely.

The Court first notes that CW2's allegations concerning the state of AT's corporate headquarters support an inference of scienter, just not a strong one. (Doc. 82 at 26–27). For instance, nowhere in their Amended Complaint do Plaintiffs allege that AT management went through the building, encountered these mile-high, stacked piles of obsolete inventory, understood that it was excessive in quantity or obsolete, and understood it to be a consequence of AT's purportedly faulty accounting and inventory system. Moreover, CW2's allegations fail to establish that AT management even knew the purportedly serious deficiencies manifest in the Baan system. A close look at CW2's allegations show CW2 only confirmed CW1's allegations to the extent that management promised employees that they would

replace the Baan system for unspecified reasons. In fact, the more helpful parts of CW2's allegations are premised on hearsay and due less deference. *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, *18 (N.D. Cal. Feb. 12, 2015) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 891, 996 (9th Cir. 2009)).

Other allegations Plaintiffs rely upon also fail to satisfy their obligation to plead a strong inference of scienter. For instance, Plaintiffs rely upon Shannon's sales of stock and the circumstances surrounding that sale to support a strong inference of scienter. "The time of stock trades by insiders . . . may be relevant to inferring scienter." *Mizzaro*, 544 F.3d at 1253. This is true where sales are out of line with prior trading practices. *Id.* (citing *In re Navarre Corp Secs. Litig.*, 295 F.3d 791, 797 (8th Cir. 2002)). Indeed, Plaintiffs allege that Shannon's stock sales during the class period diverged dramatically from his previous sales activity and that they were made without a Rule 10b5-1 trading plan. (Doc. 82 at 43). However, one of the sales with which Plaintiffs take issue occurred *after* Shannon left AT. (Doc. 82 at 67). *See Wietschner v. Monterey Pasta Co.*, 294 F.Supp.2d 1102, 1117 (N.D. Cal. 2003) (finding plaintiff's allegations insufficient to support strong inference of scienter where, inter alia, insider sold shares pending retirement). And nowhere do Plaintiffs allege that Stanton and Foliano also sold shares at the same time to maximize their potential gains as they do with Shannon. *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001). On insider sales, then, the Court is left with allegations which show

23

Shannon conducted one out-of-character sale during the class period. And this occurred shortly before he left AT. Unlike Shannon, no other insiders took part in these lucrative sales. Such sales are not uncommon when corporate managers leave a company. Considering the foregoing, Plaintiffs have failed to satisfy their scienter pleading obligations, and this statement is non-actionable.

### C.    Statements 3–5 are not actionable because Plaintiffs insufficiently pled their misleading character.

Plaintiffs also seek to hold Defendants liable for statements made in conjunction with AT's Form 10-K. Here, Plaintiffs cite (3) AT's "Management Report On Internal Control Over Financial Reporting," (Doc. 82 at 37; 86–2 at 30), and (4) Defendants Shannon and (5) Stanton's SOX Certifications, (Doc. 82 at 38; Doc. 86–2 at 31). Plaintiffs contend that these statements were "materially false and misleading when made because, as AT would be forced to later publicly admit, the Company suffered from a 'material weakness' in its internal controls over financial reporting.'" (Doc. 82 at 38).

Before the Court addresses the substance of the Parties' arguments, mention of Plaintiffs' reliance on the SOX certifications in different contexts in this matter is necessary to avoid confusion. Plaintiffs allege the SOX certifications are both actionable statements *and* evidence by which the Court should arrive at a strong inference of scienter. On one hand, Plaintiffs contend the SOX certifications are actionable Plaintiffs argue these statements were materially false, and therefore

actionable, because: (1) there were material weaknesses in AT's inventory related internal controls over financial reporting; (2) AT's E&O reserves had been understated; and (3) AT's financial results (including cost of goods sold net income, inventory, assets and net equity) for these periods were inflated. (Doc. 87 at 21–22). On the other, Plaintiffs contend, in a conclusory manner, that Stanton and Shannon knew or were severely reckless in failing to ascertain knowledge related to AT's purported material weaknesses in its internal controls. (Doc. 87 at 34–35).

Even assuming, as Plaintiffs argue, that these statements are both material and misleading, Plaintiffs still fail to establish scienter. Plaintiffs' obligations here are substantial. They cannot "plead the requisite scienter element generally, as [they] . . . could under Rule 9(b)." *Mizzaro,* 544 F.3d at 1238. Instead, they must allege facts which would make a reasonable person deem the inference of scienter at least as strong as any opposing inference. *Id.* (quoting *Tellabs* at 236).

Plaintiffs fail to provide the requisite facts needed to demonstrate a strong inference of scienter. While the Court acknowledges it is not to view Plaintiffs' allegations in isolation when determining whether Defendants acted with the requisite mental state, the allegations preceding and following these statements are entirely unhelpful to Plaintiffs' cause. In the allegations following these statements, Plaintiffs merely allege that the statements were materially false and misleading due to a subsequent disclosure made by AT. (Doc. 82 at 38). This sort of argument is

25

akin to "fraud by hindsight," and comes up short as a matter of law. *In re Colonial Bancgroup, Inc., Sec. Litig*., 9 F.Supp.3d 1256, 1265–66 (M.D. Ala. 2014) (quoting *Lousiana School Employees' Retirement System v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010)). In the allegations preceding the statement-at-issue, only CW2's allegations, other matters already addressed, and other conclusory remarks are used to support an inference of scienter as to these statements.

Finally, the Court notes that Plaintiffs' cited cases are distinguishable from the instant matter. *See In re: Ebix, Inc. securities Litigation*, 898 F. Supp. 2d 1325, 1342–43 (N.D. Ga. 2012); *MAZ Partners LP v. First Choice Healthcare Soliutions, Inc.,* 2019 WL 5394011, *11 (M.D. Fla. 2019). In both instances, the strong inference of scienter was present due to specific allegations of deliberately reckless corporate behavior. *Id.* Such specific allegations are absent here. Accordingly, Statements 3A–C are non-actionable. Because Plaintiffs only offer conclusory allegations, a theory of fraud by hindsight, and other matters which fail to create an inference of scienter that is at least as strong as any opposing inference, they have failed to meet their scienter obligations.

### D.     Statements 6–8 are non-actionable.

Plaintiffs next rely on a series of statements that management made on April 17 and April 18, 2019. The first (6), made on April 17, took place when AT

announced its reported financial results for the financial quarter ending March 31,

2019, stated:

> HUNTSVILLE, Ala. – (BUSINESS WIRE) – ADTRAN, Inc.
> (NASDAQ: ADTN) reported results for the first quarter 2019. For the
> quarter, sales were $143.8 million compared to $120.8 million for the
> first quarter of 2018. Net income was $0.8 million compared to a net
> loss of $10.8 million for the first quarter of 2018. Earnings per share,
> assuming dilution, were $0.02 compared to a loss per share of $0.22 for
> the first quarter of 2018.

(Doc. 82 at 38).[3]

The following day, AT hosted a conference call with analysts to discuss AT's

first quarter performance. After Defendants Stanton and Foliano's remarks, the floor

was opened for questions. (Doc. 86–5 at 7–9). Plaintiffs maintain that during their

presentation, and during the Q&A session, Defendants Stanton and Foliano made

several materially misleading statements concerning AT's first quarter performance.

The first of the allegedly misleading statements occurred during Stanton and

Foliano's remarks regarding AT's 1Q status and AT's GAAP net income, which

Foliano attributed to higher sales volume (Doc. 82 at 38; Doc. 86–5 at 7–8).[4] In his

opening statement, Stanton summarized AT's outlook in Statement 6 as follows:

> In summary, we are pleased with our progress in the first quarter of
> 2019. Our revenue was diverse and well balanced with material
> contributions across Lat AM. EMEA, North America, and the Pacific
> Rim regions. Furthermore, our broad portfolio continues to gain market

---

[3] Statement 6
[4] Statement 7

traction with a growing number of customers in an expanding range of market segments.

(Doc. 82 at 36; Doc. 86–5 at 6–7). Foliano then followed up on Stanton's remarks in Statement 7, noting

> [t]he increase in our Q1 non-GAAP operating income as compared to Q1 of 2018 operating loss is attributable primarily to higher sales volumes with higher gross margins in both our products and services portfolios domestically and internationally and lower operating expenses.
> . . .
> GAAP net income for quarter 1 of this year was $770,000 compared to a loss of $8.4 million last quarter and a loss of $10.8 million for the first quarter of last year. Non-GAAP net income for the first quarter of 2019 was $4.9 million compared to a loss of $5.8 million last quarter and a loss of $15.8 million in quarter 1 of 2019. Earning per share on a GAAP basis were $0.02 compared to a loss of $0.18 per share last quarter and a loss of $0.22 per share in the first quarter of 2018.

*Id.* at 7.

Finally, in Statement 8, Plaintiffs maintain Stanton and Foliano's response to an analyst's question concerning AT's improvement on gross margins as a consequence of product mix and efficiency gains also constituted materially misleading statements. (Doc. 82 at 39; Doc. 86–5 at 13).

### 1. **Plaintiffs have abandoned Statement 6.**

Defendants contend Statement 6 is non-actionable, seemingly because it represented an opinion. (Doc. 86 at 18 n. 7). After review of the Amended Complaint, it appears Plaintiffs do not rely upon this statement as an actionable instance of securities fraud. Further, Plaintiffs present no substantive argument on

this point in their Opposition; they only mention this statement in passing on an unrelated point. (Doc. 87 at 37). It is not the Court's job to formulate a party's arguments or do their legal research. *Carn v. Cooke*, *Cameron, Travis & Co., P.C.*, 2019 U.S. Dist. LEXIS 230047, *23 (N.D. Ala. June 4, 2019). The Court finds Plaintiffs abandoned this statement as an actionable misrepresentation or omission giving rise to a 10b-5 claim.

2. **Statements 7–8 do not satisfy Plaintiffs' scienter obligations.**

Even assuming, arguendo, that Statements 7 and 8 were material and misleading, Plaintiffs have failed to plead facts sufficient to give rise to a strong inference of scienter. Plaintiffs again fall back on the same arguments outlined above: allegations from CW2 (Doc. 87 at 33);[5] conclusory allegations of GAAP violations *Id* at 34; conclusory allegations concerning Defendants' knowing or severely reckless SOX certifications (Doc. 87 at 35); that these were matters concerning the company's core operations (Doc. 87 at 35); and Shannon's stock sales (Doc. 87 at 36). This is insufficient, and the Court finds these arguments unavailing because they do not, in the aggregate, create an inference of scienter that is at least as compelling as any opposing inference.

---

[5] As noted supra, the Court will not consider CW1's allegations on the issue of scienter.

### E.      Statements 9–14 are non-actionable.

Plaintiffs contend that Stanton and Foliano made additional statements during the April 18th conference unrelated to Plaintiffs' E&O theory of recovery which, they contend, were materially misleading.

### 1.      Statement 9 has been abandoned.

Stanton made Statement 9 at the beginning of the presentation when commenting on the nature of AT's successes as they related to AT's diverse customer base. (Doc. 82 at 39–40; Doc. 86–5 at 5). In full, his statement was as follows:

> The timing of key customer infrastructure projects resulted in nearly 50% of our revenue for the quarter coming from international markets. We finished the quarter with 3 10%-of-revenue customers located in 3 different markets, Lat Am, Europe, and North America, underscoring the impact ADTRAN is having as we help our customers build their best networks.

*Id*.

After review of the Amended Complaint, it appears Plaintiffs do not contend the above statement is actionable in accordance with 10b-5. The allegations immediately following this paragraph concern only AT's planned work with DT and TM in the future. Nothing there mentions Stanton's statements about Q1. (*See* Doc. 82 at 41, 42). Also absent is any reference to this statement in Plaintiffs' Opposition. Plaintiffs don't cite or mention this statement there at all. (*See generally* Doc. 87). Because Plaintiffs have not relied on this statement, failed to cite it in their

Opposition, or articulate any argument concerning it, the Court finds it abandoned and non-actionable.

**2.      Statement 10 is non-actionable because it is a forward-looking statement**

Following this statement, Stanton and Foliano gave what Plaintiffs maintain was the first of a series of inter-related statements concerning AT's plans with DT which were materially misleading. The first of these statements Plaintiffs take issue with occurred when Foliano discussed the next quarter's expectations:

> Looking ahead to the next quarter. The book and ship nature of our business, the time of revenue associated with large projects, the variability of order patterns and the customer base into which we sell as well as the fluctuation in currency exchange rates and our international markets may cause material differences between our expectations and the actual results. However, **our current expectations are that our second quarter 2019 revenue will be in the range of $154 million to $158 million**. After taking into account the potential effect of currency exchange rates and anticipated mix, we expect that our second quarter gross margins on a non-GAAP basis will be in the low 40s. We also expect non-GAAP operating expenses for the second quarter of 2019 will be up slightly over the first quarter amount.

(Doc. 86–5 at 8–9) (emphasis added).

Plaintiffs allege that this statement was both materially misleading and false because it misrepresented the knowledge of AT officials at the time it was given with relation to planned projects with DT and AT. (Doc. 82 at 41–42).

The PSLRA provides a safe-harbor for liability for forward-looking statements. Forward-looking statements are, as articulated by the *Carvelli* court,

precisely what they sound like — "a prediction, projection, or plan." *Carvelli*, 934

F.3d at 1324. The statute's carve-out provides that, in a private securities-fraud

action under Rule 10b-5, an issuer, "shall not be liable with respect to any forward-

looking statement . . . if, and to the extent that"—

> (A) the forward-looking statement is—
> (i) identified as a forward-looking statement, and is accompanied by
> meaningful cautionary statements identifying important factors that
> could cause actual results to differ materially from those in the
> forward-looking statement; or
>
> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement . . .
> was made with actual knowledge by that person that the statement
> was false or misleading.

15 U.S.C. § 78u-5(c)(1). On subsection (A)(i), the Eleventh Circuit has explained

that courts are "to examine the cautionary statement accompanying the forward-

looking statement and not the state of mind of the person making the statement."

*Carvelli*, 934. F.3d at 1329 (quotation marks omitted) (quoting *Harris v. Ivax Corp.*,

182 F.3d 799, 803 (11th Cir. 1999)). "In other words, if a statement is accompanied

by meaningful cautionary language, the defendants' state of mind is irrelevant." *Id.*

(quotation marks omitted).

The Court finds Plaintiffs' arguments that Defendants' cautionary language

was not meaningful unavailing. (Doc. 87 at 26). While it is true that boilerplate

language does not suffice for meaningful cautionary language, *Carvelli* at 1326,

Stanton's warnings about the various factors above, i.e., the book-and-ship nature of AT's business, the time of revenue associated with AT's large projects, the variability of order patterns AT receives and the customer base AT sells to, as well as the fluctuation in currency exchange rates and AT's international markets, qualify as meaningful cautionary language. In fact, these warnings bear directly upon the heart of Plaintiffs' demand theory of recovery, and much of what Plaintiffs complain of was happening in the public eye and commented upon in the earnings April 18th earnings call. For instance, Ashwin Kesireddy noted TM's "lumpy" and less-cooperative nature (Doc. 86–5 at 10) and DT's participation in the FNA 5G bids. *Carvelli* at 1327 (finding cautionary language meaningful because the complained-of statements related to matters "unfolding in the public eye"). Accordingly, the Court finds this statement non-actionable in accordance with the PSLRA's forward-looking statement exception.

### 3. Statements 11 and 12 are non-actionable because they are accompanied by meaningful cautionary language.

Plaintiffs also complain that several statements made in response to two analyst's questions during the April 18th earnings call comprise materially misleading and false statements and omissions. (Doc. 82 at 48). The exchange with those analysts, provided below, demonstrates that those responses are non-actionable.

Following Stanton and Foliano's initial remarks, analyst Aswhin Kesireddy

had questions regarding AT's visibility on the international market. Statement 11,

highlighted in the exchange between Mr. Kesireddy and Mr. Stanton below, went as

follows:

> **Kesireddy**: This is Ashwin on behalf of Rod. I wanted to ask about
> visibility heading into second half of this year, particular in Australia
> and Lat Am. Maybe Tom, on Australia, we know that there is a big
> Phase 2 opportunity there. Could you comment on what you are seeing
> there in terms of activity and your visibility? And related to Lat Am.,
> we understand that the customer there is probably a little bit more
> lumpy than other customers. Just wondering how you're thinking about
> the customer for second half of this year. And then I have a follow-up.
>
> **Stanton**: Sure. So as far as Australia, as you know, we have a large
> customer there that we're shipping family G.fast VDSL2, there are
> actual – and that business is ongoing and we – there are – there's a
> Phase 2 of that project which we feel very good about. So – but there
> are also a couple of other opportunities within that customer that we
> expect to be shipping in the second half of the year as well. So we're
> feeling good about Australia. Whether or not it'll actually equate to the
> Q1 performance, yes, I would expect actually – from our visibility
> today that we actually expect it to be up in the second half versus the
> first half. **Lat Am., same thing, that we're going to build out right
> now with a large customer in Lat Am. We have other customers in
> Lat Am. other than that one, but that one is definitely oversized
> compared to the rest. There is ongoing – there is a push for
> Vectored VDSL and for 35b VDSL. They have shared with us their
> plans. And right now, we're expecting kind of solid strength
> through the year with that customer**.

(Doc.86–5 at 10) (emphasis added).

Following Stanton's exchange with Kessireddy, Stanton took questions from

another analyst, Paul Jonas Silverstein. (Doc. 86–5 at 11). After answering Mr.

Silverstein's questions on AT's news with its "big customer in the U.S.," Mr.

Silverstein asked Stanton to discuss a "broader question":

> **Silverstein**: Can I ask you a broader question? What are you most excited about over the next 6 and 12 months in terms of driving revenue growth? You've got a number of big projects that offer – that have offered for some time the prospect of significant incremental growth. I know there's always a timing issue with these big customers. But when you look at those projects, what are you most excited about? What are you most confident in terms of material drivers over the next 6 to 12 months?

(Doc. 86–5 at 11). Statement 12 is highlighted in Stanton's response:

> **Stanton**: Probably the most exciting are the ones you're the most nervous about. So I'm very happy with what we've been able to accomplish in Australia. And I think we're positioned well to actually grow not only in the base of customers – or excuse me, in the base of product that we're shipping there today. But I think we're well positioned to grow in other areas. So I feel good about Australia over not just – over the long term, not just what we're going to do necessarily this year. **I feel the same way about Latin America. That customer – the big customer there has been kind of closed up for a period of time, and they had very clear and strong plans to increase their broadband. So I feel good about the opportunity there. I'm not saying that we've got everything inked down because it's a large customer with a lot of plans, but we're very well positioned there. And I think we're doing a good job**.

(Doc. 86–5 at 11) (emphasis added).

Plaintiffs aver that these statements are actionable because Stanton misled

analysts and omitted material facts concerning TM's plans. Specifically, Plaintiffs

contend that TM's plans with AT did not include an intent to continue the buildout

that Stanton described, nor a push for Vectored DSL or for 35b VDSL. (Doc. 82 at

41). Likewise, Plaintiffs maintain that Stanton misrepresented AT's "well-positioned" place in the market place and that AT was "doing a good job" on the TM project based on allegations from CW4. *Id.*

The Court finds Plaintiffs' contentions unavailing because they deal entirely with Stanton's state of mind—whether Stanton *believed* what he was saying or *knew* he was misleading investors. (Doc. 87 at 23–24). As noted supra, the first prong of the forward-looking statement exception pays no mind to the speaker's mental state. *Carvelli*, 934. F.3d at 1329. Rather, all that's required are the identification of a forward-looking statement and meaningful cautionary language. *Id*. And such is the case with Statements 11 and 12. As for Statement 7, Foliano provided sufficient meaningful cautionary language at the close of his initial remarks. (Doc. 86–5 at 8–9). Statement 8 includes contemporaneous cautionary language that notes the finer details of the AT–TM agreement hadn't been "inked down," and could, therefore, be subject to change. (Doc. 86–5 at 11). Accordingly, the Court finds neither statement actionable in accordance with 10b-5.

### 4. Statement 13 is not actionable because it is an opinion; Statement 14 is not actionable because it is a forward-looking statement.

The final statements Plaintiffs seek to hold Defendants liable for from the April 18th earnings call related to AT's planned buildout with DT per their 2019 contract. Both statements occurred during an exchange between analyst Richard Frank Valera and Stanton:

36

**Valera**: Tom, I'm not sure if you have given an update on your large historical European customer, but it sounds like they were strong this quarter. But can you give a sense of how you see them for the balance of the year?

**Stanton**: Yes. Actually, it's going to be a little different this year. We're actually expecting more strength in the second half versus the first. First quarter was not a bad quarter. Second quarter, we kind of see [sic] to be kind of in line-ish with the first quarter, and then we actually see a little more pickup in the third. Fourth is still kind of far out there, but – I think I answered your question.

. . .

**Valera**: Yes. So just you've mentioned, I guess, at least a couple of customers that – or engagement you expect to be up in the second half versus first. So, I'm just wondering if you'd be willing to say anything about seasonality relative to the Q2 levels. It sounds like you're not expecting that traditional kind of falloff in 3Q from your European customers, so maybe would at least be looking more like flattish sequentially from Q2.

**Stanton**: Yes. From the European customer, you're correct. We have – at this point in time – and we typically don't give guidance that far out, but at this point in time, we're seeing probably an uptick in our European customer. We typically see in the U.S. an uptick as well. The – so those 2 will be the biggest drivers. The 2 that we don't know yet about where the seasonal patterns would be because they're under specific kind of project-related build-outs, and it has to do with how fast they can install are Australia and Latin America. And I think that's just going to be related to how quickly they can get things in. In both of those cases (Australia and Latin America) there's a demand and there's – and they have stated to us with different levels of specificity what they would like to do in the second half. And in the third quarter, specifically, whether or not they hit the third quarter or fourth quarter, where that mix is at, I don't know.

(Doc. 86–5 at 14).

Plaintiffs contend that Statements 13 and 14 are actionable because "at the time of the Statements, [AT] knew that given [DT's] significant *expected* expenditures in the upcoming German 5G Spectrum auction, [DT] would have to substantially reduce capital spending on its existing projects at [AT]." (Doc. 82 at 42) (emphasis added). In other words, again, Plaintiffs rely upon DT's speculative expenditures on the auction, presuppose DT's victory in it, and conclude that the statements here were materially misleading or omitted material facts. (*See also* Doc. 87 at 22–23) (citing Doc. 82 at 35) (". . . Defendants knew that given [DT's] significant expected expenditures in the upcoming German 5G Spectrum action, [DT] would have to substantially reduce capital spending on its existing projects at [AT] . . ."). This pleading strategy, again, downplays its deficiency; it presupposes AT's victory in the 5G auction. Because Plaintiffs' theory relies upon speculation and conclusory allegations, the Court finds it unavailing. *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) (quoting *San Leandro Emergency Med. Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996)) ("[C]laims of securities fraud cannot rest 'on speculation and conclusory allegations.'").

### F.   Statement 15 is non-actionable for the same reasons that Defendants' Form 10-K is non-actionable.

Plaintiffs allege that Defendants submitted a materially misleading Form 10-Q with the SEC on May 7, 2019. (Doc. 82 at 43). Plaintiffs contend these statements contained therein were materially false and misleading because they omitted facts

nearly identical to Plaintiffs' allegations concerning AT's Form 10-K disclosure. (*Compare* Doc. 82 at 21–22 *with* Doc. 82 at 44). For the reasons already discussed above, the Court finds Plaintiffs failed to allege an actionable statement here.[6]

### G.   Statements 16–18 are non-actionable opinion or puffery.

Plaintiffs allege various statements Stanton and made on May 16, 2019, at the JPMorgan Global Technology, Media, and Communications conference in Boston, Massachusetts are actionable in accordance with 10b-5. (Doc. 86–20). The first came after analyst Samik Chatterjee asked Stanton about the volume of business AT had with "Tier 1 telecom service providers relative to . . . the MSO group." (Doc. 86–20 at 6). Mr. Chatterjee followed-up and clarified his question after Stanton's initial response, stating:

> **Chatterjee:** The reason I asked the question is what we're seeing and I kind of wanted to get your view on this is because you have the exposure to both set of customer groups. It's what we're seeing becoming more apparent with kind of the earnings reports we've seen. There seems to be more of a healthy spending pattern from the Tier 1 service providers. But then as we move over to – looking at the cable and the MSO customers, there seems to be more of a pullback at least that we're seeing in 1Q. So, I just want to get what you're seeing on the ground in terms of overall business with them and how you're thinking about them, their spend through the rest of the year.

*Id.* In response, Stanton stated that he expected "Tier 1s in the telco space to be up" for AT, generally, "because of some additional things [AT] added to the portfolio"

---

[6] Plaintiffs also fail to articulate any argument on or reference this allegation with any specificity in their Opposition. (*See generally* Doc. 87).

as well as some "fairly new [wins]." *Id.* at 7. Among those wins, Stanton highlighted TM's recent projects, stating, "Telmex, the leading – the major provider in Mexico, has started a significant build-out with our equipment. So[,] I would expect carrier space to be up." *Id.* at 7.[7]

Thereafter, Mr. Chatterjee asked Stanton a question concerning AT's competition in the telecommunications market. (Doc. 86–20 at 8). In response to Mr. Chatterjee's pointed question concerning whether Stanton believed AT's strongest growth in the near to medium term coming from Europe, Stanton provided, in addition to discussing AT's business with CenturyLink, Australia, and Europe that he "expect[ed] international [business] to grow even stronger in the second half than in the first half." (Doc. 86–20 at 9). Stanton also provided that "if you look at the Latin America marketplace and Europe, both of those have kind of good, strong potentials." (Doc. 86–20 at 9).[8]

Finally, Mr. Chatterjee asked Stanton about the long-term growth expectations from AT: "how should investors think about the long-term growth expectation on the top line when they're kind of looking at [AT]? What should they be expecting in terms of long-term growth?" (Doc. 86–20 at 13). In response to this question, Stanton stated that AT doesn't provide such guidance, but that there was

---

[7] Statement 16
[8] Statement 17

"stuff that's going on in Mexico today. We [AT] expand to – they have a long catch-up to do. They've been frozen for about 3 years now. So that started off this year as a strong customer. We expect that to carry on." *Id.*[9]

Plaintiffs maintain that each of the above statements were materially misleading and omitted material facts related to its relationship with AT. Specifically, based upon information provided from CW4 Plaintiffs contend AT "had no reason to believe [TM's] sales would continue to grow or that it would carry on as a strong customer of [AT]" because TM's build-out with AT products was "plagued by a third-party contractor's severe delays in product installations" and "improper installations that led to damaged products or massive product failures" and that AT management knew of these problems. (Doc. 82 at 45). Moreover, Plaintiffs contend, because AT refused to add installation services as a feature of their contract with AT, the TM–AT relationship was "fractured" such that future dealings were less likely. *Id*

Defendants respond that the statements above are not actionable because they are puffery and that Plaintiffs failed to adequately allege their misleading nature. (Doc. 86 at 22–23).[10] In opposition, Plaintiffs echo their earlier refrain that, at the

---

[9] Statement 18

[10] Defendants incorporate arguments on this statement in their challenged statements chart. (Doc. 86–14 at 16–18).

time Stanton delivered the statements at issue, he knew them to be false and bases these assertions on information provided by CW4. (Doc. 87 at 23–24).

The Court finds Plaintiffs' arguments unavailing; the statements above constitute "quintessential puffery." *Carvelli*, 932 F.3d at 1321. "Puffery comprises generalized, vague, nonquantifiable statements of corporate optimism." *Id*. at 1318 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)). Puffery is also "an expression of an exaggerated opinion—as opposed to a factual misrepresentation—with the intent to sell a good or service." *Id.* at 1319 (quotation marks omitted) (quoting Black's Law Dictionary 1428 (10th ed. 2014)). In sum, puffery is immaterial—it isn't something a reasonable investor would rely upon when considering the total mix of available information. *Id*. at 1320 (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200–01 (3d. Cir. 1990)).

Stanton's statements here about AT's expected performance with TM represent the "quintessential puffery" described in *Carvelli*. In each statement, Stanton acknowledged AT's recent deal with TM and simply stated that he expected AT's business to be up or strong performance to carry on as a consequence of that deal. In fact, in Statement 16 and 18, Stanton was so vague about why he believed AT's performance would continue to improve that it's hard to tell why he believed that to be the case. While Plaintiffs maintain that the Court should deny Defendant's

Motion as to these statements because Stanton could not have possibly believed them when he spoke them, their argument is unavailing. Puffery doesn't care about whether a statement was made in bad faith or without a reasonable basis. *Carvelli*, 934 F.3d 1307, 1321 (11th Cir. 2019). Accordingly, the Court finds the above statements non-actionable.

### H.    Statements 18 is mere puffery.

The final statements with which Defendants take issue and Plaintiffs seek to hold Defendants liable comprise a remark Stanton made on a July 18, 2019 earnings call, shortly after AT disclosed it was investigating its accounting for inventory reserves and possible internal control deficiencies and Defendants' assurances that their accounting practices were in line with GAAP. (Doc. 82 at 36).

Defendants maintain Statement 18 is non-actionable because Plaintiffs allegations, including information from CW4, fail to show the statement was materially false or misleading when it was made. (Doc. 86 at 25–26). On Statement 16, Defendants contend this statement is non-actionable because Plaintiffs failed to allege any facts which demonstrate how their disclosures ran afoul of GAAP, and that even if such facts were present, Plaintiffs failed to plead facts which demonstrate that the opinion held by management that the opinion that its practices were in accordance with GAAP were false. (Doc. 86 at 30).

Plaintiffs respond that Statement 18 was material—in fact, so material that its misstatement acts as indicia of scienter—because TM contributed more than 10% of AT quarterly revenue. (Doc. 87 at 35). Plaintiffs also maintain that Statement 16 was false based on information provided from CW4. *Id*. at 23.

As noted supra, statements which are excessively vague, generalized, and optimistic constitute puffer. *Carvelli* 934 F.3d at 1320. And such statements are considered immaterial. *Id*. The Court understands Plaintiffs' position—TM made up a significant portion of AT's business at the time the statement was made. However, the remarks at issue were so vague and generalized, e.g., "[W]e're just continuing to operate with them and try to meet their demand and their time lines and things like that[,]"(Doc. 86-8 at 12) that no reasonable investor would have been misled by it after hearing them in the mix with all other available information.

## I.    Statement 19 is conclusory.

Plaintiffs allege that AT's announcement of its Q2 2019 financial results violated specific GAAP and SEC rules. (Doc. 87 at 34) (Doc. 82 at 55–58, paragraphs 151–156). But, as Defendants point out, Plaintiffs' allegations here are conclusory in nature. Review of Plaintiffs' Opposition concretizes this point, as Plaintiffs merely rely upon the paragraphs which conclusorily allege such violations in their Opposition. (Doc. 87 at 33–34). Such allegations come nowhere close to

satisfying Plaintiffs' pleading burden in accordance with the PSLRA Accordingly, Statement 19 is non-actionable.

## II.  Plaintiffs' Section 20(a) "Control Persons" claim fails.

To state a "control persons" violation against Shannon, Stanton, and Foliano under section 20(a), Plaintiffs were required to allege facts showing: "(1) a primary violation of the securities laws . . . ; (2) individual defendants who had the power to control the general business affairs of the company; and (3) individual defendants who 'had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability.'" *Carvelli*, 934 F.3d at 1330 (quoting *Mizzaro*, 544 F.3d at 1237). Plaintiffs failed to state an underlying violation securities law. Because they have failed to state such a claim, their section 20(a) "control persons" claim fails, too. *See Carvelli*, 934 F.3d at 1330

## CONCLUSION

Because none of the allegedly fraudulent statements are actionable, Defendants' Motions to Dismiss (Doc. 85) is **GRANTED** and Plaintiff's claims are **DISMISSED**.

**The Clerk of Court is DIRECTED to close** the case

**DONE** and **ORDERED** March 31, 2021.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE